RAYMOND M. BUDDIE     (SBN 121353)
TIMOTHY E. ELLIOTT      (SBN 210640)
RICK W. GRADY              (SBN 235976)
PECKAR & ABRAMSON, P.C.
250 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone: (415) 837-1968
Facsimile: (415) 837-1320
Email: rbuddie@pecklaw.com
         telliott@pecklaw.com
         rgrady@pecklaw.com

Attorneys for AMERICAN CASUALTY COMPANY OF READING, PA; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA for the Use and Benefit of WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS, and WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>DICK/MORGANTI, a joint venture; DICK CORPORATION; THE MORGANTI GROUP; AMERICAN CASUALTY COMPANY OF READING, PA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | Case No.: 3:07-CV-02564-CRB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION O STAY PROCEEDINGS**<br><br><br>Hearing Date: August 24, 2007<br>Hearing Time: 10:00 a.m.<br>Location:　　Courtroom 8  (19th Floor)<br>Judge:　　　Hon. Charles R. Breyer |

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      **INTRODUCTION**

　　　Defendants AMERICAN CASUALTY COMPANY OF READING, PA ("AMERICAN") and NATIONAL UNION FIRE INSURANCE COMPANY OF

1 PITTSBURGH, PA ("NATIONAL") (AMERICAN and NATIONAL shall hereinafter
2 collectively be referred to as the "SURETIES") bring this motion to stay all causes of action
3 alleged by plaintiff WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS
4 ("WEBCOR") against the SURETIES and against defendants Dick Corporation, The Morganti
5 Group, and Dick/Morganti ("D/M") on the grounds that WEBCOR is contractually bound to
6 stay its entire action until the dispute resolution process currently underway between D/M and
7 the owner of the underlying project, the General Services Administration of the United States of
8 America (the "GSA"), is complete.

9 To date, many other similarly situated subcontractors of D/M have refrained from filing
10 suit and have assisted with D/M in presenting claims to the GSA. While WEBCOR has also
11 assisted D/M in the presentation of its claim to the GSA, by filing and now maintaining an
12 action against WEBCOR is in contravention of its clear and unambiguous contractual
13 obligations. Accordingly, the SURETIES request that WEBCOR's action be stayed.

14 **II.    RELEVANT FACTUAL BACKGROUND**

15 This action relates to the construction project known as the new San Francisco Federal
16 Building project, located at the corner of 7th and Mission Streets in the City of San Francisco
17 (the "Project"). The Project, which consists of 605,000 sq. ft. and will house over 1,500
18 government employees, includes an 18-story tower, four-story annex building, one-story
19 cafeteria, daycare facility, and a plaza.

20 D/M served as the prime contractor on the Project and was awarded its contract (the
21 "General Contract") on or about May 6, 2002. (Declaration of Michael T. Ambroso ("Ambroso
22 Decl."), ¶ 4.) A "Disputes" provision contained within the General Contract bound D/M to the
23 following terms in the event of a dispute between D/M and GSA:

24     8    FAR 52.233-1  DISPUTES (DEC 1998)

25     (a)    **This contract is subject to the Contract Disputes Act of 1978,
26 as amended (41 U.S.C. 601-613).**
    (b)    **Except as provided in the Act, all disputes arising under or
27 relating to this contract shall be resolved under this clause.**
    (c)    **"Claim," as used in this clause, means a written demand or
28 written assertion by one of the contracting parties seeking, as a matter of**

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

2
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF        Case No.: 3:07-CV-02564-CRB
MOTINO TO STAY PROCEEDINGS

> **right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant.** However, a written demand or written assertion by the Contractor seeking they payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph (d)(2) of this clause…
>
>     (d)(1) A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision…
>         (2)(i) The Contractor shall provide the certification specified in paragraph (d)(2)(iii) of this clause when submitting any claim exceeding $100,000.
>             (ii) The certification requirement does not apply to issues in controversy that have not been submitted as all or part of the claim.
> **********
>     (g) If the claim by the Contractor is submitted to the Contracting Officer or a claim by the Government is presented to the Contractor, the parties, by mutual consent, may agree to use alternative dispute resolution (ADR). If the Contractor refuses an offer for ADR, the Contractor shall inform the Contracting Officer, in writing, of the Contractor's specific reasons for rejecting the offer.
> (Bold added.)

