1  RICHARD T. BOWLES (# 46234)
   KENNETH G. JONES (# 196868)
2  BOWLES & VERNA LLP
   2121 N. California Boulevard, Suite 875
3  Walnut Creek, California  94596
   Telephone:  (925) 935-3300
4  Facsimile:  (925) 935-0371
   Email:  rbowles@bowlesverna.com
5          kjones@bowlesvera.com

6  Attorneys for Plaintiff
   WEBCOR CONSTRUCTION, INC.
7  dba WEBCOR BUILDERS

8                    UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10 | UNITED STATES of AMERICA for the Use and | **CASE NO.: 3:07-CV-02564-CRB**
   | Benefit of WEBCOR CONSTRUCTION, INC. dba |
11 | WEBCOR BUILDERS, and WEBCOR | **DECLARATION OF JACK HARRINGTON**
   | CONSTRUCTION, INC. dba WEBCOR | **IN SUPPORT OF WEBCOR'S**
12 | BUILDERS, | **OPPOSITION TO MOTION TO  STAY**
   | | **PROCEEDINGS**
13 |                    Plaintiffs, |
   | | Date:  August 24, 2007
14 |        vs. | Time:  10:00 a.m.
   | | Dept.:  Courtroom 8 (19th Floor)
15 | DICK/MORGANTI, a joint venture, DICK | Judge:  Hon. Charles R. Breyer
   | CORPORATION, THE MORGANTI GROUP, |
16 | AMERICAN CASUALTY COMPANY OF |
   | READING, PA, NATIONAL UNION FIRE |
17 | INSURANCE COMPANY OF PITTSBURGH, PA, |
   | and DOES 1 through 10, inclusive, |
18 | |
   |                    Defendants. |
19

20        I, JACK HARRINGTON, declare:

21        1.      I was the Project Manager for Webcor Construction, Inc. dba Webcor Builders

22 ("Webcor") for the project commonly referred to as the GSA Federal Building Project located in San

23 Francisco, California ("the Project").  The General Services Administration of the United States of

24 America ("the GSA") is the owner of the Project and Defendant Dick/Morganti Joint Venture

25 ("DMJV") was the prime contractor on the Project.

26        2.      As Project Manager, I was involved in all aspects of construction and was responsible

27 for the preparation and submission of Webcor's change order requests ("CORs") which are the subject

28 of this lawsuit.  I am intimately familiar with the parties' dealings pertaining to this dispute and have

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

1

DECLARATION OF JACK HARRINGTON IN SUPPORT OF
WEBCOR'S OPPOSITION TO MOTION TO  STAY PROCEEDINGS       Case No. 3:07-CV-02564-CRB

1  personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would
2  competently testify thereto.

3      3.      On or about May 5, 2003, Webcor entered into a written agreement with DMJV to
4  provide concrete and formwork services for the Project (the "Subcontract").  The Ninth Article of the
5  Subcontract, titled "Claims," defined "claims" as "delay, acceleration, loss of efficiency, extended
6  overhead, or any other type of damages therefrom" suffered by Webcor in the performance of its work
7  due to the acts of DMJV or others.  DMJV explicitly agreed, in the same Ninth Article that it "agrees to
8  transmit to the Owner, other subcontractors, or other entity any such claims submitted to it by the
9  Subcontractor."  DMJV qualified the purpose of its agreement to pass-through claims as its acting "as a
10 conduit to provide Subcontractor with contractual privity" to the GSA in order for Webcor to "seek
11 reimbursement for damages incurred."

12     4.      The Ninth Article of the Subcontract further stated that DMJV would be liable for
13 Webcor's claims if, among other things, Webcor "promptly and properly notifies the Contractor of a
14 delay or other claim" and DMJV "fails to correct promptly a delay or element of another claim caused
15 solely by the Contractor" or "fails to transmit the Subcontractor's notification to the Owner, other
16 subcontractors, or other entity causing the delay or other claim within forty-eight (48) hours of such a
17 notification."

18     5.      Throughout the course of the Project, Webcor repeatedly put DMJV on notice regarding
19 significant time and cost impacts resulting from, among other things, deficient project plans and
20 specifications, changes in the scope of Webcor's work and accessibility issues on the Project.

