1  J. Morrow Otis (CSB #039311)
   Steven L. Iriki (CSB # 142533)
2  Matthew E. McCabe (CSB #136541)
   OTIS CANLI & IRIKI, LLP
3  625 Market St., 4th Floor
   San Francisco, CA  94105-3306
4  Telephone: (415) 362-4442
   Facsimile: (415) 362-7332
5  E-mail: jmo@ocilaw.com

6  Attorneys for Third-Party Defendant
   PERFORMANCE CONTRACTING, INC.
7

8                      UNITED STATES DISTRICT COURT
9
                       NORTHERN DISTRICT OF CALIFORNIA
10
                          SAN FRANCISCO DIVISION
11

12

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS, and WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS,<br><br>        Plaintiffs,<br><br>   vs.<br><br>DICK/MORGANTI, a joint venture; DICK CORPORATION; THE MORGANTI GROUP; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; and DOES 1-10, inclusive,<br><br>        Defendants.<br><br>AMERICAN CASUALTY COMPANY OF READING, PA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>        Third-Party Plaintiffs, | Case No.  3:07-CV-02564-CRB<br><br>**PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS; AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS**<br><br>DATE:   October 19, 2007<br>TIME:   10:00 a.m.<br>JUDGE:   Hon. Charles R. Breyer<br>               (Courtroom 8) |

PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS;
AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS      Case No.  3:07-CV-02564-CRB
2010-038-PLD-Opp to Motion to Stay Proceedings.091007.doc

| | |
|---|---|
| 1 | vs. |
| 2 | BOYETT CONSTRUCTION, INC., a California corporation; MARELICH MECHANICAL CO., |
| 3 | INC., a California corporation; PERFORMANCE CONTRACTING GROUP, INC. dba |
| 4 | PERFORMANCE CONTRACTING, INC., a Delaware corporation; PERMASTEELISA |
| 5 | GROUP USA HOLDINGS CORP., a Delaware |
| 6 | corporation fdba PERMASTEELIS CLADDING TECHNOLOGIES L.P., a Delaware limited |
| 7 | partnership, fdba PERMASTEELISA CLADDING TECHNOLOGIES, LTD.; |
| 8 | ROSENDIN ELECTRIC, INC., a California corporation; THIRD PARTY DOE |
| 9 | DEFENDANTS 1 THROUGH 20. |
| 10 | Third Party Defendants. |

## I. STATUS OF CLAIMS

Performance Contracting, Inc. ("PCI") has made the following claims against Dick/Morganti ("D/M") and its Miller Act sureties: 1) $3,005,018.00 for base contract work; 2) financing costs of $253,817.34 resulting from D/M's failure to pay bi-weekly sums to PCI as required under the contract; 3) $500,094.44 for change order work; and 4) $3,853,402.05 for delay and impact damages resulting from D/M's mismanagement of the project.

PCI has never agreed that its claims fall under the Contract Disputes Act ("CDA"). To assist D/M in whatever negotiations it may have with the GSA, PCI presented a compendium of its claims to D/M on June 29, 2007. PCI has not heard from D/M since that submission, and PCI can only surmise that D/M has not submitted any claim to the "contract officer" pursuant to 41 U.S.C. 605(c)(1).

Because of D/M's unilateral suspension of contract payments to PCI beginning in September, 2006, PCI filed an action in this Court on August 15, 2007 (Case No. C-07-4180) against D/M and its sureties for breach of contract, enforcement of Miller Act payment bond, and unjust enrichment. The total amount of the claim, exclusive of costs, attorneys' fees, penalties, and a portion of its interest, is $7,612,331.83. PCI does not plan to raise any additional claims. PCI's claims are separate from Webcor's claims, and the adjudication of Webcor's claims will not directly impact those of PCI.

