1  J. Morrow Otis (CSB #039311)
   Steven L. Iriki (CSB # 142533)
2  Matthew E. McCabe (CSB #136541)
   OTIS CANLI & IRIKI, LLP
3  625 Market St., 4th Floor
   San Francisco, CA  94105-3306
4  Telephone: (415) 362-4442
   Facsimile: (415) 362-7332
5  E-mail: jmo@ocilaw.com

6  Attorneys for Third-Party Defendant
   PERFORMANCE CONTRACTING, INC.
7

8
                    UNITED STATES DISTRICT COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10
                    SAN FRANCISCO DIVISION
11

12

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS, and WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS,<br><br>          Plaintiffs,<br><br>vs.<br><br>DICK/MORGANTI, a joint venture; DICK CORPORATION; THE MORGANTI GROUP; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; and DOES 1-10, inclusive,<br><br>          Defendants. | Case No.  3:07-CV-02564-CRB<br><br>**DECLARATION OF MATTHEW E. MCCABE IN SUPPORT OF PERFORMANCE CONTRACTING, INC.'S OPPOSITION TO MOTION TO STAY PROCEEDINGS**<br><br>DATE:    October 19, 2007<br>TIME:    10:00 a.m.<br>JUDGE:   Hon. Charles R. Breyer<br>              (Courtroom 8) |
| AMERICAN CASUALTY COMPANY OF READING, PA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>          Third-Party Plaintiffs, | |

-1-

DECLARATION OF MATTHEW E. MCCABE IN SUPPORT OF
OPPOSITION TO MOTION TO STAY PROCEEDINGS                    Case No.  3:07-CV-02564-CRB
2010-038-PLD-Opp to Motion to Stay Proceedings - McCabe Decl.092007.doc

vs.

BOYETT CONSTRUCTION, INC., a California corporation; MARELICH MECHANICAL CO., INC., a California corporation; PERFORMANCE CONTRACTING GROUP, INC. dba PERFORMANCE CONTRACTING, INC., a Delaware corporation; PERMASTEELISA GROUP USA HOLDINGS CORP., a Delaware corporation fdba PERMASTEELIS CLADDING TECHNOLOGIES L.P., a Delaware limited partnership, fdba PERMASTEELISA CLADDING TECHNOLOGIES, LTD.; ROSENDIN ELECTRIC, INC., a California corporation; THIRD PARTY DOE DEFENDANTS 1 THROUGH 20.

Third Party Defendants.

I, Matthew E. McCabe, declare as follows:

1. I am a member of the State Bar of California and am associated with the law firm Otis Canli and Iriki, LLP, the attorneys of record for third-party defendant Performance Contracting, Inc. ("PCI") in the above-captioned case. If called upon, I could and would competently testify to the matters stated herein.

2. The deposition of Fred Daven, was taken on July 27, 2006 in San Francisco Superior Court Case No. CGC 06-450903. Mr. Daven oversaw the construction of the new GSA Federal Building located at 7th and Mission Streets on behalf of Dick/Morganti "D/M"). See pages 6-9 of the Daven deposition transcript, attached hereto as Exhibit 1.

3. At his deposition Mr. Daven authenticated an email dated August 3, 2005 that he sent to Dick Company employees W. L. Higgins, Dan Arana, and J. Dravet. A true and correct copy of that email (which is Exhibit 8 to the deposition transcript) is attached hereto as Exhibit 2. A true and correct copy of the deposition testimony authenticating the email is attached hereto as Exhibit 3. In the email Mr. Daven stated that "[b]ecause we didn't quite handle things correctly

-2-
**DECLARATION OF MATTHEW E. MCCABE IN SUPPORT OF OPPOSITION TO MOTION TO STAY PROCEEDINGS**
2010-038-PLD-Opp to Motion to Stay Proceedings - McCabe Decl.092007.doc

Case No. **3:07-CV-02564-CRB**

-3-

1  at the start of the project and because the subs are financing the project, their taste has really
2  soured."
3     4.    Attached hereto as Exhibit 4 are pages 39-40 of the Daven transcript. In these
4  pages Mr. Daven testified that he had been working on D/M's claim to the GSA since September
5  2005 until the time he left the company in June 2006.
6     I declare under penalty of perjury under the laws of the State of California that the
7  foregoing is true and correct. Executed on September 20, 2007, at San Francisco, California.

