RAYMOND M. BUDDIE (SBN 121353)
TIMOTHY E. ELLIOTT (SBN 210640)
RICK W. GRADY (SBN 235976)
PECKAR & ABRAMSON, P.C.
455 Market Street, 21st Floor
San Francisco, CA 94105
Telephone: (415) 837-1968
Facsimile: (415) 837-1320
Email: rbuddie@pecklaw.com
       telliott@pecklaw.com
       rgrady@pecklaw.com

PATRICK S. HALLINAN (SBN 33838)
KENNETH H. WINE (SBN 142385)
HALLINAN & WINE
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102
Telephone: (415) 621-2400
Facsimile: (415) 575-9930

Attorneys for AMERICAN CASUALTY COMPANY OF READING, PA; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA for the Use and Benefit of WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS, and WEBCOR CONSTRUCTION, INC. dba WEBCOR BUILDERS,<br><br>Plaintiffs,<br><br>vs.<br><br>DICK/MORGANTI, a joint venture; DICK CORPORATION; THE MORGANTI GROUP; AMERICAN CASUALTY COMPANY OF READING, PA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND ALL RELATED COUNTER-CLAIMS AND THIRD PARTY COMPLAINTS; AND CONSOLIDATED ACTIONS | Case No.: 3:07-CV-02564-CRB; Consolidated with Case No.: 3:07-CV-07-04180-EDL<br><br>**SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS**<br><br>Hearing Date: October 19, 2007<br>Hearing Time: 10: a.m.<br>Location: Courtroom 8 (19th Floor)<br>Judge: Hon. Charles R. Breyer |

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.:
3:07-CV-02564-CRB
Consolidated with
Case No. 3:07-CV-07-04180 EDL

Defendants and Third Party Complainants AMERICAN CASUALTY COMPANY OF READING, PA and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA ("Sureties") submit the following supplemental brief in support of their Motion to Stay (the "Motion").[1]

## I. SUMMARY OF THE SURETIES' POSITION

This dispute arises out of the construction of a large and complex Federal government building, known as the San Francisco Federal Building (the "Project"). Defects and deficiencies in the owner's plans and specifications, as well as owner-directed changes, led to constructability issues, schedule delays, and significant cost overruns, each of which permeated and impacted nearly every aspect of the Project. These design errors affected the performance of work by Dick/Morganti, as well as WEBCOR CONSTRUCTION, INC. ("Webcor") and the other Third-Party Defendant Subcontractors (collectively, the "Subcontractors"). The Project owner, the General Services Administration ("GSA"), has benefited from the Project while refusing to pay for its full value. The Sureties' principal (the general contractor Dick/Morganti), is finalizing its comprehensive claim ("Global Claim") for submission to the GSA's Contracting Officer pursuant to the Contract Disputes Act ("CDA"). The Global Claim will likely exceed $50,000,000. Contrary to their collective assertions, the Subcontractors' claims are entirely related to, and will be incorporated within, the Global Claim, with only some very minor exceptions. Dick/Morganti is not wrongfully withholding money from the Subcontractors, and their participation in preparing and finalizing the Global Claim is necessary to compel the GSA to pay monies rightfully owed to Dick/Morganti and the Subcontractors.

**As a <u>legal</u> matter**, any separate prosecution of Subcontractor claims should be stayed pending resolution of the Global Claim with the GSA due to the clear and express dispute resolution clause (the "Disputes Clause") within each Subcontract. Importantly, the Sureties are seeking a temporary *stay* of subcontractor Miller Act actions, not an outright *waiver* of such

---

[1] Since the Sureties are entitled to assert all defenses available to their bonded principal, the Sureties have standing to bring this Motion. (See generally, *Kalfountzos v. Hartford Fire Ins. Co.*, 37 Cal.App.4th 1655, 1658 (1995); California Civil Code section 2809; and *Hussmann Corp. v. Fidelity & Deposit Ins. Co. of MD.*, 999 F.Supp. 734, 748 (D.NJ. 1998).)