(Ambroso Decl., ¶ 5.) A complete copy of this provision is attached to the Declaration of Michael T. Ambroso as Exhibit B.

On or about August 13, 2002, and pursuant to its obligations under the General Contract and under the Miller Act (40 U.S.C. §§ 3131-3134), D/M procured a payment bond in the penal sum of $3,600,000 which was issued by the SURETIES (the "Bond"). (Ambroso Decl., ¶ 6.) The SURETIES subsequently issued a rider, or consent to increase of penal sum, whereby the penal sum of the Bond was increased by $133,826,918.07. (Ambroso Decl., ¶ 6.)

In its role as prime contractor, D/M entered into various subcontract agreements for the provision of labor, material, and equipment for the Project. On or about May 5, 2003, D/M entered into a subcontract agreement with plaintiff WEBCOR (the "WEBCOR Subcontract") whereby WEBCOR agreed to provide concrete and formwork services on the Project. (Ambroso Decl., ¶ 7.) The WEBCOR Subcontract included a dispute resolution provision that expressly referenced, incorporated, and bound WEBCOR to the terms of the Disputes clause within the General Contract. The relevant portions of the dispute resolution provision of the

WEBCOR Subcontract include the following:

> THIRTY-EIGHTH.   Choice of Law and Disputes.
> \*\*\*\*\*\*\*\*\*\*
>
> (d)  **If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to** arbitration or **some other dispute resolution procedure specified in the General Contract and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees (i) to join in and be bound by the** same arbitration or **other disputes resolution procedure** upon written request by the Contractor **and (ii) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted**. If the Owner refuses to allow this joinder of the Subcontractor, the Subcontractor agrees (i) to cooperate with the Contractor, (ii) to assist in the discovery and other preparations for the hearing, (iii) to make available its employees for testimony before or at the hearing, (iv) to share proportionately the costs and legal fees associated with the preparation for and execution of the hearing _to the extent mutually agreed upon related to the amount of damage being pursued by the Contractor on Subcontractor's behalf_, (v) to stay any action filed by the Subcontractor _as long as the Subcontractor's position is being diligently pursued by Contractor in the Owner dispute and the Subcontractor's positions are being carried forward through the Contractor's prosecution of the claims with the Owner_ until the dispute resolution and appeals process between the Contractor and the Owner is exhausted, and (vi) to be bound by the results of the arbitration or other disputes resolution procedure as it relates to the dispute, controversy, or claim of the subcontractor _to the extent that Subcontractor cooperated and was actively involved in this dispute resolution process_. (Bold added. Underline and italics in original.)

(Ambroso Decl., ¶ 8.)  Similar dispute resolution provisions were included in each of D/M's subcontracts, however, WEBCOR specifically sought to modify, and actually modified, the dispute resolution provision within the WEBCOR Subcontract and such modifications are denoted by the presence of italicized and underlined font.

Subsequent to commencement of its work on the Project, WEBCOR, through its submission of various change order requests ("COR's"), sought compensation for additional work it provided on the Project. (Ambroso Decl., ¶ 9.) D/M has processed WEBCOR's COR's and has submitted them to the GSA on behalf of WEBCOR. (Ambroso Decl., ¶ 9.) To date, however, the GSA has denied entitlement for additional compensation for most of the COR's submitted by D/M on behalf of WEBCOR and, further, the GSA has disputed the claimed value

1   of WEBCOR's COR's. (Ambroso Decl., ¶ 10.)