21     6.      On or about July 29, 2005, I submitted Webcor's COR 60 for equitable adjustment based
22 on the cost and schedule impacts associated with the Project's rebar congestion and increased finish
23 requirements.  COR 60 specifically sought additional compensation in the amount of $5,221,053.00 and
24 209 calendar days of schedule extension.  Because of the magnitude of the COR, I directed DMJV to
25 immediately forward the claim to the GSA.  A true and correct copy of the COR 60 cover sheet is
26 attached hereto as Exhibit A.

27     7.      Three months later, on October 31, 2005, I submitted Webcor's CORs 61-65 to DMJV,
28 along with documentation substantiating each claim.  Each COR requested DMJV to immediately issue

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

2

DECLARATION OF JACK HARRINGTON IN SUPPORT OF
WEBCOR'S OPPOSITION TO MOTION TO STAY PROCEEDINGS     Case No. 3:07-CV-02564-CRB

1  a change order for execution and payment. The total value of CORs 61 through 65 is $1,480,277.00.

2  True and correct copies of the cover sheets to CORs 61-65 are attached hereto as Exhibit B.

3      8.    DMJV refused to pass Webcor's CORs 61 through 65 through to the GSA for review. I

4  have had several conversations with Jim Dravet and Fred Daven of DMJV regarding these CORs and

5  each time I have been informed that it is DMJV's position that Webcor's CORs 61 through 65 are not

6  the GSA's responsibility, do not involve the GSA, will not be a part of the formal FARS claims process

7  and that DMJV will not pass CORs 61 to 65 through to the GSA.

8      9.    On or about October 10, 2006, which is approximately fifteen (15) months after I

9  submitted COR 60, the GSA's Contracting Officer rejected Webcor's claim. However, the Contracting

10 Officer closed his letter by stating that DMJV retained its right to request a Contracting Officer's

11 Decision under the disputes clause of the General Contract. A true and correct copy of the GSA's

12 rejection letter is attached hereto as Exhibit C.

13     10.   On March 22, 2007, I executed a certification of the claim, declaring that, under penalty

14 of perjury, Webcor's COR 60 was accurate and made in good faith. I requested DMJV to forward the

15 certification to the GSA. A true and correct copy of the certification is attached hereto as Exhibit D.

16     11.   On April 10, 2007, I executed a revised certification of the claim and requested DMJV to

17 forward the certification to the GSA. A true and correct copy of the certification is attached hereto as

18 Exhibit E. On April 11, 2007, DMJV again refused to certify and pass through Webcor's certified

19 claim to the GSA.

20     12.   As of April 2007, DMJV had still not provided me with any insight as to their position

21 on Webcor's CORs 61 through 65, other than that they would not submit them to the GSA. I still had

22 not learned DMJV's positions on CORs 61-65 although I submitted them well over a year and a half

23 prior.

24     13.   Faced with the fact that DMJV had refused, on multiple occasions over the course of

25 several months, to pass through Webcor's COR 60 and CORs 61 through 65, and faced with the fact

26 that Webcor's statute of limitations on its Miller Act claims was running, Webcor considered DMJV in

27 breach of its obligations under the Subcontract and had no recourse but to bring this action.

28

**DECLARATION OF JACK HARRINGTON IN SUPPORT OF**
**WEBCOR'S OPPOSITION TO MOTION TO STAY PROCEEDINGS    Case No. 3:07-CV-02564-CRB**

14.    DMJV's delay and refusal to pass through Webcor's claims of entitlement to the GSA is not only contrary to its obligations under the Subcontract, but has prejudiced Webcor by denying it the ability to resolve its entitlement to payment for work completed, costing Webcor hundreds of thousands of dollars in potential interest, impacting Webcor's cash flow.

15.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16.    Executed this 3rd day of August, 2007, at San Francisco, California.


JACK HARRINGTON

Bowles & Verna LLP
121 N. California Blvd
Suite 875
Walnut Creek 94596

DECLARATION OF JACK HARRINGTON IN SUPPORT OF
WEBCOR'S OPPOSITION TO MOTION TO STAY PROCEEDINGS

EXHIBIT A



GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

June 29, 2005


Dick/Morganti JV
Mr. Fred Daven
1068 Mission St.
San Francisco, CA 94103


RE:   **COR 60**
      **Rebar Congestion & Increased Finishes**


Dear Mr. Daven:

Enclosed please find Webcor's Change Order Request No. 60 that details Webcor's entitlement
and cost and time impacts as a result of the well documented rebar congestion and concrete
finish issues on the Project. A summary of the COR Exhibits is as follows.