## II. OPPOSITION TO MOTION TO STAY PROCEEDINGS

On or about April 22, 2003, PCI entered into a subcontract with D/M under which PCI agreed to furnish and install, among other things, FRC panels, lath & plaster, gypsum board, metal studs, and ceilings, for the new GSA Federal Building located at 7th and Mission Streets in San Francisco. See Declaration of James T. Strout in Support of Performance Contracting, Inc.'s Opposition to Motion to Stay Proceedings (the "Strout Declaration"), par. 2; see also Exhibit 1 to Strout Decl. PCI's claims arise from the work performed pursuant to this contract, and are attributable to 1) D/M's refusal to timely pay amounts due under the contract; and 2) the delay and

-1-

impact damages caused by D/M's mismanagement of the project. Strout Decl., par. 3.

D/M mismanaged the project so severely that the GSA issued its first "cure notice" to D/M on May 5, 2004. Strout Decl., par. 4; see Exhibit 2 to Strout Decl. There, the GSA threatened to discharge D/M as the general contractor for the entire project based upon 1) D/M's failure to properly manage the project; 2) D/M's lack of scheduling; 3) the disruptive turnover of D/M's personnel; and 4) D/M's lack of quality control. Exhibit 2 to Strout Decl. D/M responded to the cure notice in a letter dated June 25, 2004. Strout Decl., par. 5; see Exhibit 3 to Strout Decl. D/M acknowledged that it was responsible for the GSA's charges of mismanagement and promised that it would correct the problems. Exhibit 3 to Strout Decl. Despite the gravity of the GSA's charges, D/M failed to resolve these deficiencies. Some 14 months later, on July 20, 2005, the GSA issued a *second* "cure notice" to D/M, re-charging D/M with the same or similar delinquencies. Strout Decl., par. 6; see Exhibit 4 to Strout Decl. These cure notices and the admissions in D/M's response show that most, if not all, of the responsibility for project mismanagement lies with D/M – not the GSA. Moreover, these mismanagement problems are the same problems that caused PCI's delay and impact damages. Strout Decl., par. 7.

For over 18 months, PCI did out of scope work and diligently presented D/M with change order requests for extra work as required by the PCI-D/M subcontract. Strout Decl., par. 8. PCI began to send the change order requests to D/M in or about April 2004. Strout Decl., par. 9. Over the next several months, personnel at D/M assured PCI that PCI's various change order requests had been submitted to the owner. Ibid. After many months of non-payment and lack of response by D/M, PCI insisted on a meeting with various D/M personnel in April 2006. Ibid. During this meeting, Curtis Lawyer, a project engineer for D/M on the project (who was responsible for processing PCI's change order requests), admitted that most of PCI's change order requests had not been submitted to the owner. Ibid. Thus, PCI learned through the April

-2-

1. 2006 meeting that D/M's previous statements about the change order requests was false – D/M had not submitted the vast majority of PCI's change order requests to the GSA! Strout Decl., par. 10. PCI subsequently sent a letter to the GSA dated May 1, 2006, noting that many of these change orders requests had been outstanding for more than 18 months. Ibid; see Exhibit 5 to Strout Decl. D/M now attempts to represent to this Court that these change order requests are all pass-through claims. This claim is untrue. If D/M had truly believed that they were pass-through claims, it would surely have passed them on to GSA so that PCI would be paid directly by GSA, instead of having PCI look for payment from D/M years later. If these change order requests were in truth pass-through claims, D/M's clear financial interest would have caused D/M to process them as change orders and thus avoid the claims now before this Court.

In fact, D/M has never been concerned with payments to its subcontractors. PCI submits that D/M made a conscious decision to fund this project largely on the backs of its subcontractors. In an internal email, D/M complained of the negative attitude of its unpaid subcontractors and stated that "[b]ecause we didn't quite handle things correctly at the start of the project and because the subs are financing the project, their taste has really soured." See Declaration of Matthew E. McCabe in Support of Performance Contracting, Inc.'s Opposition to Motion to Stay Proceedings (the "McCabe Declaration"). par. 3; see also Exhibit 2 to McCabe Decl..