*Matthew E. McCabe*
Matthew E. McCabe

-3-
DECLARATION OF MATTHEW E. MCCABE IN SUPPORT OF
OPPOSITION TO MOTION TO STAY PROCEEDINGS
2010-038-PLD-Opp to Motion to Stay Proceedings - McCabe Decl.092007.doc

Case No.  3:07-CV-02564-CRB

# EXHIBIT 1

A006382
FRED DAVEN - July 27, 2006

```
 1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2       IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
 3
                              - - -
 4
         PERFORMANCE CONTRACTING, INC.,     )
 5                                          )
                         Plaintiff,         )
 6                                          )
             vs.                            ) No. CGC 06-450903
 7                                          )
         DICK/MORGANTI, a joint venture;,   )
 8       DICK CORPORATION; THE MORGANTI     )
         GROUP, INC.; and DOES 1 through 50,)
 9       inclusive,                         )
                                            )
10                       Defendants.        )
         _____)
11
12
13
14
                            DEPOSITION OF
15
                             FRED DAVEN
16
                       SAN FRANCISCO, CALIFORNIA
17
                        THURSDAY, JULY 27, 2006
18
19
20
         ATKINSON-BAKER, INC.
21       COURT REPORTERS
         (800) 288-3376
22       www.depo.com
23       REPORTED BY:  PATRICIA SEGOVIA-VALDES, CSR NO. 8416
24       FILE NO.:  A006382
25
```

## Page 2

```
 1   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2   IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
 3                         ---
 4
     PERFORMANCE CONTRACTING, INC.,  )
 5                                   )
              Plaintiff,             )
 6                                   )
         vs.                         ) No. CGC 06-450903
 7                                   )
     DICK/MORGANTI, a joint venture;,)
 8   DICK CORPORATION; THE MORGANTI  )
     GROUP, INC.; and DOES 1 through 50,)
 9   inclusive,                      )
                                     )
10            Defendants.            )
     _____)
11
12
13
14       Deposition of FRED DAVEN, taken on behalf of
15   Plaintiff, at Otis Canli & Iriki, 180 Montgomery Street,
16   Suite 1240, San Francisco, California 94104, commencing
17   at 1:30, p.m., Thursday, July 27, 2006, before PATRICIA
18   SEGOVIA-VALDES, CSR NO. 8416.
19
20
21
22
23
24
25
```

## Page 3

```
 1              APPEARANCES
 2   FOR THE PLAINTIFF:
 3   OTIS CANLI & IRIKI, LLP
     By: STEVEN L. IRIKI
 4   180 Montgomery Street
     Suite 1240
 5   San Francisco, California 94104
     (415) 362-4442
 6
     PERFORMANCE CONTRACTING GROUP
 7   By: ROGER LENNENBERG
           Corporate Counsel
 8   8015 S.W. Hunziker Road
     Tigard, OR 97223
 9   (503) 603-5345
10   PERFORMANCE CONTRACTING GROUP
     By: Jon Miklos
11       Senior Vice President
     16400 College Boulevard
12   Lenexa, KS 66219
     (913) 310-3377
13
     FOR THE DEFENDANTS:
14
     PECKAR & ABRAMSON
15   By: RAYMOND M. BUDDIE
     250 Montgomery Street
16   16th Floor
     San Francisco, California 94104
17   (415) 837-1968
18   DICK CORPORATION
     By: MICHAEL T. AMBROSO
19       Corporate Counsel
     P.O. Box 10896
20   Pittsburgh, PA 15236-0896
     (412) 384-1287
21
     ALSO PRESENT:
22
     JIM STROUT, Performance Contracting Group.
23
24
25
```

## Page 4

```
 1                    I N D E X
 2   WITNESS:   FRED DAVEN
 3                                              PAGE
 4   EXAMINATION BY MR. STEVEN L. IRIKI            6
 5
 6
 7   EXHIBITS:
 8   1   Subcontract Agreement GSA Project        15
 9   2   Letter from Jim Strout to Fred Daven
10       and James Dravet dated June 13,
11       2005                                     20
12   3   Letter from Fred Daven to John Nolte
13       dated July 7, 2005                       22
14   4   String of e-mails. Last e-mail from
15       Fred Daven to Jim Strout dated
16       July 12, 2005                            24
17   5   Letter from Roger Wiesnoski to Fred
18       Daven dated July 13, 2005                27
19   6   Letter from Fred Daven to Jim Strout
20       dated July 20, 2005                      27
21   7   Letter from Fred Daven to Jim Strout
22       ad Steve Nelle dated September 9,
23       2005                                     30
24   8   E-mail from Fred Daven to W.
25       Higgins, Dan Arana, J. Dravet
```