1

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-CV-07-04180 EDL

LAW OFFICES
Peckar & Abramson
A Professional Corporation

rights, and this approach is supported by applicable law.

**From an equitable perspective**, the GSA's failure to completely pay for the Project has severely diminished Dick/Morganti's financial viability. While Dick/Morganti recognizes the potential financial hardships for the Subcontractors related to the Project, the Subcontractors are large, sophisticated, and experienced entities that know the construction claims process, as well as the inherent risks in complex construction of this type.[2]

**From a practical standpoint**, Webcor and the Subcontractors present their claims from a limited perspective. Due to the complexity of the claims and the nature of the Project, entitlement to *any* additional compensation and the amount thereof is *directly dependent on a comprehensive schedule and causation analysis linking cost and entitlement*. Moreover, analysis of these issues is dependent on Dick/Morganti's contract with the owner, the performance of the owner's architects and engineers, as well as the performance of other subcontractors and suppliers on the Project. As a result, any separate, simultaneous, and/or piecemeal prosecution of the Subcontractors' claims will lead to inconsistent legal and factual determinations in an inefficient use of the parties' and the Court's resources. Thus, any further litigation by the Subcontractors should be stayed, pursuant to the respective Subcontracts, pending resolution of Dick/Morganti's related claim against the GSA.

## II. FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. Design Errors And Resulting Cost And Schedule Impacts

The original price of the General Contract, including the construction phase, was $137,346,965. The GSA's design documents contained numerous critical defects and deficiencies which led to an increase in the amount of labor, materials, and equipment needed for the Project. This resulted in severe cost overruns for probably all who worked on the Project. As PCI explains, this became a "...massive $200,000,000.00 federal construction

---

[2] As stated on Webcor's website (http://www.webcor.com/about_history.html), Webcor has over 800 employees and $1.3 billion in open contracts. Per PCI's parent company's website (www.pcg.com), the company is "Ranked #1 U.S. Wall and Ceiling Contractor" and "Ranked #10 Largest Specialty Contractor in the U.S."

[3] The facts are more thoroughly set forth in the supporting October 5, 2007 Declaration of Michael T. Ambroso and exhibits thereto ("Ambroso Decl.").

2

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL

1  project." (See PCI's September 21, 2007 brief, page 6, line 6.) The defective design elements
2  include: improper and insufficient details on the amount and location of steel rebar for the
3  foundations and structure; insufficient information regarding the finished surface of the
4  concrete; incomplete design for the interior and exterior walls, including the load bearing
5  components; incomplete design of the window wall and sunscreen; and problems with the
6  design of the mechanical and electrical systems. (See Ambroso Decl. ¶'s 5-11.)

7  Webcor completed its work approximately nine months late. This initial delay affected
8  all subsequent subcontractors since they could not perform their work as originally scheduled.
9  And, as the other subcontractors began working, they discovered defects in the plans and
10 specifications for their trade work, which caused further delays and cost increases. Despite
11 Dick/Morganti's requests for more time for the total delay of approximately 415 days, the GSA
12 granted only 58 days of extension. The subcontractors' schedule claims, include, for example,
13 PCI's claim for a 461 calendar day extension. (See Ambroso Decl., ¶ 26.)

14  **B.  Change Order Requests From Dick/Morganti To The GSA**

15  Dick/Morganti presented to the GSA approximately 680 change order requests
16 ("CORs"), totaling in excess of $25,000,000. Almost every one of these CORs includes
17 amounts sought by Dick/Morganti on behalf of its various subcontractors and suppliers for this
18 changed or added work. Unfortunately, the GSA has not promptly or fairly addressed and dealt
19 with the large number of CORs on this Project. In many cases, the GSA has simply rejected the
20 CORs and directed Dick/Morganti and the subcontractors to incur the costs of performing the
21 disputed work. (See Ambroso Decl., ¶'s 16-18.)