2   Due to the GSA's denial and dispute as to the value of certain of WEBCOR's COR's,
3   D/M has initiated the dispute resolution process with the GSA in accordance with the Disputes
4   provision of the General Contract, and otherwise consistent with the Contract Disputes Act
5   ("CDA"). (Ambroso Decl., ¶ 11.) The aggregate amount sought by WEBCOR in the disputed
6   COR's exceeds $100,000 and, thus, as required by the Disputes provision, D/M has submitted
7   the denied and disputed COR's as a formal, certified claim to the GSA's Contracting Officer for
8   determination. (Ambroso Decl., ¶ 12.) This claim was submitted by D/M to the Contracting
9   Officer on or about June 13, 2007. (Ambroso Decl., ¶ 12.) Pursuant to the General Contract
10  and the Contract Disputes Act of 1978, The Contracting Officer has 60 days to decide the claim
11  or otherwise notify the claimant when a decision will be made. (Ambroso Decl., ¶ 13.) To
12  date, however, the Contracting Officer has neither made a decision nor notified D/M of a future
13  date by which a decision will be made and, further, the matter has not been fully exhausted
14  through the appeals process referenced within the General Contract. As such, the matter
15  remains subject to the Disputes procedures as set forth in the General Contract. (Ambroso
16  Decl., ¶ 14-15.)

17  WEBCOR filed its complaint on or about May 15, 2007. Via a stipulation of the parties,
18  an order was entered by the Court on June 29, 2007 extending all defendants' time to respond to
19  the complaint until and including September 17, 2007. This motion of the SURETIES to stay
20  WEBCOR's action follows.

21  **III.   LEGAL DISCUSSION**

22  **A.   The Court Has The Authority To Fashion The Relief Requested Herein**

23  The Court is authorized and empowered to grant the SURETIES' requested relief. The
24  Court's authority arises both from statute and simply through the enforcement of the WEBCOR
25  Subcontract.

26  As discussed, *supra*, this matter is subject to the CDA. Section 605(c)(5) of the CDA
27  states:

28  > Any failure by the contracting officer to issue a decision on a contract claim
> within the period required will be deemed to be a decision by the contracting

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF   Case No.: 3:07-CV-02564-CRB
MOTINO TO STAY PROCEEDINGS

officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter. **However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, <u>the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer</u>. (Bold and underline added.)**

(41 U.S.C. § 605(c)(5);  see *U.S. Partition Systems, Inc. v. U.S.*, 59 Fed.Cl. 627, 641-642 (2004)("*Partition Sytems*").)  Thus, the "tribunal" -- here, the United States District Court for the Northern District of California -- is expressly authorized by statute to stay these proceedings so that the dispute resolution process currently taking place may be fully exhausted[1].  Indeed, Section 605(c)(5), as applied, has been interpreted to grant courts broad discretion to issue a stay while dispute resolution efforts are undertaken:

> The exercise of the Court's authority to issue a stay under Paragraph 605(c)(5) [of the CDA] is committed to the Court's discretion. [Citation.]  The Court may issue a stay to obtain a final decision when the Court believes that such a decision would be beneficial to the parties and assist resolution of the matter. [Citation.]

(*United Partition Systems, Inc. v. U.S.*, 59 Fed.Cl. 627, 641-642 (2004).)

Additionally, the clear and unambiguous contract disputes provision within the WEBCOR Subcontract <u>requires</u> WEBCOR to *voluntarily* stay its action pending exhaustion of the CDA process.  Since WEBCOR has not fulfilled its contractual obligations, it is simply a matter of contract enforcement for the Court to impose a stay of these proceedings.  (*See Hyundai America, Inc. v. Meissner & Wurst GMBH & Co.-U.S. Operations, Inc.*, 26 F.Supp.2d 1217, 1219 (N.D.Cal. 1998) ["Under traditional principles of contract interpretation … unambiguous contracts are enforced according to their terms.  Courts interpret contracts as made by the parties and do not make new ones for them."];  see also *D'Ambra Constr. Co., Inc. v. St. Paul Mercury Ins. Co.*, 24 F.Supp.2d 218, 221-222 (D.R.I. 1998) [Subcontractor's Miller Act

---

[1] Additionally, Rule 52.2(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC") authorizes a court to "… remand appropriate matters to any administrative or executive body or official with such direction as may be deemed proper and just." Although RCFC 52.2 has no counterpart in the Rules of Civil Procedure, Rule 52.2 is nonetheless persuasive authority and merely supplements this Court's clear authority to stay these proceedings as granted pursuant to the CDA.  (41 U.S.C. § 605(c)(5).)

claim against general contractor and surety limited by subcontract provision wherein subcontractor consented to resolution of disputes via general contractor and owner disputes resolution process.].)