The documents enclosed within the "Entitlement" tabs summarize Webcor's entitlement to
additional time and compensation as a result of the rebar congestion and concrete finishes at the
Project. Following that, you will find a summary of our damages in association with these two
issues, with the appropriate supporting information for each issue.

Given the magnitude of this COR (**$5,221,053.00** and **209 days**), I would appreciate it if you
would give it your utmost attention. This COR should be submitted to GSA for approval and
payment immediately. Also, please copy me on any correspondence and/or transmittal to or
from Dick and/or the GSA regarding the enclosed COR.

If you have any questions, please contact me at (510) 476-2500.

Sincerely,
Webcor Concrete Group



Jack Harrington
Project Manager


cc:  file – to D/M, J. Bowles, R. Edwards Jr., K. Jones (Bowles & Verna)


EXHIBIT A

# EXHIBIT B



GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

October 31, 2005

Dick/Morganti JV
Fred Daven
1068 Mission St.
San Francisco, CA 94103

**RE:     COR 61**
          **Late Start Delay to Work**

Dear Mr. Daven:

Webcor Concrete respectfully requests a change order in the amount of **$271,275.00** and **58 calendar days of schedule extension** for compensable delays to our work due to delays which prevented us from beginning our work per the Contract Schedule of May 19, 2003.

Webcor Concrete is seeking compensation, including both time and money, for delays to our work, per Article Eighth of our Subcontract Agreement. You will also find enclosed a pricing summary and supporting pricing information, as well as as-built schedule data, to substantiate our claims and associated costs.

Webcor Concrete is owed compensation for delays to the project which occurred during the excavation phase, which resulted in a late start to our work. Per the May 19, 2003 Project Schedule, referenced in our Subcontract Agreement, we were to perform the critical path activity of placing the protection slab at the Tower Core area on June 16, 2003. Due to delays in the preceding activities of excavating and waterproofing, we were not released to place this concrete until August 13, 2003, resulting in a delay of 58 calendar days.

Per the terms of our Subcontract Agreement, we are owed the lesser of our actual costs or $12,000 for the first day of a delay, and $5,500 for each additional day. Our actual costs due to these 58 days of delay are $271,275.00, which is lesser than $325,500.00, as calculated by the daily rates. Please issue a change order in this amount for immediate execution and payment. If you have any questions, I can be reached at (510) 476-2500.

Sincerely,
Webcor Concrete Group

Jack Harrington

cc:  file – to D/M, COR 61, K. Jones (B&V)

## EXHIBIT B



GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

October 31, 2005

Dick/Morganti JV
Fred Daven
1068 Mission St.
San Francisco, CA 94103

RE:    COR 62
       Compensable Delay – Adverse Weather

Dear Mr. Daven:

Webcor Concrete respectfully requests an additive change order in the amount of **$232,106.00** and **28 calendar days** of schedule extension due to delays caused by adverse weather conditions on the Project.

As a result of adverse weather conditions, including rain and high winds, Webcor suffered 19.5 work days of delay, which equates to 28 calendar days of delay. These delays occurred throughout the project and can be individually identified by reviewing the As-Built Schedule and Delay Matrix, both of which are attached for your reference.

Webcor was delayed by adverse weather for 6 calendar days in the 2003-04 winter, and for 22 days in the 2004-05 winter. We have calculated our actual costs separately for each year, as our formwork rental needs were different in the lower floors than in the upper floors. Per the terms of our Subcontract Agreement, we are owed the lesser of our actual costs or $12,000 for the first day of a delay, and $5,500 for each additional day. Our actual costs due to these 28 days of delay are $211,006.00, which is lesser than $336,000.00, as calculated by the daily rates. Please find attached a summary of these costs, with appropriate supporting information.

Please issue the change order immediately for execution. If you have any questions, please contact me at (415) 255-9790.