The sad fact is that the subcontractors – not the general contractor – financed much of this project. This is because D/M formed a continuing policy not to pay the subcontractors on the project. PCI submits that this policy is now driving D/M's current efforts to stay this case. The provisions of this contract (see Paragraph Ninth) and FAR Regulations require subcontractors to perform all work on Federal projects as directed by the general contractor. Disputes are to be later resolved. D/M knew this. Yet, not only did D/M fail to pay PCI and other subcontractors for base contract work, it failed to even bother to process change order

-3-

requests. To aggravate matters, D/M made false statements about the situation. D/M made a conscious effort to find ways to avoid paying the subcontractors while they were forced to continue on with the project.

When PCI complained about these problems, D/M became vindictive. In September 2006, D/M unilaterally stopped all base contract payments to PCI. Strout Decl., par. 11. Nevertheless, PCI continued to perform its work and to supply materials to the project until February, 2007. Strout Decl., par. 11.[1] In addition to falsely stating that the change order requests had been submitted to the GSA, D/M attempted to deflect PCI's and other subcontractors' demands for payment by claiming that it has been "working" on a claim to the GSA for nearly two years. See McCabe Decl., par. 4 and Exhibit 4 to McCabe Decl.; see Strout Decl., par. 13. To PCI's knowledge, D/M has still submitted no claim to the GSA, and has given no copy to any subcontractors. Strout Decl., par. 13.

PCI submits that if this Court were to grant the instant motion to stay this case, the stay would cause: 1) needlessly delay in the adjudication of PCI's and other subcontractors' claims that are primarily, if not wholly, direct claims against D/M - not pass-through claims to the GSA; and 2) deprive PCI and other subcontractors of their right to an expeditious payment as required by the Miller Act.

### A.  PCI'S CLAIM FOR AMOUNTS DUE UNDER THE CONTRACT IS NOT A PASS-THROUGH CLAIM.

PCI's claim for $3,005,018.00 of base contract work is for a payment owed by D/M under the contract, pure and simple. It is not an obligation of the GSA. This contract obligation does not depend on any issues that will be addressed in D/M's claim against the GSA. PCI's additional claim for $253,817.34 of financing costs is attributable to D/M's failure to pay PCI bi-weekly as required under D/M's contract. This contractual provision to pay every two weeks

---

[1] This delay was approximately 14 months past the completion date that D/M had originally scheduled for PCI. Strout Decl., par. 11.

-4-

was a promise to pay by D/M – not by the GSA. This claim is also not dependent on any issues that will be addressed in D/M's claim against the GSA. This $3,258,835.34 is a pure contract claim against D/M and has nothing to do with any issue between D/M or the GSA. There are no grounds to stay such a claim.

### B.    PCI'S CHANGE ORDER CLAIM IS NOT A PASS-THROUGH CLAIM.

For over 18 months, PCI did out of scope work and diligently presented D/M with change order requests for extra work as required by the PCI-D/M subcontract. PCI believes that D/M's contract with the GSA was a "lump sum" contract. See Strout Decl., par. 14. Despite D/M's representations that it had submitted these change order requests to the GSA, PCI discovered that these representations were false. No change order requests had been passed through to the GSA as required by PCI's contract. PCI submits that D/M's failure to pass through change order requests is an admission by D/M that its lump sum contract with the GSA did not allow D/M to pass-through PCI's claims to the GSA. In this motion, D/M for the first time claims that all of PCI's change order claims are pass-through claims. Not only is such a contention factually false, PCI submits that D/M is estopped from such an argument which would further delay payment of long overdue claims. Given D/M's admissions, its deception, and the substantial delay that has already occurred, the Court should allow PCI's claim for $500,094.44 of change order work to be adjudicated in this Court.