## Page 5

```
 1       dated August 3, 2005                     34
 2   9   PCI COR Log                              37
 3   10  Letter from James Strout to Ron
 4       Brookfield dated April 6, 2006           38
 5   11  PCI Log of CO's and COR's                45
 6
 7   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
 8   Is it your understanding that the
 9       language I just read to you
10       from the subcontract is a
11       pay of pay provision?          7   17
12
13   INFORMATION TO BE SUPPLIED:
14           (None)
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1  FRED DAVEN
2  having first been duly sworn, was
3  examined and testified as follows:
4  EXAMINATION BY MR. STEVEN L. IRIKI
5  MR. IRIKI: Q. Good afternoon, Mr. Daven.
6  First of all, could you please state and spell your name
7  for the record.
8  A. Fred Daven. D-A-V-E-N.
9  Q. Mr. Daven, have you ever had your deposition
10 taken before?
11 A. Yes.
12 Q. How many times have you been deposed before?
13 A. Three.
14 Q. Do you need for me to go through the ground
15 rules governing your deposition today?
16 A. I don't think so.
17 Q. All right. There is one ground rules I am
18 going to go over. You understand that your testimony
19 today is under penalty of perjury? Even though we are
20 in my conference room today, it's as if you're
21 testifying in a court of law. Do you understand that?
22 A. Yes.
23 Q. Is there any reason why your deposition cannot
24 go forward today?
25 A. No.

**Page 7**

1  Q. Are you taking any medication that would
2  affect your ability to give testimony today or that
3  affects your memory?
4  A. No.
5  Q. Mr. Daven, if you could summarize your
6  education for me since high school.
7  A. I've got a bachelor of science degree in
8  architecture.
9  Q. And where did you obtain that degree?
10 A. North Carolina State.
11 Q. What year did you graduate from North Carolina
12 State?
13 A. 1977.
14 Q. How are you currently employed? Who do you
15 work for?
16 A. Trans Can Development. T-R-A-N-S, C-A-N.
17 Q. And when did you start working for Trans Can?
18 A. Tenth of July.
19 Q. And what's your position with Trans Can?
20 A. Executive vice president and chief operating
21 officer.
22 Q. What kind of work does Trans Can do?
23 A. They are a developer.
24 Q. What kind of projects do they develop?
25 A. Commercial and retail.

**Page 8**

1  Q. Where is their office located?
2  A. Alamo, California.
3  Q. Can you give me the address, please?
4  A. I don't know what the address is.
5  Q. Do you remember what street they are on?
6  A. I could look at my cards. 3189 Danville
7  Boulevard.
8  Q. Mr. Daven, what's your home address, please?
9  A. 63 Foster Drive.
10 Q. What city is that located in?
11 A. San Ramon.
12 Q. And where did you work before you went to work
13 for Trans Can?
14 A. Dick Corporation.
15 Q. When did you start working for Dick
16 Corporation?
17 A. May of '04, I believe.
18 Q. May of 2004?
19 A. Yes.
20 Q. When did you leave Dick Corporation?
21 A. June of '06.
22 Q. When you first started working for Dick
23 Corporation, what was your job title?
24 A. Director.
25 Q. Was that your title when you left Dick

**Page 9**

1  Corporation?
2  A. Yes.
3  Q. What were your duties and responsibilities as
4  a director?
5  A. Overseeing the San Francisco federal building
6  project.
7  Q. The project located near the corner of 7th and
8  Mission?
9  A. Correct.
10 Q. That was for the General Services
11 Administration?
12 A. That's who we were building it for, correct.
13 Q. Where did you work before you worked for Dick
14 Corporation?
15 A. Swinerton Builders.
16 Q. When did you start working for Swinerton?
17 A. I would say around 2002.
18 Q. Did you work for them until 2004?
19 A. Yes.
20 Q. What was your job title with Swinerton when
21 you started?
22 A. Project executive.
23 Q. What was your job title when you left
24 Swinerton?
25 A. Same.

# EXHIBIT 2

Page 1 of 1

**James R. Dravet**

*PC 1*

| | |
|---|---|
| From: | Daven, Fred H. [fhdaven@dickcorp.com] |
| Sent: | Wednesday, August 03, 2005 11:56 AM |
| To: | wlhiggins@dickcorp.com |
| Cc: | Dan Arana; jrdravet@dcmsx03.dickcorp.com |

**Subject:** PCI

Bill - Have you had a chance to speak to the PCI VP about the project? If not, please make this request to do so a priority.

Issues that need to be discussed are;

1) Center Core Framing - They are refusing, (verbally) to perform the work unless a change order is issued. This is a $1.8MM impact to them. It is a potential delay to the project. Must be resolved by next week.

2) Interior design/engineering support not being performed in an adequate or timely manner. This has schedule implications.