22  In numerous other instances, per the Equitable Adjustment provision, the GSA
23 acknowledged that the COR's represent changed or added work, but the GSA then unilaterally
24 dictated how much it would pay Dick/Morganti and the subcontractors for the changed or added
25 work. In all but a few instances, these payments only amounted to 10% to 20% of the amounts
26 requested by Dick/Morganti and its subcontractors for that work. The GSA's inequitable
27 handling of the CORs placed a huge negative financial burden on Dick/Morganti and the
28 subcontractors, as the amounts the GSA unilaterally determined did not nearly compensate for

3

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-CV-07-04180 EDL

the actual costs of the changed and added work. (See Ambroso Decl., ¶ 16.)

Given this scenario, Dick/Morganti is preparing to present its Global Claim so that it and its subcontractors can be properly compensated for additional work requested and received.

### III. CERTIFICATIONS AND STATUS OF CLAIMS[4]

#### A. Final Decisions By The GSA's Contracting Officer

The Contracting Officer has issued five Final Decisions and Dick/Morganti has timely appealed each of these decisions to the U.S. Civilian Board of Contract Appeals ("CBCA"). On March 22, 2007, the CBCA issued an Order regarding three of the five appeals, and suspended the appeals until March 15, 2008 so that the comprehensive Global Claim could first be presented to the Contracting Officer, rather than presenting claims and prosecuting appeals in a piecemeal fashion. The CBCA treated the other two appeals in the same manner, issuing its Order on July 12, 2007. (See Ambroso Decl. ¶ 22.) As detailed below and in the attached Declaration, Dick/Morganti has drafted its Global Claim to address the disputed COR's and Final Decisions, and anticipates submitting it in November or December 2007.

#### B. Subcontractor Certifications

The Contracting Officer has requested additional time to review the certified claim Dick/Morganti submitted on behalf of Webcor on June 13, 2007. If this claim is denied, Dick/Morganti will timely appeal. The entitlement issues are being integrated in the Global Claim.

PCI has submitted a "certification," but PCI's description does not meet the requirements of the Disputes provision of the General Contract. Additionally, PCI's problems with its pricing for CORs have delayed or prevented the submission of some CORs, and certain elements of PCI's original scope of work have been deleted, therefore reducing its subcontracted balance. (See Ambroso Decl., ¶'s 38–39.) Notwithstanding these issues, PCI's claim is being incorporated into the Global Claim, as PCI's extra work is directly related to the GSA's erroneous design and GSA issued changes. Dick/Morganti completely rejects PCI's

---

[4] See Ambroso Decl. ¶'s 14–28 and 32–46 for a detailed breakdown of the claims process and status, as well as details as to each Subcontractor's certification, or lack thereof.

4

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL

unsupported, false assertion that cure notices are "extremely rare" on Projects of this type and that Dick/Morganti "admitted" to mismanaging the Project. (See Ambroso Decl., ¶'s 36-41.)

Boyett has submitted a proper certification and its claim is being incorporated into the Global Claim. Neither Marelich, Permasteelisa, nor Rosendin have certified their claims, but Dick/Morganti will work with each of them to incorporate their claims into the Global Claim.

### C.  Current Status Of Global (Omnibus) Claim

Dick/Morganti has drafted the entitlement section of its Global Claim, which by itself approaches 100 pages. Dozens of exhibits, numerous pages of cost documentation, and detailed electronic schedule data, among other material, will support this document. As more supporting, incoming data is analyzed, the length of the entitlement section will likely increase. Dick/Morganti anticipates certifying and submitting the Global Claim in November or December 2007, and expects the total amount sought by the Global Claim, including Subcontractor claims, will be approximately $50,000,000 to $60,000,000. Finalizing the Global Claim is largely dependent on further analysis and data from Dick/Morganti's subcontractors and suppliers for the Project because of the interrelated nature of the work. For example, each of the Subcontractors has schedule extension and labor productivity impact claims.