Accordingly, the Court has authority to stay these proceedings.

### B. WEBCOR's Claims Are Subject To The CDA And, As Such, WEBCOR Is Obligated To Permit The Exhaustion Of Administrative Remedies Therein

The purpose of the SURETIES' stay request herein is to permit the parties to await a final decision from the Contracting Officer by way of the CDA process. Since the General Contract is subject to the CDA by way of specific incorporation and by way of WEBCOR's independent contractual agreement, so too is the WEBCOR Subcontract.

"The purpose of enacting the CDA was to create a comprehensive statutory scheme of administrative and legal remedies so that contract claims against the Government could be uniformly resolved. [Citation.]" (*Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 854 F.Supp. 400, 415 (D.S.C. 1994).)  The CDA purpose and policy has been further described as follows:

> An aggrieved contractor must first submit his claim to the contracting officer and receive a decision before a suit can be commenced in the Court of Federal Claims because, as the Court of Federal Claims noted, "completion of these steps is a jurisdictional prerequisite to the filing of a complaint relative to the claim in this court… This is in keeping with the general federal policy of requiring exhaustion of administrative remedies before seeking review by a court of competent jurisdiction. *See, e.g.,* McCarthy v. Madigan, 503 U.S. 140, ---, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291, 299 (1993) ("This Court has long acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts. Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency.")

(*Ibid.*)  These stated policies of the CDA will be frustrated if WEBCOR is permitted to maintain an action for its claims before this Court.  In particular, resources of both the Court and the Contracting Officer of the GSA will be wasted due to the undertaking of duplicative efforts with regard to WEBCOR's claims, which currently exist in each forum.  Since D/M and the GSA have agreed to the process as set forth by the General Contract and the CDA -- and a certified

claim prepared in accordance with both the General Contract and the CDA has actually been submitted by D/M on behalf of WEBCOR and is currently under evaluation by the Contracting Officer (Ambroso Decl., ¶¶ 11-15) -- WEBCOR, too, is bound by this process.

Pursuant to the General Contract and the CDA, the Contracting Officer of the GSA must, within 60 days of the submission of the claim, decide the claim or notify D/M of the date by which the decision will be made. (Ambroso Decl., ¶ 13.) Since WEBCOR's claim was submitted on June 13, 2007, the 60 day time period within which the contracting officer is obligated to make a decision or notify D/M of the date for a decision has not yet lapsed. In the event the Contracting Officer denies the claim submitted on behalf of WEBCOR, D/M intends to appeal such decision and continue with the dispute resolution process pursuant to the General Contract and the CDA. (Ambroso Decl., ¶ 15.)

Accordingly, it is appropriate that the Court stay these proceedings while the dispute resolution process of the General Contract and the CDA is ongoing.

### C. The Disputes Clause Within the WEBCOR Subcontract Clearly And Unambiguously Requires WEBCOR To Stay Its Claims Against D/M Because D/M Has Initiated, And Is Participating In, the Disputes Resolution Process Proscribed Within The General Contract

As noted above, the WEBCOR Subcontract requires WEBCOR, among other things, "… **to stay any action filed by the Subcontractor until the dispute resolution and appeal process between the Contractor and the Owner is exhausted**…"(Bold added.) (Ambroso Decl., ¶ 8.) "The general rule is that parties are free to contract for dispute resolution procedures which, in effect, turn breach of contract claims into claims for relief under the contract." (*Seal & Co., Inc. v. A.S. McGaughan Co.*, 907 F.2d 450, 454 (4th Cir. 1990).) "Parties are bound to exhaust such procedures unless they are 'inadequate or unavailable,' as, for example, where the Contracting Officer is unwilling to act." [Citation.] (*Ibid.*) Further, the "inadequacy or unavailability of administrative relief must clearly appear before a party is permitted to circumvent his own contractual agreement." [Citation.] (*Ibid.*)

In this instance, WEBCOR's contractual obligation to stay its claims has arisen by virtue of the fact that D/M has initiated, is participating in, and intends to continue the dispute

resolution process provided for in the General Contract. (Ambroso Decl., ¶¶ 11-15.) WEBCOR is thus obligated to refrain from separately prosecuting its claims while its claims are moving through the established claims process.