Sincerely,
Webcor Concrete Group

Jack Harrington

cc:  file – to D/M, EP, TR, COR 62



GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

October 31, 2005

Dick/Morganti JV
Fred Daven
1068 Mission St.
San Francisco, CA 94103

**RE:  COR 63**
**Productivity Impacts due to Access and Site-Staging**

Dear Mr. Daven:

Webcor Concrete respectfully requests a change order in the amount of **$754,825.00** for productivity impacts suffered by Webcor during the course of the Project, in regards to access and site staging. While we have previously notified DMJV of these impacts, please find below a more detailed description of each issue.

Lack of OSHA Access to Work Areas

Part B, Item 28 of our Subcontract Agreement requires OSHA approved access to our work areas to be provided by DMJV. CAL/OSHA calls for two means of access and egress to working decks in Subchapter 4, Article 18, Section 1629, attached for reference. Throughout the course of the project, DMJV neglected to provide adequate access, per these standards. In fact, we were usually forced to use our own crews and equipment to provide access to the decks so that our work activities could proceed. At other times, DMJV would provide access, but only with one ladder for access to the typical flyer decks. Not only did this provide an unsafe condition for our crew, but it greatly impacted our efficiency in performance of top deck work activities.

Further, DMJV was late in erecting a manlift for access to the building floors. Per Cal/OSHA, the manlift should have been installed after completion of the third floor. The flyer tables were stripped and removed from the third floor on 4/21/04 on the East side and 5/5/04 on the West side. The manlift was not erected and operational until 7/16/04, while Webcor was working on the seventh floor.

During the construction of the Tower portion of the Project, Webcor suffered losses in productivity due to the lack of access that we are owed per our Subcontract, as described above. Our losses are due to the simple fact that it took a longer time for our crews to arrive at their work areas, they arrived in a more fatigued state than they would have if proper access had been provided, it was not possible to transport tools and materials as efficiently which caused inefficiencies in tower crane usage, and led to further dilution of our supervision.

In order to quantify these impacts, we compiled a summary of the manhours expended on "leading edge," or top deck activities, and applied an impact percentage, consistent with industry-recognized productivity factors for such impacts. This survey is attached for your review. Levels 4 through 7 show a higher impact because these areas were impacted by the lack of deck access as well as the lack of manlift access. The total impact of these issues is $217,036.00. For your reference, please find attached the governing Cal/OSHA standard, as well as pricing information and supporting data.

Excavation, Stockpile and Site Staging Impact

Webcor was greatly impacted by DMJV's management of the jobsite. The most severe impacts arose from the lack of coordination in the Project's site logistics, particularly with the mass excavation and off-haul of material. We were first impacted when DMJV accumulated a massive stockpile of dirt squarely within the footprint of the building in the North half of the Annex area, well after the mass-excavation for the entire site was to be complete. This resulted in a major disruption to our workflow in foundation construction as we were forced to "leapfrog" our material and resources from the Tower area to the South end of the Annex while the stockpile was relocated. DMJV then relocated this material to the South East quadrant of the project site, resulting in the loss of virtually all the staging area for the Project.

The work activities that were most impacted by the presence of the stockpile were those associated with the fabrication and assembly of our formwork, particularly our flying deck forms. While our Subcontract Agreement states that we would be provided with an area on-site for formwork assembly (Part A, Item 29), DMJV did not remove the stockpile of material before we needed to receive our formwork in order to have it assembled before cycling it into use. With no space to assemble these forms, we were forced to lease a private vacant lot across the street from the Project, hoist our formwork materials to the new location, and then back again to the Project. This leased property was only accessible with one of the tower cranes, which forced more inefficiencies due to excessive handling of materials. The excessive crane usage and inefficiencies in this major work activity caused disruption to concurrent work activities such as construction of foundations and walls and columns.

We have determined the impact to these issues by applying an estimated impact percentage to the areas of work that were most affected, which you will find enclosed. Our total impact due to site logistics is $537,789.00. Please find attached pricing information and supporting data, including photographs illustrating the conditions which impacted us.

In summary, our costs for these issues are:

| | |
|---|---|
| Lack of OSHA Access to Work | $217,036.00 |
| Late Excavation, Dirt Stockpiling and Site Staging | $537,789.00 |
| **Total Change Order** | **$754,825.00** |

Please issue this change order for immediate execution and payment. If you have any questions, please contact me at (415) 255-9790.

Sincerely,
Webcor Concrete Group

Jack Harrington

cc:  file – to D/M, TR, COR 63

 **WEBCOR CONCRETE**

GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

October 31, 2005

Dick/Morganti JV
Fred Daven
1068 Mission St.
San Francisco, CA 94103

RE:    COR 64
       Compensable Delays due to Tower Crane

Dear Mr. Daven:

Webcor Concrete respectfully requests a change order in the amount of **$85,110.00** and **10 calendar days of schedule extension** for compensable delays to our work due to tower crane issues, as described below.

During the course of the Project, Webcor was delayed as a result of periodic shutdowns of the tower cranes for various reasons, as detailed below.

| Event | Dates | Critical Path Delay |
|---|---|---|
| Crane Jump Delay | 10/4/2004 | 1 work day |
| East Crane Shutdown | 10/20/2004 through 10/29/2004 | 7 work days |
| Absent Crane Operator | 11/29/2004 | 0.5 work days |
| North Crane Shutdown | 12/9/2004 & 12/10/2004 | 3 work days |
| | | 11.5 work days |

Webcor Concrete worked, at DMJV's direction, two weekends on 10/23/04 and 10/30/04 to mitigate delays. As shown on the attached as-built schedule and delay matrix, these events caused 10 calendar days of delay to the critical path schedule.

Per the terms of our Subcontract Agreement, we are owed the lesser of our actual costs or $12,000 for the first day of a delay, and $5,500 for each additional day. Our actual costs due to these 10 days of delay are $82,349.00, which is lesser than $120,000.00, as calculated by the daily rates. We are also owed $2,761.00 for the direct costs associated with the two weekends worked, previously submitted in Webcor COR 46. Please find attached a summary of these costs, with appropriate supporting information.

Please issue this change order for immediate execution and payment. If you have any questions, please contact me at (415) 255-9790.

Sincerely,
Webcor Concrete Group

Jack Harrington

cc: file – to D/M, TR, COR 64



GSA Jobsite Office:
1085 Mission St.
San Francisco, CA 94103
Ph. (415) 255-9790
Fx. (415) 255-9740

October 31, 2005

Dick/Morganti JV
Fred Daven
1068 Mission St.
San Francisco, CA 94103

**RE:    COR 65**
**Costs Associated with February 21, 2004 Fire**
**Dick Construction Claim No. P01038182DN**

Dear Mr. Daven:

Webcor Concrete respectfully requests a change order in the amount of **$136,961.00** and **20 calendar days of schedule extension** for compensable delays to our work due to the fire that occurred on-site on February 21, 2004.

As evident from the latest correspondence on this subject, there still exists between Webcor and DMJV a disagreement on the responsibility for costs associated with the fire of February 21, 2004, which destroyed material, created re-work and delayed the project for 20 calendar days. It is Webcor's position that direct costs associated with the fire are clearly covered by the builder's risk policy, held by DMJV, a fact supported by Dee Harpster's (of Allianz, the carrier) email correspondence to Webcor dated 12/16/2004, attached for your reference. As shown in our Change Order Request letter of May 24, 2004, Webcor's direct costs associated with the fire are $33,010.00. Per Part A, Item 31 of our Subcontract Agreement, our portion of the policy deductible is $25,000 per occurrence, leaving a balance of $8,010.00 as reimbursable to Webcor.

Ms. Harpster also correctly noted that delay costs are not recoverable through the policy. DMJV should be pursuing compensation for the days of delay as a force majeure event, as the resulting delay to the project was beyond the control of the contractors. As shown in the attached as-built schedule, the delay to the critical path was 20 calendar days. Per the Daily Delay Summary worksheet attached, our actual costs due to the delay are $170,856.00. Per the Subcontract's daily rates, the compensable delay is (1 x $12,000) + (19 x $5,500) = $116,500.00. For such delays, we are owed the lesser of these values and as such, we are seeking $116,500.00 and 20 calendar days in compensable delay costs.

In summary, we are seeking compensation for the following, in association with the fire of February 21, 2004:

Direct Costs:              $8,010.00

Compensable Delay Costs:   $116,500.00

Subtotal:                    $124,510.00

Mark-up at 10%:              $12,451.00

**Total Change Order:**      **$136,961.00**


Please issue this change order for immediate execution and payment.  If you have any questions, please contact me at (415) 255-9790.

Sincerely,
Webcor Concrete Group

Jack Harrington

cc:  file – to D/M, TR, COR 65

# EXHIBIT C



October 10, 2006

**GSA Pacific Rim Region**

RECEIVED

OCT 1 1 2006

DICK/MORGANTI

Francis Sarmiento, Project Manager
Dick/Morganti
1068 Mission Street
San Francisco, CA 94103

Subject:     New San Francisco Federal Office Building
             GSA Project No. NCA00049
             GSA Contract No. GS-09P-02-KTC-0002

Regarding:   Issue 364 – Rebar Congestion & Concrete Finishes REA
             DM Letter 21058-02486 dated 07/08/05, COR #GSA182 (Rec'd 07/14/05)
             DM Letter 21058-02600 dated 07/26/05, COR #GSA182B

Mr. Sarmiento:

The Government has reviewed Dick/Morganti Letters 21058-02486 dated 7/28/05 and
21058-02600 dated 07/26/05, and does not find merit for the associated requests for equitable
adjustment submitted under COR Nos. GSA182 & GSA182B. Additionally, the Government
finds DM's Requests for Equitable Adjustments to be incomplete with regard to time and not
consistent with the Contract Requirements. The attachment to this letter provides additional
detail on which we base this conclusion.

The Government rejects and disallows the cost associated with COR Nos. GSA182 &
GSA182B, Issue 364 as already being a requirement of the Contract. Should D/M disagree
with this rejection it still retains its right to request a Contracting Officer's Decision under
the disputes clause.

Roger K. Wiesnoski
Contracting Officer

Cc:     J. Nolte, M. Agleham, (GSA)
        D. Proctor (Hunt)
        W. Loftis (SmithGroup)
        T. Christ (mOrphosis)
        Issue 364
        File

**U.S. General Services Administration**
450 Golden Gate Avenue
San Francisco, CA 94102-3434
www.gsa.gov



EXHIBIT C

Issue #364 – Rebar Congestion & Concrete Finishes
CORs Nos. GSA182 & GSA182B - Comments
May 5, 2006

**1   Webcore - Rebar Congestion, COR #GSA182**

a. Merit

DM/Webcor base their request on the Contract Documents being deficient with respect to ACI standards, however, they cite only three specific parts of the ACI and provide no specific examples of where the design documents are not in compliance. Hunt's review concludes the Contractor has failed to substantiate merit for this issue.

DM's design assist services included the deliverable of a Constructability Review. Although DM failed its contractual obligation and now characterizes the Structural Drawings as deficient and unconstructible.

DM/Webcor's arguments amount to the work, absent of any scope changes, was harder than they anticipated. However, later in the project with increased coordination, improved means and methods, changes in staff, and attention to quality the Contractor demonstrated the documents were, in fact, constructible to the specified level of quality.

b. Contractual Issues (Notwithstanding Merit)

DM's Request for Equitable Adjustment is incomplete under GSAR 552.243-71. While Webcore has included some scheduling information and time related costs related to its alleged time impact, DM has made no statement on time, or provided documentation on how the alleged impact has affected the critical path of the project other than to state DM may submit for additional time and costs at a later date.

DM has included Webcore costs which are included as part of $8,000/day compensable delay costs under Section H – Special Contract Requirements No. 5 of the Contract.

DM has included Webcore costs which are included as part of the 18% markup under Section H – Special Contract Requirements No. 5 of the Contract.

c. Other

DM has included Webcore costs for remedial work and for products to improve the finish over the initial quality achieved in the lower levels to meet the specified finish which are considered means and methods.

Markup rate included exceeds the 18% markup under Section H – Special Contract Requirements No. 5 of the Contract.

Issue #364 – Rebar Congestion & Concrete Finishes
CORs Nos. GSA182 & GSA182B - Comments
May 5, 2006

2. **Webcor - Concrete Finishes, COR #GSA182**

   a. Merit

      DM/Webcor base their request on ambiguity between the "smooth form finish" concrete specified in the contract and a GSA direction to provide Class A finish per the ACI. While the ACI defines Class A finish as smooth form finish in areas exposed to view, no direction has been provided the Contractor to meet a standard higher than that specified in the in the Contract.

      DM/Webcor confirmed their understanding of the level of quality required by the Contract with its mockup submittal prior to proceeding with the work. No notification of additional costs was made at the time the mockup was submitted and approved.

      As it relates to rebar congestions, DM/Webcor argue the rebar consolidation affected the consolidation of the concrete making the specified concrete finish unachievable. However, later in the project with increased coordination, improved means and methods, changes in staff, and attention to quality the Contractor demonstrated the required finish quality was achievable despite any alleged problems caused by the rebar congestion.

   b. Contractual Issues (Notwithstanding Merit)

      DM's Request for Equitable Adjustment is incomplete under GSAR 552.243-71. While Webcore has included some scheduling information and time related costs related to its alleged time impact, DM has made no statement on time, or provided documentation on how the alleged impact has affected the critical path of the project other than to state DM may submit for additional time and costs at a later date.

      DM has included Webcore costs which are included as part of $8,000/day compensable delay costs under Section H – Special Contract Requirements No. 5 of the Contract.

      DM has included Webcore costs which are included as part of the 18% markup under Section H – Special Contract Requirements No. 5 of the Contract.

   c. Other

      DM has included Webcore costs for remedial work and for products to improve the finish over the initial quality achieved in the lower levels to meet the specified finish which are considered means and methods.

      Markup rate included exceeds the 18% markup under Section H – Special Contract Requirements No. 5 of the Contract.

Issue #364 – Rebar Congestion & Concrete Finishes
CORs Nos. GSA182 & GSA182B - Comments
May 5, 2006

### 3. Bay Area Reinforcing – Rebar Congestion, COR #GSA182B

a.

DM/BAR base their request on the Contract Documents being deficient with respect
to ACI standards, however, they cite only three specific parts of the ACI and provide
no specific examples of where the design documents are not in compliance. Hunt's
review concludes the Contractor has failed to substantiate merit for this issue.

DM's design assist services included the deliverable of a Constructability Review.
While BAR was apparently not involved with input in this review, DM failed its
contractual obligation and now characterizes the Structural Drawings as deficient
and unconstructible.

DM/BAR's arguments amount to the work, absent of any scope changes, was harder
than they anticipated. However, later in the project with increased coordination,
improved means and methods, changes in staff, and attention to quality the
Contractor demonstrated the documents were, in fact, constructible to the specified
level of quality.

b. Contractual Issues (Notwithstanding Merit)

DM's Request for Equitable Adjustment is incomplete under GSAR 552.243-71.
While BAR has included some scheduling information and time related costs related
to its alleged time impact, DM has made no statement on time, or provided
documentation on how the alleged impact has affected the critical path of the project
other than to state DM may submit for additional time and costs at a later date.

DM has included BAR costs which are included as part of $8,000/day compensable
delay costs under Section H – Special Contract Requirements No. 5 of the Contract.

DM has included BAR costs which are included as part of the 18% markup under
Section H – Special Contract Requirements No. 5 of the Contract.

c.

DM has included BAR costs for changes approved under Substitution Requests
which were conditionally approved on the basis the approval represented no cost to
the Government.

The alleged congestion problem occurred in the vertical elements of the project. The
only significant scope change to rebar on the project, Instruction Bulletin #5, involved
mainly the horizontal elements. DM/BAR have represented they have been
adequately compensated for this work, including its impact on adjacent vertical work,
in the negotiated agreement on IB #5, COR/Issue 94, PS106.

# EXHIBIT D

## Certification of Claim

I certify, under penalty of perjury, that Webcor's claim for additional compensation as a result of the rebar congestion and increased finish requirements on the GSA Project No. NCA 00049 is made in good faith; that the supporting data is accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes it is entitled; and that I am duly authorized to certify the claim on behalf of the Contractor.

Dated: _3/22/07_

By: _____
     Webcor Concrete

# EXHIBIT D

# EXHIBIT E

**Certification of Claim**

I certify, under penalty of perjury, that Webcor's claim for additional compensation as a result of the rebar congestion and increased finish requirements on the GSA Project No. NCA 00049 is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes Dick Morganti and the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Dated: 4/10/2007

By: _____
        Webcor Concrete

EXHIBIT E