### C.    PCI'S CLAIM RELATING TO D/M'S MISMANAGEMENT IS NOT A PASS-THROUGH CLAIM.

PCI's claim for delay and impact damages is not a pass-through claim because D/M has admitted that it is responsible for the mismanagement complained of on this project. As the two separate GSA "cure notices" and D/M's reply indicate, D/M is the party responsible for the problems giving rise to PCI's delay and impact damages. In a federal construction project of this magnitude, such cure notices are extremely rare. Removal of a general contractor with the

-5-

required depth of knowledge and extensive accumulated factual background associated with a massive, multi-year project such as the 7th and Mission Streets GSA building is a very serious matter. Yet in this case, there were *two* such notices within a 14-month period. D/M's mismanagement was so apparent and so severe that the GSA thought it had no choice but to consider, on two separate occasions, the termination of its general contractor in the middle of a massive $200,000,000.00 federal construction project. When it responded to the cure notices, D/M *admitted* that the GSA's mismanagement concerns were well-founded and promised to correct all of the problems. Surely, D/M did not consider then (and does not consider now) that the GSA was responsible for the mismanagement issues. Having admitted its mismanagement, D/M should not be now permitted to argue that PCI's $3.8 million delay claim for mismanagement is somehow a claim to be made solely against the GSA. Such an argument serves but one purpose – to further delay an adjudication of PCI's claims for as long as possible so D/M can continue its barely concealed policy of avoiding payments to its subcontractors for its own mismanagement.

In conclusion, PCI submits that the great majority, if not all, of its impact clams are direct contract claims against the contractor. The contract between D/M and the GSA appears to be a "lump sum" contract, as to which D/M has heretofore failed or refused to pass-through ordinary, run-of-the-mill change order claims to the owner. Such direct claims are subject to resolution in the Federal District Court. It is well established that a contracting officer has no jurisdiction to resolve disputes between a general contractor and a subcontractor. See *NavCom Defense Electronics, Inc. v. Ball Corp.*, 92 F.3d 877, 880 (9th Cir. 1996); *U.S. West Communications Services v. United States*, 940 F.2d 622, 627 (Fed. Cir. 1991).

### D.  D/M'S POLICY ARGUMENTS IGNORE THE PURPOSE OF THE MILLER ACT.

D/M and its sureties imply that their motion is merely an attempt to uphold the policies of protecting administrative authority and promoting judicial efficiency. This claim is not true. In

-6-

PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS;
AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS          Case No. 3:07-CV-02564-CRB
2010-038-PLD-Opp to Motion to Stay Proceedings.091007.doc

making this argument, D/M is, in fact, undermining the very protections afforded subcontractors under the Miller Act.

The primary purpose for enactment of the Miller Act was to provide subcontractors with an expedited procedure to obtain payment for goods and services provided on federal construction projects. In asking this Court to focus narrowly on the restrictive language in the subcontracts drafted by the contractor, and to ignore the contractor's failure to pay for base contract work, to process change orders, and to properly manage the project, D/M is effectively asking this Court to repudiate the basis of the Miller Act.

The predecessor of the Miller Act was the Heard Act. The reason for passage of the Heard Act was that many contractors constructing public buildings for the government were insolvent when entering into the contracts or at the completion of the work. Because mechanics' and materialmen's liens were not provided for on public buildings, subcontractors furnishing labor or material to the contractors were left without a remedy. See *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F.Supp. 853, 857 (N.D.Ill.1973); see also *United States for the Use of DDC Interiors, Inc. v. Dawson Constr. Co., Inc.*, 895 F.Supp. 270, 272 (Dist. Colo. 1995).

The Heard Act was repealed by the Miller Act because it did not provide subcontractors with a sufficiently expedited remedy. One of the resulting hardships was that subcontractors were often forced to accept compromises of their claims:

> [I]t appears that claimants frequently find themselves under the necessity of choosing whether they will wait for years for their money or accept compromises which, if they do not involve greater loss, at least destroy the profitableness of the contract. Those in financial stringency, of course, have no choice but the latter alternative.

See *United States v. Daniel, Urbahn, Seelye and Fuller, supra*, 357 F.Supp. at 857, citing H.R.Rpt. No. 1263, 74th Cong., 1st Sess. 2 (1935). Thus, the purpose of the Miller Act was to expedite payment to subcontractors and avoid forced and unfair compromises.

-7-

PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS;
AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS                Case No. 3:07-CV-02564-CRB
2010-038-PLD-Opp to Motion to Stay Proceedings.091007.doc

By this request to stay these proceedings, D/M and its sureties are attempting to return to the pre-Miller Act era and force the subcontractors before this Court to wait for an extended period to get paid. PCI submits that if D/M can force PCI and the other subcontractors to wait for payment of tens of millions of dollars of unpaid claims, while it litigates with the GSA, the subcontractors in this action will ultimately have to accept a compromise of their claims. The Court should deny the sureties' motion because granting the requested stay constitutes a repudiation of the purpose underlying the Miller Act.

### III. CONCLUSION

For all the reasons cited above, PCI respectfully requests that the motion for a stay of these proceedings, especially as it relates to PCI's claims, be denied.

Dated: September 21, 2007         OTIS CANLI & IRIKI, LLP

By: _____
J. Morrow Otis
Attorneys for Third-Party Defendant
PERFORMANCE CONTRACTING, INC.

-8-

PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS;
AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS          Case No. 3:07-CV-02564-CRB
2010-038-PLD-Opp to Motion to Stay Proceedings.091007.doc

# PROOF OF SERVICE

CASE NAME: *Webcor Construction, Inc., et al. v. Dick/Morganti, et al.*
COURT INFORMATION: United States District Court, Northern District of California, San Francisco Division Case No. 3:07-CV-02564-CRB

I, the undersigned, hereby certify that I am a citizen of the United States, over the age of 18 years, and am not a party to the within action. I am employed in the City and County of San Francisco, California, and my business address is 625 Market Street, 4th Floor, San Francisco, California 94105-3306. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service. On the date listed below, following ordinary business practice, I served the following document(s):

- **PERFORMANCE CONTRACTING, INC.'S 1) STATUS UPDATE ON CLAIMS; AND 2) OPPOSITION TO MOTION TO STAY PROCEEDINGS;**
- **DECLARATION OF JAMES T. STROUT IN SUPPORT OF PERFORMANCE CONTRACTING, INC.'S OPPOSITION TO MOTION TO STAY PROCEEDINGS; and**
- **DECLARATION OF MATTHEW E. MCCABE IN SUPPORT OF PERFORMANCE CONTRACTING, INC.'S OPPOSITION TO MOTION TO STAY PROCEEDINGS**

on the party(ies) in this action, through his/her/their attorneys of record, by placing true and correct copies thereof in sealed envelope(s), addressed as shown on the attached Service List for service as designated below:

| | |
|---|---|
| Attorneys for Defendants<br>Dick/Morganti; Dick Corporation; and The Morganti Group, Inc. | Raymond M. Buddie, Esq.<br>Rick W. Grady, Esq.<br>Peckar & Abramson, P.C.<br>250 Montgomery Street, 16th Fl.<br>San Francisco, CA 94104 |
| Attorneys for Defendants<br>American Casualty Company of Reading, PA; National Union Fire Insurance Company of Pittsburgh, PA | Raymond M. Buddie, Esq.<br>Rick W. Grady, Esq.<br>Peckar & Abramson, P.C.<br>250 Montgomery Street, 16th Fl.<br>San Francisco, CA 94104 |
| Attorneys for Plaintiff<br>Webcor Construction, Inc. dba Webcor Builders | Kenneth G. Jones, Esq.<br>California Plaza<br>2121 N. California Blvd., Ste. 875<br>Walnut Creek, CA 94596-8180 |
| Attorneys for Permasteelisa Group USA Holdings Corp., and Permasteelisa Cladding Technologies, L.P. fdba Permasteelisa Cladding Technologies, LTD. | Roger P. Heyman, Esq.<br>James K.T. Hunter, Esq.<br>Heyman Densmore LLP<br>21550 Oxnard Street, Suite 450<br>Woodland Hills, CA 91367 |

(XX) BY ELECTRONIC FILING/SERVICE: I caused such document(s) to be Electronically Filed and Served through the PACER system for the above-entitled case. Electronic service has been accomplished by the service maintained by PACER.

( X ) (Federal) I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on September 21, 2007, at San Francisco, California.

Michael McIntosh