3) The Cement Board Panels - PCI is using a lame excuse about having attachment clip issues resolved prior to ordering the units. (must come from Switzerland). They are balking at every opportunity. Their upper management needs to better support this project and plumb up the project staff/management. (PCI will now have to expedite the units and fly them here).

To provide you some history; PCI met with me twice and issued a letter asking that their contract be terminated. They stated that they are losing over $2MM on the project. I informed them that I will not do that. I've been working close with them, helping to support their efforts at every turn. They need to get off the dime.

We may need to look at releasing them from their contract and notifying their bonding company. I have a good sub ready to step in and complete the project. I know this is a last resort, but we need to be prepared to do whatever it takes to get the project completed.

I've worked with PCI on other large and complex projects. They have always performed well and they were never high maintenance. Because we didn't quite handle things correctly at the start of the project and because the subs are financing the project, their taste has really soured. We need them to step up and start getting into gear.

I'm holding off speaking to them in a more stern manner until you speak with their execs. Please let me know your plans.

Thanks

Fred Daven
Director

Dick/Morganti JV
Office - 415.522.1320
Cell - 415.760.7753

PLAINTIFF'S
DEPOSITION
EXHIBIT
8
7/27/06 Daven

8/3/2005

# EXHIBIT 3

Page 34

1  and then split the remainder with PCI?
2     A. I believe that's what it says.
3     Q. Do you recall, did PCI accept this proposal?
4     A. I don't believe they did.
5     Q. Who ended up doing the in-fill framing work,
6  do you remember?
7     A. Yes. We hired a separate subcontractor.
8     Q. Is that Burger Brothers?
9     A. Yes.
10    Q. Did they do the work on a T and M basis?
11    A. Yes.
12    Q. To your knowledge, have they finished the
13 in-fill framing?
14    A. I haven't been on the project since October, I
15 don't know.
16          (E-mail from Fred Daven to W.
              Higgins, Dan Arana, J. Dravet dated
17            August 3, 2005 marked Plaintiff's
              Exhibit No. 8 for identification.)
18
19    MR. IRIKI: For the record, the next exhibit
20 I've marked is Exhibit No. 8, it's a one-page e-mail, it
21 appears to be from Mr. Daven to W.L. Higgins with a CC
22 to Dan Arana and J. Dravet, it's dated August 3, 2005.
23    Mr. Daven, do you recognize this e-mail?
24    A. I'm going through it right now.
25    Q. Take your time, I'm sorry.

Page 35

1     A. Okay.
2     Q. Do you recognize the e-mail?
3     A. Yes.
4     Q. Is this an e-mail that you sent on or about
5  August 3, 2005?
6     A. More than likely.
7     Q. Who is W.L. Higgins?
8     A. Our COO.
9     Q. And who is Dan Arana?
10    A. He is senior vice president.
11    Q. Of Dick Corp?
12    A. Dick Pacific.
13    Q. And who is J. Dravet?
14    A. Project manage.
15    Q. For Dick Corp?
16    A. Yes.
17    Q. He was a project manager for the GSA project?
18    A. Yes.
19    Q. And the second to the last paragraph, you say,
20 "I've worked with PCI in other large and complex
21 projects. They have always performed well and they were
22 never high maintenance." Do you see that?
23    A. Yes.
24    Q. Were you referring to the Franchise Tax Board
25 project in this paragraph?

Page 36

1     A. Yes.
2     Q. Prior to the GSA project, had you worked on
3  any projects with Jim Strout before?
4     A. No.
5     Q. The sentence, the paragraph goes on to read,
6  "Because we didn't quite handle things correctly at the
7  start of the project and because the subs are financing
8  the project, their taste has really soured. We need
9  them to step up and start getting into gear."
10       What do you mean "Because we didn't quite
11 handle things correctly at the start of the project"?
12    A. There is documentation from the subs and our
13 documentation supporting them.
14    Q. What were you referring to, though?
15    A. It was a general statement with the problems
16 that we have had with documentation from subcontractors,
17 and us being able to process the documentation and try
18 to get some resolution to the issues.
19    Q. When you say processing the documentation, are
20 you including change orders in that?
21    A. They could be change order proposals, whatever
22 it is, issues of design, it doesn't matter.
23    Q. You go on to say that, "because the subs are
24 financing the project, their taste has really soured."
25    A. Yes.

Page 37

1     Q. When you say that they are financing the
2  project, do you mean that the subcontractors were being
3  asked to do extra work for which they weren't being paid
4  for?
5     A. Depends on what you call extra work. They
6  were directed to do the work by the GSA, as we were.
7     Q. But the subcontractors, many of them took the
8  position that that work was extra work?
9     A. They took the position that it was extra work.
10    Q. And the GSA wasn't paying for that work,
11 correct?
12    A. The GSA believed there was no entitlement.
13    Q. In turn, Dick/Morganti wasn't paying the
14 subcontractors for that work?
15    A. We were passing down the directives to the
16 subcontractors as our contract states it.
17    Q. To your knowledge, in taking that position,
18 was Dick/Morganti relying on the pay of pay provisions
19 in its contract with its various subcontractors?
20    A. Not to my knowledge.
21    Q. All right. Why don't we take a break, a short
22 break.
23       (Off the record.)
24       (PCI COR Log marked Plaintiff's
         Exhibit No. 9 for identification.)
25

# EXHIBIT 4

Page 38

1  MR. IRIKI: We will go back on the record.
2  I have marked as the next exhibit Exhibit
3  No. 9, a four-page document on Dick/Morganti stationery
4  and it's entitled PCI COR log.
5  Q. Mr. Daven, do you recognize this document?
6  A. Not generally, no.
7  Q. Do you recall seeing any change order logs
8  that Dick/Morganti had generated summarizing change
9  orders submitted by PCI?
10  A. I may have.
11           (Letter from James Strout to Ron
12            Brookfield dated April 6, 2006
                marked Plaintiff's Exhibit No. 10
13              for identification.)
14  MR. IRIKI: For the record, I've marked as the
15  next exhibit Exhibit No. 10, a four-page document. The
16  first page is a letter from the James Strout to Ron
17  Brookfield, it's dated April 6, 2006.
18  Q. First of all, Mr. Daven, do you recognize this
19  letter?
20  A. No, I don't.
21  Q. You never received a copy of this letter?
22  A. I never saw it.
23  Q. Okay. In April of 2006, do you recall PCI
24  ever taking the position that Dick/Morganti wasn't
25  submitting their change order proposals to the owner?

Page 39

1  A. I wasn't on the project at that time.
2  Q. All right. Were you still working for the
3  Dick Corporation in April of 2006?
4  A. Yes.
5  Q. Where were you located?
6  A. Pleasanton.
7  Q. Which project were you working on?
8  A. I wasn't working on a project.
9  Q. What were you doing?
10  A. I was developing a claim.
11  Q. Which claim were you developing?
12  A. Our claim against GSA.
13  Q. On the GSA building?
14  A. Yes.
15  Q. When was the last time you worked at the
16  project site?
17  A. I would say September of '05.
18  Q. September of '05, did you leave to go to
19  Dick's offices in Pleasanton, did you say?
20  A. Yes, we established an office there.
21  Q. When you began working in the Pleasanton
22  office in September of '05, what did you work on?
23  MR. BUDDIE: I am not going to let you ask any
24  specific questions about anything that invades
25  attorney/client or attorney work product privilege.

Page 40

1  MR. IRIKI: Understood.
2  Q. I am asking in general.
3  A. Developing a claim for the subcontractors
4  against GSA.
5  Q. And is that what you worked on until you left
6  Dick Corporation in June of 2006?
7  A. Correct.
8  Q. To your knowledge, did any part of that claim
9  involve any work by PCI?
10  A. Not at that time.
11  Q. Mr. Daven, I am going to go back to something
12  you touched upon earlier in your testimony. I believe
13  you indicated that you have been deposed approximately
14  three times before; is that correct?
15  A. Correct.
16  Q. The first time you were deposed, do you recall
17  when that deposition took place?
18  A. I would say late '70's.
19  Q. Do you remember what that case involved?
20  A. No, I don't.
21  Q. Were you a party to the lawsuit?
22  A. Yes.
23  Q. Do you remember generally what type of case it
24  was?
25  A. I think it was the client that owed me money.

Page 41

1  Q. So you sued the client?
2  A. Yes.
3  Q. The second time you were deposed, when was
4  that?
5  A. The second and third were with Swinerton.
6  Q. The second deposition when you were with
7  Swinerton, did that concern a particular project?
8  A. The Franchise Tax Board.
9  Q. Swinerton was the general contractor on that
10  project?
11  A. Correct.
12  Q. Was Swinerton involved in litigation on that
13  project?
14  A. I believe so.
15  Q. The third time you were deposed, did that
16  involve a particular project?
17  A. The same one.
18  Q. Mr. Daven, when you worked on the GSA project,
19  when you first started working on the project, do you
20  remember if the project was behind schedule?
21  A. I don't remember if it was behind schedule at
22  that time or not. Or if it was, it's not something that
23  I concentrated on at that point.
24  Q. When you left the project, do you recall that
25  the project was behind schedule?