The labor productivity impacts or "labor inefficiency" Claims arise from work performed out of sequence as contemplated by the original, unmodified plans and specifications. These claims also arise from "trade stacking," which occurs, for example, when both the electrical trade workers and the plumbing trade workers perform their tasks in the same areas and at the same time.

Under the original schedule, the subcontractors could simultaneously occupy different areas of the Project to productively complete their work. As the initial, GSA-caused delays occurred, however, certain tasks needed to be expedited, often leading to trade stacking. These labor inefficiency issues spread to nearly all trades on the Project. This decreased the overall efficiency of the work, causing Dick/Morganti and its subcontractors to incur additional costs through added labor hours, and increased the time needed to complete the Project. Given the overlapping and interrelated nature of the claims, the Subcontractors' final analyses and

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL

5

supporting data are essential in finalizing and prosecuting the Global Claim against the GSA. (See Ambroso Decl. ¶'s 23-28.)

## IV. LEGAL DISCUSSION

### A. The Disputes Clause In Each Of The Subcontracts Expressly Mandates The Exhaustion Of Administrative Remedies, Via A Stay, Prior To Litigation

In bringing this Motion, the Sureties rely on Paragraph 38 of the Webcor Subcontract, the Disputes Clause, which expressly binds Webcor to the terms of the dispute resolution provision in the General Contract. The Disputes Clause in the Webcor Subcontract states:

> If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to arbitration or **some other dispute resolution procedure specified in the General Contract and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees (i) to join in and be bound by the** same arbitration or **other disputes resolution procedure** upon written request by the Contractor **and (ii) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted.** If the Owner refuses to allow this joinder of the Subcontractor, the Subcontractor agrees (i) to cooperate with the Contractor, (ii) to assist in the discovery and other preparations for the hearing, (iii) to make available its employees for testimony before or at the hearing, (iv) to share proportionately the costs and legal fees associated with the preparation for and execution of the hearing *to the extent mutually agreed upon related to the amount of damage being pursued by the Contractor on Subcontractor's behalf,* (v) to stay any action filed by the Subcontractor *as long as the Subcontractor's position is being diligently pursued by Contractor in the Owner dispute and the Subcontractor's positions are being carried forward through the Contractor's prosecution of the claims with the Owner* until the dispute resolution and appeals process between the Contractor and the Owner is exhausted, and (vi) to be bound by the results of the arbitration or other disputes resolution procedure as it relates to the dispute, controversy, or claim of the subcontractor *to the extent that Subcontractor cooperated and was actively involved in this dispute resolution process*. [5]

(Underline and italics in original. Bold emphasis added.) (Ambroso Decl. ¶ 30.) Interestingly, none of the Subcontractors claim that the language of the Disputes Clause is ambiguous, unclear, or something other than an express agreement to stay any separate action. Indeed, in their various briefs, the Subcontractors do not even discuss or quote the language of the

---

[5] Nearly identical provisions were included in each of Subcontracts; however, Webcor modified its Disputes Clause as denoted by the presence of italicized and underlined font.

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL

Disputes Provision. Rather, the Subcontractors rely on generalizations and citation of inapplicable case law with regard to the Disputes Clause. In reality, the Disputes Clause is an express and detailed disputes provision rather than a general incorporation clause.

The purpose of the Disputes Clause is to require consistent resolution of claims involving parties not in privity and not subject to jurisdiction in the same forums. Thus, the Subcontractors are not without a remedy in this case. Indeed, the Disputes Clause sets forth a specific, clear, express, and comprehensive dispute resolution process, and their interests will be aggressively pursued by Dick/Morganti through the CDA process.

The clear intent of the parties as manifested within the respective Subcontracts should be enforced by the Court and to do otherwise would promote an injustice.

**B.    The Cases Cited By The Subcontractors In Support Of Their Opposition Actually Support The Sureties' Motion To Stay This Case**

The Disputes Clause is completely different from the disputes clauses that are in the cases cited by the Subcontractors. The substantive differences in these distinguishable cases cannot be understated. The cases, generally, stand for the proposition that where a dispute resolution provision within a prime contract is incorporated into a subcontract by way of a general incorporation by reference provision, the incorporated dispute resolution provision does not operate to bind the subcontractor to such dispute resolution process and, further, cannot operate as a waiver of the subcontractor's Miller Act rights. Another critical distinction is the fact that the Sureties do not seek a wholesale "waiver" of Miller Act rights but, rather, seek a temporary stay of these rights while administrative procedures are carried out. In any event, the cases cited by the Subcontractors are inapposite and actually support the Motion.

For example, in *DDC Interiors, Inc. v. Dawson Constr. Co., Inc.* (D.Colo. 1995) 895 F.Supp. 270 ("*DDC*"), the Colorado District Court acknowledged that a claimant could waive its Miller Act rights in certain circumstances:

> [The right] to sue under the Miller Act may be waived by clear and express provisions in the contract between the prime contractor and the subcontractor. [Citation.] However, courts "do not favor finding that a subcontractor has contractually abandoned his rights under the act." [Citation.] Indeed, such a "drastic curtailment" of a subcontractor's rights will not be read into a general

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-CV-07-04180 EDL

agreement by the subcontractor to be bound by the terms of the prime contract. [Citation.]

(272–273.) *DDC* is distinguishable from this matter in that *DDC* involved a general, *i.e.*, non-specific, subcontract provision that purported to *completely waive* the subcontractor's Miller Act rights. Here, the subcontract provision is a *specific* clause that does not purport to relinquish Miller Act rights. Similarly, *Fanderlik-Locke Co. v. U.S.* (10th Cir. 1960) 285 F.2d 939 is inapposite because the subcontract involved therein did not include a "disputes" clause such as the Webcor Subcontract but, rather, merely an incorporation by reference clause. (*Id.* 942.) Indeed, the entire line of cases cited by the Subcontractors follow substantially the same line of analysis, *i.e.*, a general incorporation clause cannot "waive" Miller Act rights, but a specific, clear, and express clause can. Since the Disputes Clause is inarguably "specific, clear, and express," it follows that these cases support the Sureties' position that separate Subcontractor litigation should be stayed.

Several other authorities support the Sureties' requested relief. *Moretrench American Corp. v. S.J. Groves & Sons Co.* (7th Cir. 1988) 839 F.2d 1284 ("*Moretrench*") involved a Miller Act suit by a subcontractor, and the district court stayed the matter on the request of the prime contractor, pending resolution of disputes between the prime contractor and the Corps of Engineers (the owner). Although the Seventh Circuit Court disposed of the appeal on procedural grounds – therefore leaving the stay in place – Judge Posner nonetheless approved of the district court's stay of the case:

> The stay in this case is much like a stay granted because a plaintiff has failed to exhaust administrative remedies, or because the dispute is within the primary jurisdiction of an administrative agency. Indeed, the stay in this case may *be* such a stay rather than just an analogy to it – for is not the dispute process between the prime contractor and the Corps of Engineers, with appeal to a board of contract appeals or to the Claims Court, an administrative procedure that [the subcontractor] must allow to be completed before it can obtain damages in court?

(*Moretrench, supra,* 839 F.2d 1284, 1288.) Further, the disputes provision in *Moretrench* was likely not as explicit as the Disputes Clause herein:

[T]he disputes clause in the contract between [the prime contractor] and [the

8

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-CV-07-04180 EDL

subcontractor] provided that in the event of a dispute between the parties that involved the owner, [the subcontractor] would be bound by the determination of responsibility made in accordance with the procedures set forth in the contract between [the prime contractor] and the Corps of Engineers. That contract provided for initial determination by a federal contracting officer with a right of appeal to a board of contract appeals or to the United States Claims Court.

(*Id.* 1285.) Likewise, in *R. Rudnick & Co. v. Daniel, Urbahn, Seelye & Fuller* (N.D.IL. 1973) 357 F.Supp.853 ("*Rudnick*"), the court barred a subcontractor claimant from proceeding with a Miller Act claim until administrative remedies had been fully exhausted, where the disputes clause in the subcontract expressly required such exhaustion. In addition, the court did not view the stay as a "waiver" of the subcontractor's Miller Act rights:

> While plaintiff is not barred from filing this suit, it is barred from proceeding further until it exhausts its administrative remedies. It explicitly agreed to follow those procedures and it cannot now claim that it is not obligated to do so. At this point in the lawsuit it does not appear that requiring it to do so would be contrary to the purposes of the Miller Act. [¶] Thus, this court finds that plaintiff has not waived all its Miller Act rights and therefore this proceeding will be stayed pending the outcome of the disputes clause proceeding.

(*Id.* 862.) Thus, as the Sureties have consistently maintained, a stay pending administrative remedies does not waive or otherwise diminish the Subcontractors' ultimate Miller Act rights.

Taken together, these cases clearly require that this matter be stayed.[6]

## V.   EQUITABLE CONSIDERATIONS

Staying the Subcontractors' prosecution of their claims pending exhaustion of the administrative process will avoid the inequities if Dick/Morganti has to go down two legal paths, both originating from the same complex facts. Moreover, this will advance the purposes of both the parties' contracts. "The general rule is that parties are free to contract for dispute resolution procedures which, in effect, turn breach of contract claims into claims for relief under the contract." (*Seal & Co., Inc. v. A.S. McGaughan Co.* (4th Cir. 1990) 907 F.2d 450, 454.) "Parties are bound to exhaust such procedures unless they are 'inadequate or unavailable,' as,

---

[6] Permasteelisa's focus on 40 U.S.C. § 3133 subd. (c) is misplaced, as that subsection deals with a *waiver*, which is not what the Sureties seek.

9

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL

LAW OFFICES
Peckar & Abramson
A Professional Corporation

for example, where the Contracting Officer is unwilling to act. [Citation]." (*Ibid.*) Further, the "inadequacy or unavailability of administrative relief must clearly appear before a party is permitted to circumvent his own contractual agreement [Citation]." (*Ibid.*) Thus, to set aside the express contractual agreement of the parties would be an injustice.

If this case is not stayed, Dick/Morganti will be forced to pursue its remedy against the GSA <u>and</u> simultaneously litigate with the Subcontractors in a separate forum, which would likely lead to multiple inconsistent results, all while expending massive resources. Although PCI attempts to make an issue of a statement, taken out of context, that "the Project was being financed by the Subcontractors," none of the Subcontractors note that the GSA has failed to pay amounts due solely Dick/Morganti, which has caused Dick/Morganti's huge losses on this Project. Thus, Dick/Morganti is not only in the same boat as the Subcontractors, but it also has a tremendous incentive to have this dispute fully resolved as expeditiously as possible. This common goal will only be frustrated if this dispute is resolved in piecemeal fashion.

## VI. CONCLUSION

The practical and sensible result is a stay of this action. For the foregoing reasons the Sureties respectfully request that their Motion be granted.

Dated: October 5, 2007                               PECKAR & ABRAMSON, P.C.


By: _____/s/_____
Raymond M. Buddie
Timothy E. Elliott
Rick W. Grady
Attorneys for AMERICAN CASUALTY COMPANY OF READING, PA; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

10

LAW OFFICES
Peckar & Abramson
A Professional Corporation

SUPPLEMENTAL BRIEF OF AMERICAN CASUALTY COMPANY OF READING, PA; AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA RE: MOTION TO STAY PROCEEDINGS
50395.01/10/05/07

Case No.: 3:07-CV-02564-CRB
Consolidated with
Case No.: 3:07-CV-07-04180 EDL