The SURETIES anticipate that WEBCOR may argue that the disputes resolution provision within the WEBCOR Subcontract is *unenforceable*, and that it constitutes an impermissible *waiver* of WEBCOR's right to sue pursuant to the Miller Act. Such an argument, however, would be misplaced. In *DDC Interiors, Inc. v. Dawson Constr. Co., Inc.*, 895 F.Supp. 270 (D.Colo. 1995)("*DDC*"), the court acknowledged that a claimant could waive its Miller Act rights in certain circumstances:

> Right to sue under the Miller Act may be waived by clear and express provisions in the contract between the prime contractor and the subcontractor. [Citation.] However, courts "do not favor finding that a subcontractor has contractually abandoned his rights under the act." [Citation.] Indeed, such a "drastic curtailment" of a subcontractor's rights will not be read into a general agreement by the subcontractor to be bound by the terms of the prime contract. [Citation.]

(*DDC, supra,* 895 F.Supp. 270, 272-273.) The court determined, however, that the subcontract language was insufficient to effect such a waiver and, further, the court offered a recommendation for contract language to validate contractual waivers of Miller Act rights:

> [D]efendants argue that the subcontract specifically incorporates by reference the 'plans, specifications, and amendments' to the prime contract between Dawson and the GSA. The prime contract disputes clause, however, is not specifically referenced anywhere in the subcontract. Consequently, the incorporation by reference of the prime contract's disputes clause is general rather than specific.
>
> \*\*\*\*\*\*\*\*\*\*
>
> [T]he prime contract's disputes clause is not specifically referenced anywhere in the subcontract, nor is the contents of the disputes clause described or discussed. Under these circumstances, [the Court] concludes that the incorporation language in the subcontract does not effect waiver of DDC's Miller Act rights. [¶] At a minimum, an effective wavier of Miller Act rights must include mention of the Miller Act and unambiguously express intention to waive the rights provided by it. No such language is found in the contract documents before [the Court].

(*DDC, supra,* 895 F.Supp. 270, 273-274.)

*DDC* is distinguishable from this matter, however, for several reasons. First, as noted by the *DDC* court, the applicable subcontract provision therein was *general*, rather than specific,

1 and did not reasonably advise the subcontractor of its rights, duties, and obligations pursuant to the disputes resolution provision in the general contract. WEBCOR's Subcontract, in contrast, is *specific* in that it makes express reference to the General Contract's Disputes provision and, further, discusses in great detail the rights, duties, and obligations of WEBCOR.

Second, the disputes resolution clause within the WEBCOR Subcontract does not purport to *waive*, *i.e.*, relinquish, WEBCOR's Miller Act rights. Rather, it simply provides for the *stay* of WEBCOR's claims subject to the disputes resolution process between D/M and the GSA. Further, contrary to the *DDC* court's recommendation that the term "Miller Act" be specifically included in dispute resolution clauses, inclusion in this instance would be superfluous. WEBCOR, as a sophisticated contractor, was obviously well aware that it was entering into a subcontract for a Federal public works project and, as a consequence of such, WEBCOR knew that the Miller Act was applicable.

Accordingly, since the GSA and D/M have begun the dispute resolution process, WEBCOR's contractual obligations have been triggered, and the Court should enforce those obligations and stay these proceedings.

## IV.  CONCLUSION

For the reasons set forth herein, the SURETIES respectfully request that the Court stay these proceedings in order to give full effect to the parties' contractual obligations and intent.

Dated: July 20, 2007                              PECKAR & ABRAMSON, P.C.


By:  _____/s/_____
     Raymond M. Buddie
     Timothy E. Elliott
     Rick W. Grady
     Attorneys for AMERICAN CASUALTY COMPANY OF READING, PA; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA