1  RAYMOND M. BUDDIE      (SBN 121353)
   TIMOTHY E. ELLIOTT      (SBN 210640)
2  RICK W. GRADY         (SBN 235976)
3  PECKAR & ABRAMSON, P.C.
   455 Market Street, 21st Floor
4  San Francisco, CA 94105
   Telephone: (415) 837-1968
5  Facsimile: (415) 837-1320
6  Email: rbuddie@pecklaw.com
         telliot@pecklaw.com
7        rgrady@pecklaw.com

8  PATRICK HALLINAN      (SBN 33838 )
   KENNETH WINE         (SBN 142385)
9  LAW OFFICES OF HALLINAN & WINE
10 345 Franklin Street
   San Francisco, CA 94102
11 Telephone: (415) 621-2400
   Facsimile: (415) 575-9930
12 Email: butchhallinan@hotmail.com
13        kenwine@hotmail.com

14 Attorneys for AMERICAN CASUALTY COMPANY OF READING, PA; and NATIONAL
   UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
15
                  UNITED STATES DISTRICT COURT
16
       NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
17

18 UNITED STATES of AMERICA for the Use        Case No.: 3:07-CV-02564-CRB;
   and Benefit of WEBCOR CONSTRUCTION,         Consolidated with Case No.: 3:07-CV-07-
19 INC. dba WEBCOR BUILDERS, and               04180 EDL
   WEBCOR CONSTRUCTION, INC. dba
20 WEBCOR BUILDERS,
                                               DECLARATION OF MICHAEL T.
21              Plaintiffs,                     AMBROSO IN SUPPORT OF
                                               SUPPLEMENTAL BRIEF OF
   vs.                                         AMERICAN CASUALTY COMPANY OF
22                                             READING, PA; AND NATIONAL UNION
   DICK/MORGANTI, a joint venture; DICK        FIRE INSURANCE COMPANY OF
23 CORPORATION; THE MORGANTI                    PITTSBURGH, PA RE: MOTION TO
   GROUP; AMERICAN CASUALTY                     STAY PROCEEDINGS
24 COMPANY OF READING, PA;
   NATIONAL UNION FIRE INSURANCE
25 COMPANY OF PITTSBURGH, PA, and
   DOES 1 through 10, inclusive,
26
                Defendants.
27
   AND ALL RELATED COUNTER-CLAIMS;
28 THIRD PARTY COMPLAINTS; and
   CONSOLIDATED ACTIONS.

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

1    I, Michael T. Ambroso, declare as follows:

2        1.    Unless otherwise indicated herein, the facts set forth below are personally known

3    to me, and if called upon, I am willing and able to testify in support of these facts.

4        2.    I am the Assistant General Counsel and Assistant Secretary for Defendant Dick

5    Corporation. Dick Corporation is the managing partner of Defendant Dick/Morganti, a Joint

6    Venture formed between Defendants Dick Corporation and Morganti Texas, Inc.

7    Dick/Morganti's sureties for the construction project, which is the subject matter of this lawsuit,

8    are, Defendants and Third Party Complainants, American Casualty Company of Reading, PA

9    ("American"), and National Union Fire Insurance Company of Pittsburgh, PA ("National").

10        3.    On behalf of Dick/Morganti, I have been involved in the San Francisco Federal

11    Building Project (the "Project") since 2003. I have detailed knowledge of the Project and the

12    events that give rise to this action, as well as detailed knowledge of Dick/Morganti's

13    relationship with the owner of the Project, the General Services Administration of the United

14    States Government ("GSA" or "Owner").

15        4.    I have detailed knowledge of Dick/Morganti's history of presenting change order

16    requests to the GSA for the Project, as well as the current status of Dick/Morganti's preparation

17    of its Global Claim for the Project. Additionally, I have detailed knowledge of Dick/Morganti's

18    relationship with its subcontractors for the Project, including the Third Party Defendants: Boyett

19    Construction, Inc. ("Boyett"); Marelich Mechanical Co. Inc. ("Marelich"); Performance

20    Contracting, Inc. ("PCI"); Permasteelisa Cladding Technologies ("Permasteelisa"); and

21    Rosendin Electric, Inc. ("Rosendin"). I am also knowledgeable in the subcontractors'

22    performance on the Project, and issues that may have impacted that performance.

23                            **PROJECT BACKGROUND**

24        5.    On May 6, 2002, the GSA awarded Dick/Morganti the Base Contract on this

25    Project, the scope of work consisting of a constructability review, participation in design

26    resolution, site excavation, the development of a plan for removal of contaminated soil from the

27    site, and the actual removal of that contaminated soil. On February 25, 2003, the GSA then

28    awarded Dick/Morganti the construction phase of the Project. The total value of the Base

2

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1    General Contract and the construction phase equaled $137,346,965. The contract price was
2    based on a set of drawings and specifications, which the GSA represented and warranted as
3    being complete and accurate with which to construct the Project.

4       6.    The Project is approximately 605,000 square feet and includes an 18-story office
5    tower. The structural frame is made of steel reinforced concrete. The Project also includes a
6    four-story annex, a separate public café, and a daycare facility. The building's design includes a
7    complex natural ventilation system with, among other features, a full sunshade on the south
8    façade of the tower, automatic window openers, and waved or "scalloped" concrete ceilings on
9    the interior.

10      7.    The original completion date for the Project was November 12, 2005, but the
11   GSA recognized the Project as substantially complete on February 28, 2007, and an official
12   dedication ceremony was held on July 7, 2007.

13                          **THE GSA'S DEFECTIVE DESIGN**

14      8.    As the Project began, Dick/Morganti and its subcontractors and suppliers
15   attempted to install the work in accordance with the plans and specifications that the GSA and
16   its architects and engineers provided. As the work progressed, however, Dick/Morganti and its
17   subcontractors discovered numerous defects in the plans and specifications for which the GSA
18   is responsible. Thereafter, the GSA issued numerous changes to the design that increased the
19   scope of Dick/Morganti's and its subcontractors' work. Additionally, the GSA directed
20   Dick/Morganti and its subcontractors to perform significant additional work, which
21   Dick/Morganti believes was never part of its scope of work.

22      9.    Due to the design defects, and as the GSA issued changes to the plans and
23   specifications, Dick/Morganti and its subcontractors submitted Requests for Information
24   ("RFIs") to the GSA. The RFIs sought clarification of the plans and specifications, as well as
25   information about the insufficiencies and conflicts in the GSA's design. Dick/Morganti
26   submitted approximately 4,200 RFIs to the GSA on the Project, and these RFIs relate to the
27   thousands of discrete problems with the plans and specifications.

28   ///

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

| DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL BRIEF RE: MOTION TO STAY PROCEEDINGS 50283.01 | Case No.: 3:07-CV-02564-CRB Consolidated with Case No.: 3:07-CV-07-04180 EDL |

10. The defects in the GSA's plans and specifications touched almost every aspect of the Project, including, but not limited to: improper and insufficient details on the amount and location of steel rebar for the foundations and structure; insufficient information regarding the finished surface of the concrete; incomplete design for the interior and exterior walls, including the load bearing components; incomplete design of the window wall and sunscreen; and problems with the design of the mechanical and electrical systems.

11. These defects and the disputed additional work directed by the GSA caused Dick/Morganti and its subcontractors to perform substantial additional work, including additional design work and the provision of additional labor and materials which were not part of the original scope of work. The substantial additional work also impacted the Project schedule and caused interruptions and delays to the sequencing of the trade work, which thereby decreased the efficiency in performing the work. All of this resulted in Dick/Morganti and the subcontractors incurring substantial, additional labor, equipment, and material costs.

### SUBMISSION OF CHANGE ORDER REQUESTS

12. Due to the design defects and the added work directed by the GSA, the costs and amount of time necessary for completing the work increased dramatically for D/M and its subcontractors. Given the additional and changed work, Dick/Morganti, on behalf of itself and its subcontractors, presented change order requests ("CORs") to the GSA throughout the Project. The purpose of submitting CORs is to seek adjustments to the General Contract for additional compensation and time for completing the work. In other words, the CORs are based on changed or added work, which caused Dick/Morganti, its subcontractors, and suppliers to incur extra costs for labor, materials, equipment and/or other costs. .

13. Dick/Morganti presented to the GSA approximately 680 CORs totaling in excess of $25,000,000 for this Project. Almost every one of these CORs includes amounts sought by Dick/Morganti on behalf of its subcontractors and suppliers for this changed or added work.

### PROCEDURE FOR CORs UNDER THE GENERAL CONTRACT

14. The CORs were submitted pursuant to the Equitable Adjustments clause of the General Contract, which is entitled "General Services Acquisition Regulation 552.243-71." A

4

| DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL BRIEF RE: MOTION TO STAY PROCEEDINGS 50283.01 | Case No.: 3:07-CV-02564-CRB Consolidated with Case No.: 3:07-CV-07-04180 EDL |
|---|---|

1    true and correct copy of the Equitable Adjustments clause from the General Contract is attached

2    hereto as **Exhibit A**.

3         15.    Pursuant to the Equitable Adjustments clause and Dick/Morganti's Total

4    Evaluated Price proposal for the Project, Dick/Morganti, in presenting the CORs, is entitled to

5    add an 18% markup fee on the Direct Costs Dick/Morganti and its subcontractor incurred in

6    performing the changed or added work. Clearly, Dick/Morganti has a financial incentive in

7    passing on CORs from its subcontractors up to the GSA, as the approval and payment of CORs

8    increase the amount payable to both Dick/Morganti and its subcontractors and suppliers.

9              **THE CONTRACTING OFFICER'S DECISIONS ON CORs**

10        16.    Unfortunately, the GSA has not, in Dick/Morganti's opinion, promptly or fairly

11   addressed and dealt with the large number of CORs on this Project. In many cases, the GSA

12   has simply rejected the CORs and directed Dick/Morganti and the subcontractors to incur the

13   costs of performing the disputed work. In a large number of other instances, the GSA has (per

14   the Equitable Adjustment provision) acknowledged that the CORs represent changed or added

15   work, but the GSA then unilaterally dictated how much it would pay Dick/Morganti and the

16   subcontractors for that changed or added work. In all but a few instances, the amount that the

17   GSA unilaterally paid on the CORs amounted to 10% to 20% of the amounts requested by

18   Dick/Morganti and its subcontractors for that changed or added work. Because those amounts

19   unilaterally dictated by the GSA did not come close to compensating for the actual costs of

20   performing the changed and added work, the GSA's inequitable handling of the CORs for the

21   Project created a huge negative financial burden for Dick/Morganti and the subcontractors.

22        17.    Based on the submission of CORs, approximately 230 Change Orders (both

23   bilateral and unilateral) were issued by the GSA to Dick/Morganti on this Project. Those

24   change orders increased the General Contract Price by approximately $10,600,000.

25   Additionally, through those change orders, the GSA agreed to extend the original completion

26   date to January 9, 2006. The unresolved CORs remain in dispute since the GSA has disputed

27   Dick/Morganti's entitlement to additional compensation and time, or at least disputed the

28   amount of additional compensation due to Dick/Morganti and its subcontractors.

5

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1    18.    Despite not reaching an agreement with the GSA on the pricing for many of the

2    CORs, Dick/Morganti and the subcontractors were required to proceed with the work under

3    protest, pursuant to the Changes Clause (FAR 52.243-4) of the General Contract.

4    Consequently, Dick/Morganti and its subcontractors have many millions of dollars tied up in

5    unresolved or disputed CORs, which will be included as part of Dick/Morganti's Global Claim

6    to the GSA.

7    19.    Pursuant to the Contract Disputes Act (41 U.S.C., § 601 et seq.), a Contracting

8    Officer's Final Decision must be obtained on any contractor claim before that decision can be

9    appealed to the Board of Contract Appeals. (41 U.S.C., § 606.)  During this Project, the

10   Contracting Officer issued five (5) separate Final Decisions on Dick/Morganti's claims,

11   including some of which were presented as CORs.

12                      **APPEAL OF FINAL DECISIONS**

13   20.    The Contract Disputes Act requires that Dick/Morganti appeal any Final

14   Decision by the Contracting Officer with which it does not agree within 90 days of that

15   decision.  (41 U.S.C., § 606.)  Dick/Morganti has filed appeals for the five Final Decisions to

16   the U.S. Civilian Board of Contract Appeals ("CBCA").

17   21.    On March 22, 2007, the CBCA issued an Order regarding three of the five

18   appeals, and suspended the appeals until March 15, 2008.  The suspension was ordered to allow

19   Dick/Morganti time "to prepare and to submit to the Contracting Officer an omnibus claim" and

20   to allow the Contracting Officer time to "consider the claim and render a decision on the claim."

21   A true and correct copy of the CBCA's March 22, 2007 Order is attached hereto as **Exhibit B**.

22   22.    On July 12, 2007, the CBCA issued an Order regarding Dick/Morganti's appeal

23   of the other two Final Decisions and also suspended these appeals to March 15, 2008, per the

24   terms of the March 22, 2007 Order.  A true and correct copy of the CBCA's July 12, 2007

25   Order is attached hereto as **Exhibit C**.

26                  **CURRENT STATUS OF GLOBAL (OMNIBUS) CLAIM**

27   23.    Dick/Morganti has completed a draft of the entitlement section of its Global

28   Claim, which approaches 100 pages in length.  This document will be supported by dozens of

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1    exhibits, numerous pages of cost documentation, and detailed electronic schedule data, among

2    other material. As more supporting data is received and analyzed, the length of the summary

3    will likely increase.

4         24.    Dick/Morganti anticipates certifying and submitting its Global Claim during

5    November or December 2007, and expects that the total amount sought by the Global Claim

6    (including subcontractor amounts) will be approximately $50,000,000 to $60,000,000.

7         25.    Finalizing the Global Claim is, in large part, related to and dependent on further

8    analysis and data from Dick/Morganti's subcontractors and suppliers for the Project because of

9    the interrelated nature of the work. As an example, Webcor and each of the Third Party

10   Defendants have schedule extension claims and labor productivity impact claims.

11        26.    The schedule claims for each subcontractor must be considered in

12   Dick/Morganti's analysis of the approximately 415 calendar-days of delay. To date, the GSA

13   has only granted 58 days in non-compensable time extensions, and Dick/Morganti will be

14   seeking compensation for most, if not all, of the 415 additional days required for the Project.

15   The subcontractors' schedule claims must be harmonized with Dick/Morganti's overall

16   schedule claim, including, for example, PCI's claim that they are entitled to a 461 calendar-day

17   time extension and almost $2,000,000 for additional time related costs.

18        27.    A significant portion of the subcontractors' claims on the Project can be

19   categorized as "labor inefficiency" claims or "labor productivity impact" claims. These claims

20   arose from work performed out of sequence, i.e., work not performed in the same order and the

21   same amount of time as contemplated by the original, unmodified plans and specifications.

22   Productivity is also negatively impacted by "trade stacking" when, for example, both the

23   electrical trade workers and the plumbing trade workers are trying to perform their tasks in the

24   same areas at the same time. Under the original schedule, and before the defective plans and

25   specifications created impacts to the work, the work was scheduled so that the trades could

26   occupy certain areas of the Project and productively complete their work without having to

27   "work around" other trades. As initial, GSA-caused delays and impacts occurred, however,

28   certain tasks needed to be completed in an expedited manner to make up for lost time. This

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1   catch-up work often involved having field personnel and their equipment working in the same

2   area at the same time.  In many cases, this decreased the efficiency of the work, and often

3   caused Dick/Morganti and its subcontractors to incur additional costs through added labor

4   hours.  These labor inefficiency problems were experienced by almost each trade on the Project

5   and significantly impacted the overall increased costs and time for completing the Project.

6       28.     Given the interrelated nature of the claims, the subcontractors' analyses and

7   supporting data are essential in finalizing and prosecuting the Global Claim against the GSA.

8   **THE DISPUTES CLAUSES IN THE SUBCONTRACTS**

9       29.     Article 38, subsection (d), of the subcontracts is a material term upon which

10  Dick/Morganti relies, given the complex, interrelated nature of the claims on this Project.  Dick

11  Corporation includes exact or very similar language in all of its subcontracts for large projects.

12      30.     Webcor negotiated changes to Article 38 and, like the other subcontractors,

13  agreed to be bound by the terms of the subcontract.  A true a correct copy of Article 38 from

14  Webcor's subcontract, including the underlined modifications to the subcontract, is attached

15  hereto as **Exhibit D**.

16      31.     Attached hereto as **Exhibit E** is a true and correct copy of Article 38 from the

17  PCI subcontract.  This clause is identical to Article 38 in Dick/Morganti's subcontracts with

18  Boyett, Permasteelisa, and Rosendin.  Article 38 in Dick/Morganti's subcontract with Marelich

19  is identical to Article 38 in the PCI subcontract, except for the deletion of subsection (g).

20  **SUBCONTRACTOR CLAIMS**

21      32.     On July 24, 2007, Dick/Morganti requested Webcor, Rosendin, Boyett, PCI,

22  Permasteelisa, and Marelich to identify their claims concerning the actions by the GSA and its

23  agents relating to the Project, present these claims to Dick/Morganit, and join with

24  Dick/Morganti to cooperatively pursue their claims, pursuant to the provisions of their

25  respective subcontracts with D/M.  A true and correct copy of these July 24, 2007 requests to

26  identify, present, and cooperatively pursue these claims are attached hereto as **Exhibit F**.

27      33.     The problems Webcor encountered in placing, forming, and pouring the steel-

28  reinforced concrete foundation and structural beams dramatically affected the work performed

8

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1    on the Project by each of the Third Party Defendants—Boyett, Marelich, PCI, Permasteelisa and

2    Rosendin. Until Webcor completed a substantial amount of the foundation and structure, the

3    Third Party Defendants could not proceed with the bulk of their work on the Project. Webcor,

4    Bay Area Reinforcing (the rebar subcontractor), and Dick/Morganti have all stated their beliefs

5    that the GSA's design deficiencies and actions caused the delays and negative impacts to the

6    foundations and structure. Indeed, Webcor's claim for delays and impacts to the concrete work

7    is currently before the GSA awaiting the Contracting Officer's Final Decision. Webcor's work

8    was completed approximately nine months later than scheduled. The late completion of

9    Webcor's foundations and structure had a dramatic impact on the ability of the Third Party

10   Defendants to timely start and complete their respective work. All of the resultant added costs

11   incurred by the Third Party Defendants are related to the entitlement for Webcor's claim, and

12   should properly be presented to the GSA as additional damages caused by the GSA's design

13   deficiencies and actions.

**BOYETT'S CLAIM**

14

15       34.    Boyett submitted its certified claim to Dick/Morganti on July 18, 2007, and its

16   certification is in compliance with the Disputes clause of the General Contract. Boyett's claim

17   is currently being analyzed and will be presented to the GSA as part of Dick/Morganti's Global

18   Claim.

**MARELICH'S CLAIM**

19

20       35.    Marelich has not yet submitted a certified claim to Dick/Morganti. Based on

21   discussions with Marelich, Dick/Morganti believes Marelich's claims against the GSA consist

22   of: a) damages arising out of the delays and productivity impacts caused by the GSA's design

23   deficiencies on the Project; and b) costs of the changed and added work for which Marelich has

24   not been paid, and which are included in the disputed and unresolved CORs to the GSA on the

25   Project. These Marelich claims will be presented to the GSA as part of Dick/Morganti's Global

26   Claim.

27   / / /

28   / / /

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1   ///

2   <u>**PCI'S CLAIM**</u>

3      36.    PCI submitted its claim and certification to Dick/Morganti on June 29, 2007.

4 This certification does not meet the requirements in the Disputes clause of the General Contract

5 because it apparently excludes "…items that are equal to or less than $100,000 or any items that

6 cannot be passed through as claims to the Government Services Administration." A true and

7 correct copy of PCI's certification is attached hereto as **Exhibit G**, and a true and correct copy

8 of the Disputes clause of the General Contract is attached hereto as **Exhibit H**.

9      37.    PCI's claim does not otherwise clarify or justify why components of its claim

10 under $100,000 are not subject to the certification, and the claim is unclear as to items PCI

11 believes "cannot be passed through as claims to the Government Services Administration."

12      38.    PCI's assertion in its September 21, 2007 Brief that it is owed "$3,005,018 for

13 base contract work" is untrue and unsupported because it fails to account for, among other

14 things, Dick/Morganti's valid back-charges and deletions to PCI's subcontract scope of work.

15 PCI, as the stud wall and drywall subcontractor, refused to perform a disputed significant piece

16 of framing work that the GSA directed Dick/Morganti to perform. Following the GSA's

17 directive, Dick/Morganti, pursuant to its rights in the subcontract, directed PCI to perform this

18 disputed work. Because of PCI's refusal, however, Dick/Morganti was forced to locate, hire

19 and compensate a replacement subcontractor, Berger Brothers, to perform this work. This

20 disputed work is the subject of one of Dick/Morganti's five current appeals to the CBCA, and

21 Dick/Morganti's claim to the GSA for this work totals approximately $1,700,000. Until that

22 claim to the GSA is satisfactorily resolved and paid, Dick/Morganti has the right, under the

23 subcontract, to withhold from PCI those amounts that Dick/Morganti paid to Berger Brothers,

24 since PCI's subcontract obligated it to perform this disputed work. Additionally, certain work

25 in PCI's subcontract was deleted from PCI's scope of work and the value of that deleted work is

26 not owed to PCI, since PCI never performed it.

27      39.    PCI's assertion that "[n]o change order requests had been passed through to the

28 GSA as required by PCI's contract," as stated on page 5, lines 11-12 of PCI's September 21,

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1   2007 brief, is false. Approximately 65 of PCI's change order requests have been made a part of

2   Dick/Morganti's CORs to the GSA. Also of importance is that Dick/Morganti has had a very

3   difficult time in obtaining timely and accurate pricing regarding PCI's CORs from PCI. While

4   entitlement to additional compensation is derived from the GSA's defective design documents,

5   until accurate pricing from its subcontractors is presented, Dick/Morganti cannot submit CORs

6   to the GSA for consideration. For example, on the GSA's Bulletin 23 (PCI COR #17-6), PCI

7   submitted different prices for this changed/added work at least six different times. PCI's

8   pricing on this item was as high as $1,115,000 and as low as its current submitted price of

9   $94,741. On the GSA's Bulletin 31 (PCI COR #13R2), PCI again submitted at least six

10  different prices for this changed/added work. The highest PCI price was $246,322, and PCI's

11  current price is $28,598.

12      40.    In its September 21, 2007 brief and in the Declaration of James Strout in support

13  of PCI's brief, PCI states that, in Dick/Morganti's June 25, 2004 letter responding to the GSA's

14  May 5, 2004 Cure Notice, Dick/Morganti "acknowledged that it was responsible for the GSA's

15  charges of mismanagement and promised that it would correct the problems." This

16  characterization by PCI is incorrect and false. First, Dick/Morganti's June 25, 2004 letter

17  makes no such acknowledgement or statement. Second, PCI ignores Dick/Morganti's May 17,

18  2004 specific response to the GSA's May 5, 2004 Cure Notice. A true and correct copy of

19  Dick/Morganti's May 17, 2004 letter is attached hereto as **Exhibit I**. In that letter,

20  Dick/Morganti makes clear that, while it is addressing the GSA's assertions and demands in its

21  Cure Notice, Dick/Morganti reiterates its position that significant problems, delays, and impacts

22  have previously occurred on the Project as a result of design deficiencies and the actions of the

23  GSA. Dick/Morganti has consistently held this position throughout the Project. It should also

24  be noted that Dick/Morganti strongly disagrees with PCI's assertions that the GSA's use of

25  Cure Notices is "extremely rare." Dick Corporation has built numerous, large GSA

26  construction projects and, based on my experience, while the underlying basis or rationale used

27  by the GSA is often incorrect, GSA frequently sends Cure Notices to its contractors on such

28  projects.

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1  ///

2      41.    Dick/Morganti believes that PCI's claims consist of:  a) damages arising out of

3  the delays and productivity impacts caused by the GSA's design deficiencies on the Project; and

4  b) costs of the changed and added work for which PCI has not been paid and which are included

5  in the disputed and unresolved CORs to the GSA on the Project.  These PCI claims will be

6  presented to the GSA as part of Dick/Morganti's Global Claim.

7                          **PERMASTEELISA'S CLAIM**

8      42.    Permasteelisa has not yet submitted a certified claim.  In fact, Permasteelisa has

9  not submitted any backup documentation for its claim for "...additional costs in excess of

10  $2,000,000 due to delays, disruption and storage requirements on the Project," as stated in its

11  September 14, 2007 brief.  The assertions in its brief also do not account for the subcontract

12  work which Permasteelisa failed to perform and which had to be completed by Dick/Morganti.

13  Dick/Morganti believes that Permasteelisa's claims consist of:  a) damages arising out of the

14  delays and productivity impacts caused by the GSA's design deficiencies on the Project; and b)

15  costs of the changed and added work for which Permasteelisa has not been paid and which are

16  included in the disputed and unresolved CORs to the GSA on the Project.  These Permasteelisa

17  claims will be presented to the GSA as part of Dick/Morganti's Global Claim.

18                          **ROSENDIN'S CLAIM**

19      43.    Rosendin has not yet submitted a certified claim.  Based on discussions with

20  Rosendin, Dick/Morganti believes that Rosendin's claims consist of:  a) damages arising out of

21  the delays and productivity impacts caused by the GSA's design deficiencies on the Project; and

22  b) costs of the changed and added work for which Rosendin has not been paid and which are

23  included in the disputed and unresolved CORs to the GSA on the Project.  These Rosendin

24  claims will be presented to the GSA as part of Dick/Morganti's Global Claim.

25                          **WEBCOR'S CLAIM**

26      44.    Webcor's claim certification was submitted to Dick/Morganti on April 10, 2007

27  and Dick/Morganti requested a Final Decision by the Contracting Officer on that claim on June

28

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

1   13, 2007.  A true and correct copy of Dick/Morganti's request and certification is attached

2   hereto as **Exhibit J**.

3       45.     On August 13, 2007, the GSA informed Dick/Morganti that it would need

4   additional time for issuing a Final Decision on this claim.  If this claim is wholly or partially

5   denied by the Contracting Officer, Dick/Morganti intends to appeal the denial.  Because of the

6   significant impacts to the Project from the rebar congestion and concrete finish issues, those

7   Webcor claim issues are being incorporated into Dick/Morganti's Global Claim.  A true and

8   correct copy of the GSA's August 13, 2007 request for additional time is attached hereto as

9   **Exhibit K**.

10      46.     As detailed in the Sureties' August 10, 2007 Reply Brief, Webcor's uncertified

11  claims (Webcor's CORs 61-65) arise out of and are related to the GSA's actions and defective

12  design, including Webcor's COR 63 seeking $754,825 for labor inefficiency, late excavation,

13  and site staging.  These claims are being analyzed for incorporation into Dick/Morganti's

14  Global Claim.

15

16

17      I declare under penalty of perjury under the laws of the State of California that the

18  foregoing is true and correct.

19

20  Executed this 5th day of October, 2007 at Pittsburgh, Pennsylvania.

21

22                                          Michael T. Ambroso

23

24

25

26

27

28

LAW OFFICES

Peckar &
Abramson
A Professional Corporation

DECLARATION OF MICHAEL T. AMBROSO IN SUPPORT OF SUPPLEMENTAL
BRIEF RE: MOTION TO STAY PROCEEDINGS
50283.01

Case No.: 3:07-CV-02564-CRB
Consolidated with Case No.: 3:07-
CV-07-04180 EDL

Exhibit A

# ATTACHMENT V

**27.    GSAR 552.243-71   EQUITABLE ADJUSTMENTS (APR 1984)**

(a) The provisions of the "Changes" clause prescribed by FAR 52.243-4 are supplemented as follows:

(1) Upon written request, the Contractor shall submit a proposal, in accordance with the requirements and limitations set forth in the "Equitable Adjustments" clause, for work involving contemplated changes covered by the request. The proposal shall be submitted within the time limit indicated in the request or any extension of such time limit as may be subsequently granted. The Contractor's written statement of the monetary extent of a claim for equitable adjustment shall be submitted in the following form:

(i)  Proposals totaling $5,000, or less shall be submitted in the form of lump sum proposal with supporting information to clearly relate elements of cost with specific items of work involved to the satisfaction of the Contracting Officer, or his/her authorized representative.

(ii) For proposals in excess of $5,000, the claim for equitable adjustment shall be submitted in the form of a lump sum proposal supported with an itemized breakdown of all increases and decreases in the contract in at least the following detail:

<u>Direct Costs</u>
Material quantities by trades and unit costs (manufacturing burden associated with material fabrication performed will be considered to be part of the material costs of the fabricated item delivered to the job site)Labor breakdown by trades and unit costs (identified with specific item of material to be placed or operation to be performed) Construction equipment exclusively necessary for the change Costs of preparation and/or revision to shop drawings resulting from the change Workmen's Compensation and Public Liability Insurance Employment Taxes under FICA and FUTA Bond Costs--when size of change warrants revision

**<u>Mark-up rate on Direct Costs</u>**
**The Mark-up rate on direct costs submitted on the Total Evaluated Price by the Contractor shall be used as the rate on all equitable adjustments during both the Design Assist phase and the Construction phase.**

**<u>Daily Delay Rate</u>**
**The Daily Delay Rate shall be an allowable cost added to Equitable Adjustments with the following exceptions:**
**(1) Daily Delay Rate shall not be allowable on any changes during the Design Assist phase which occur prior to approval of the Contractor's proposed construction schedule.**
**(2) Daily Delay Rate shall not be allowable on any changes during the Design Assist phase which occur after approval of the Contractor's proposed construction schedule if the changes do not affect the Contractor's proposed start of construction.**
**(3) Daily Delay Rate shall not be allowable on any changes to correct problems, which occur during construction that should have been identified during the Contractor's Constructibility Review.**

Equitable adjustments for deleted work shall include credits for **direct costs plus the mark-up rate.** On proposals covering both increases and decreases in the amount of the contract, the application of **the mark-up rate** on the net change in direct costs for the Contractor or subcontractor performing the work.

  (3) The Contractor shall submit with the proposal his request for time extension (if any), and shall include sufficient information and dates to demonstrate whether and to what extent the change will delay the contract in its entirety.

  (4) In considering the proposal, the Government shall make check estimates in detail, utilizing unit prices  where specified or agreed upon, with a view to arriving at an equitable adjustment.

  (5) After receipt of a proposal the Contracting Officer shall act thereon within 30 days;  provided however, that when the necessity to proceed with a change does not allow time properly to check a proposal or in the event of failure to reach an agreement on a proposal, the Government may order the Contractor to proceed on the basis of price to be determined at the earliest practicable date.  Such price shall not be more than the increase or less than the decrease proposed.

  (6) If a mutually acceptable agreement cannot be reached, the Contracting Officer may determine the price unilaterally.

 (b) The provisions of the "Differing Site Conditions" clause prescribed by FAR 52.236-2 are supplemented as follows:  The Contractor shall submit all claims for equitable adjustment in accordance with, and subject to the requirements and limitations set out in paragraph (a) of this "Equitable Adjustments".

(End of Clause)

Exhibit B

**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

ORDERED: March 22, 2007

CBCA 420, 450, 451

DICK/MORGANTI, A JOINT VENTURE

Appellant,

v.

GENERAL SERVICES ADMINISTRATION,

Respondent.

Kerry L. Kester and Joel D. Heusinger of Woods & Aitken, LLP, Lincoln, NE, counsel for Appellant.

M. Leah Wright, Office of Regional Counsel, General Services Administration, Auburn, WA, counsel for Respondent.

**BORWICK**, Board Judge.

On Tuesday, March 20, 2007, we held a telephonic pre-hearing conference with counsel for appellant and respondent participating. The San Francisco Building project reached substantial completion in mid-February. The parties requested a further suspension of proceedings in these appeals pending the submission of an omnibus claim to the contracting officer and a decision on that claim.

For good cause shown, these appeals are suspended until **Friday March 15, 2008**. The suspension of proceedings will allow: (1) the appellant to prepare and to submit to the contracting officer an omnibus claim; (2) the contracting officer to consider the claim and render a decision on the claim; and (3) the appellant to file an appeal with the Board should appellant be dissatisfied with the decision of the contracting officer. Upon the filing of such

GSBCA 420, 450, 451                                                                 2

an appeal, it will be consolidated with the instant appeals and further proceedings on consolidated appeals will then be scheduled. The Board will hold a status teleconference with the parties at 2:00 p.m. EDT on **Friday, March 14, 2008.**

Appellant's counsel will confer with respondent's counsel about tolling Contract Disputes Act interest on the instant appeals during the suspension period.

ANTHONY S. BORWICK
Board Judge

Exhibit C



**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

## ACKNOWLEDGMENT OF RECEIPT OF INFORMATION
## FACSIMILE TRANSMITTAL SHEET

**DATE:**       July 12, 2007

**FROM:**       DARLENE PEEBLES, SR. LSA, 202-606-8824

**CBCA:**       DICK/MORGANTI, CBCA 420, 450, 451, 810, 818

**SUBJECT:**    ORDER

**TO:**         [APPELLANT]
                KERRY L. KESTER, ESQ.
                JOEL D. HEUSINGER, ESQ.
                WOODS & AITKEN, LLP
                301 S. 13TH STREET, SUITE 500
                LINCOLN, NE 68502
                TELEPHONE: 402-437-8513
                FAX: 402-437-8558

                [RESPONDENT]
                M. LEAH WRIGHT, ESQ.
                OFFICE OF REGIONAL COUNSEL, GSA
                AUBURN, WA 98001-6599
                253-931-7396
                FAX: 253-931-7842

                THOMAS Y. HAWKINS, ESQ.
                OFFICE OF GENERAL COUNSEL, GSA
                202-501-1121
                FAX: 202-501-1944

---

SIGNATURE OF RECEIVING OFFICIAL  DATE
TOTAL PAGES TRANSMITTED: 3
UPON RECEIPT OF THIS DOCUMENT, PLEASE <u>SIGN</u> THIS SLIP AND <u>RETURN</u>
IT TO THE CIVILIAN BOARD OF CONTRACT APPEALS, 1800 F STREET, N.W.,
WASHINGTON, DC 20405. FAX: 202-606-0019

## Board of Contract Appeals

General Services Administration
Washington, D.C. 20405

---

ORDERED: July 12, 2007

---

CBCA 420, 450, 451, 810, 818

DICK/MORGANTI, A JOINT VENTURE

Appellant,

v.

GENERAL SERVICES ADMINISTRATION,

Respondent.

Kerry L. Kester and Joel D. Heusinger of Woods & Aitken, LLP, Lincoln, NE, counsel for Appellant.

Thomas Y. Hawkins, Office of General Counsel, General Services Administration, Washington, DC; M. Leah Wright, Office of Regional Counsel, General Services Administration, Auburn, WA, counsel for Respondent.

**BORWICK**, Board Judge.

### ORDER

On July 11, 2007, the appellant filed two appeals, CBCA 810 and 818, from the contracting officer's decisions on contractor claims involving the San Francisco Building project. Unless the parties object within ten days, these appeals are consolidated with CBCA 420, 450, and 451, appeals which involve the same project.

CBCA 420, 450, 451, 810, 818                                                    2

The Board's order of March 22, 2007 in CBCA 420, 450 and 451, applies to CBCA 810 and 818 and the proceedings in CBCA 810 and 818 are suspended until March 15, 2008, in accordance with that order.

ANTHONY S. BORWICK
Board Judge

Exhibit D

this Subcontract Execution of this Subcontract shall constitute Contractor's approval of Subcontractor to sublet the portions of the work for which Subcontractor customarily sublets the work. The timing, terms, and conditions of these sub-subcontracts shall be the sole responsibility of Subcontractor, and shall not be auditable by the Contractor except to the extent required for the Owner's approval of Change Orders or other Owner rights as specified in the Contract Documents.

THIRTY-SEVENTH.    Severability.
If any one or more of the provisions contained in this Subcontract, for any reason, are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Subcontract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

THIRTY-EIGHTH.    Choice of Law and Disputes.
(a) The performance of this Subcontract and all of its terms and conditions, as well as any arbitration or judicial proceeding, shall be interpreted and governed by the laws of the State of California.

(b) Subcontractor agrees that any dispute of any kind, nature or description or any controversy or claim arising out of or relating to this Subcontract or the breach thereof may, at the mutual agreed upon election of the parties, be settled by non-binding mediation or by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. In any such arbitration, full discovery will be allowed as described in the Federal Rules of Civil Procedure, and any remedy or relief granted by the arbitrator(s) shall be in accordance with the terms of this Subcontract as interpreted under and governed by the laws of the jurisdiction identified in paragraph (a), above. In any such arbitration, the arbitrator(s) shall not be empowered or authorized to add to, subtract from, delete or in any other way modify the terms of this subcontract. If arbitration is so elected by the Contractor, then judgment upon the award rendered by the arbitrator(s) may be entered in the courts having jurisdiction over this subcontract. If the parties elect to proceed by arbitration, the venue of such proceeding shall be the project area.

(c) The parties shall have the right to elect to proceed to non-binding mediation or binding arbitration, as described in paragraph (b) above, at any time prior to the commencement of a judicial proceeding by the Contractor, or in the event a judicial proceeding is instituted by the Subcontractor, at any time prior to the last day to answer and/or appear to a Summons and/or Complaint of the Subcontractor.

(d) If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to arbitration or some other disputes resolution procedure specified in the General Contract and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees (i) to join in and be bound by the same arbitration or other disputes resolution procedure upon written request by the Contractor and (ii) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted. If the Owner refuses to allow this joinder of the Subcontractor, Subcontractor agrees (i) to cooperate with the Contractor, (ii) to assist in the discovery and other preparations for the hearing, (iii) to make available its employees for testimony before or at the hearing, (iv) to share proportionately the costs and legal fees associated with the preparation for and execution of the hearing *to the extent mutually agreed upon related to the amount of damage being pursued by the Contractor on Subcontractor's behalf*, (v) to stay any action filed by the Subcontractor *as long as the Subcontractor's position is being diligently pursued by Contractor in the Owner dispute and the Subcontractor's positions are being carried forward through the Contractor's prosecution of the claims with the Owner* until the dispute resolution and appeals process between the Contractor and the Owner is exhausted, and (vi) to be bound by the results of the arbitration or other disputes resolution procedure as it relates to the dispute, controversy, or claim of the subcontractor *to the extent that Subcontractor cooperated and was actively involved in this dispute resolution process.*

(e) To the extent that any dispute, controversy, or claim arises hereunder and a suit is instituted, it shall be brought in and before the State or Federal Court of the project location wherein exclusive jurisdiction shall lie. Notwithstanding the above, if the Owner is joined by the Contractor in any such suit, Subcontractor hereby stipulates that it shall agree to move the suit to the venue of the project site and/or to the disputes resolution forum specified in the General Contract upon the request or motion of the Contractor.

(f) Subcontractor shall insert a provision identical to this Article Thirty-Eighth into all of its sub-subcontracts for the project. Nothing in this section shall be deemed to waive, alter or modify any condition precedent to suit contained in any other provision of the Subcontract or to give the sub-subcontractors any contractual privity with or rights against the Contractor.

(g) No action or proceeding shall lie or shall be maintained by Subcontractor against the Contractor unless such action shall be commenced within one (1) year after the date payment is mailed or otherwise made in respect of the Final Application for Payment or, if this Subcontractor or performance under this Subcontract is terminated by the Contractor, unless such action or proceeding is commenced within one (1) year after the date of such termination.

THIRTY-NINTH.    Headings.

FOR THE PROJECT KNOWN AS:       GSA Federal Building, San Francisco
                                Subcontract Number 21058-109
                        GSA Contract No. GS-09P-02-KTC-0002
                                GSA Project No. NCA00049
                                COST CODE:  033000

Exhibit E

THIRTY-EIGHTH.    Choice of Law and Disputes.
(a) The performance of this Subcontract and all of its terms and conditions, as well as any arbitration or judicial proceeding, shall be interpreted and governed by the laws of the State of California.

(b) Subcontractor agrees that any dispute of any kind, nature or description or any controversy or claim arising out of or relating to this Subcontract or the breach thereof may, at the mutual agreed upon election of the parties, be settled by non-binding mediation or by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.  In any such arbitration, full discovery will be allowed as described in the Federal Rules of Civil Procedure, and any remedy or relief granted by the arbitrator(s) shall be in accordance with the terms of this Subcontract as interpreted under and governed by the laws of the jurisdiction identified in paragraph (a), above.  In any such arbitration, the arbitrator(s) shall not be empowered or authorized to add to, subtract from, delete or in any other way modify the terms of this subcontract.  If arbitration is so elected by the Contractor, then judgment upon the award rendered by the arbitrator(s) may be entered in any Court having jurisdiction thereof.  If the Contractor elects to proceed by arbitration, the venue of such proceeding shall be the project area.

(c) Contractor shall have the right to elect to proceed to non-binding mediation or binding arbitration, as described in paragraph (b) above, at any time prior to the commencement of a judicial proceeding by the Contractor, or in the event a judicial proceeding is instituted by the Subcontractor, at any time prior to the last day to answer and/or appear to a Summons and/or Complaint of the Subcontractor.

(d) If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to arbitration or some other disputes resolution procedure specified in the General Contract and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees (i) to join in and be bound by the same arbitration or other disputes resolution procedure upon written request by the Contractor and (ii) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted.  If the Owner refuses to allow this joinder of the Subcontractor, Subcontractor agrees (i) to cooperate with the Contractor, (ii) to assist in the discovery and other preparations for the hearing, (iii) to make available its employees for testimony before or at the hearing, (iv) to share proportionately the costs and legal fees associated with the preparation for and execution of the hearing, (v) to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted, and (vi) to be bound by the results of the arbitration or other disputes resolution procedure as it relates to the dispute, controversy, or claim of the subcontractor.

(e) To the extent that any dispute, controversy, or claim arises hereunder and a suit is instituted, it shall be brought in and before the State or Federal Court of the project location wherein exclusive jurisdiction shall lie.  Notwithstanding the above, if the Owner is joined by the Contractor in any such suit, Subcontractor hereby stipulates that it shall agree to move the suit to the venue of the project site and/or to the disputes resolution forum specified in the General Contract upon the request or motion of the Contractor.

(f) Subcontractor shall insert a provision identical to this Article Thirty-Eighth into all of its sub-subcontracts for the project.  Nothing in this section shall be deemed to waive, alter or modify any condition precedent to suit contained in any other provision of the Subcontract or to give the sub-subcontractors any contractual privity with or rights against the Contractor.

(g) No action or proceeding shall lie or shall be maintained by Subcontractor against the Contractor unless such action shall be commenced within one (1) year after the date payment is mailed or otherwise made in respect of the Final Application for Payment or, if this Subcontractor or performance under this Subcontract is terminated by the Contractor, unless such action or proceeding is commenced within one (1) year after the date of such termination.

THIRTY-NINTH.    Headings.
The headings inserted in this Subcontract Agreement are for convenience only and shall in no way affect the interpretation of this Agreement.

FORTIETH.    Owner Approval, Succession of Interests and Modification.
It is understood and agreed that the Owner has the right to approve or disapprove the employment of this Subcontractor and in the event that the Owner does not execute the General Contract with the Contractor or does not approve this Subcontract, this Subcontract shall become null and void.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors, and permitted assigns of the parties hereto, but no third party benefits are created by this Subcontract and no modification of this Agreement shall be binding upon the Contractor unless such modification is in writing and signed by the Contractor.

FORTY-FIRST. California License
California law requires that contractors and Subcontractors be licensed and regulated by the

FOR THE PROJECT KNOWN AS:
GSA Federal Building, San Francisco
Subcontract Number 21058-118
GSA Contract No. GS-09P-02-KTC-0002
GSA Project No. NCA00049
COST CODE:   092500

Exhibit F



*Building Excellence for Over 80 Years!*

*Michael T. Ambroso*
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

<u>VIA FACSIMILE #650-524-7399</u>
<u>and First Class Mail</u>
John Bowles
General Counsel
Webcor Builders
951 Mariners Island Blvd. - 7th Floor
San Mateo, CA 94404

RE:    San Francisco Federal Building
       Subcontractor Claims

Dear John:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Webcor Builders has previously informed D/M that it believes that Webcor Builders has entitlement under Subcontract Agreement No. 21058-109 (the "Subcontract") to seek additional compensation for its unanticipated costs incurred as a result of certain events and conditions which occurred during construction of this Project. As D/M has previously informed you, D/M (on behalf of itself and its affected subcontractors) is pursuing claims for additional compensation against the GSA based on the actions and decisions of the GSA and its agents on this Project. Pursuant to D/M's contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for additional compensation which Webcor Builders may have rights to assert pursuant to its Subcontract with D/M. Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract, Webcor Builders is required to join with D/M and to cooperatively pursue our respective claims relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Webcor Builders, pursuant to the requirements of the Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims, identify all claims that Webcor Builders may have arising out of the actions and decisions of the GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon as possible. Any such claims will be reviewed by D/M and, pursuant to the requirements of D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's claims against the GSA.

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896    Pittsburgh, PA 15236-0896    412-384-1287
mtambroso@dickcorp.com



If you have any questions about this letter or the claims process, please contact the undersigned.

          Sincerely,

          Dick/Morganti, a Joint Venture

          Michael T. Ambroso

MTA/lsn
cc:    Vince Petito
       Ron Brookfield
       Bill Higgins

Dick Corporation

Contractors, Construction Managers & Design Builders

P.O. Box 10896    Pittsburgh, PA 15236-0896    412-384-1287

mtambroso@dickcorp.com

**DICK**
C O R P O R A T I O N

*Building Excellence for Over 80 Years!*

Michael T. Ambroso
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

VIA FACSIMILE #408-793-5001
and First Class Mail
Larry Beltramo
Executive Vice President
Rosedin Electric
880 Mabury Road
San Jose, CA 95133

RE:   San Francisco Federal Building
      Subcontractor Claims

Dear Larry:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Rosedin Electric
has previously informed D/M that it believes that Rosedin Electric has entitlement under
Subcontract Agreement No. 21058-103 (the "Subcontract") to seek additional compensation for
its unanticipated costs incurred as a result of certain events and conditions which occurred during
construction of this Project. As D/M has previously informed you, D/M (on behalf of itself and
its affected subcontractors) is pursuing claims for additional compensation against the GSA based
on the actions and decisions of the GSA and its agents on this Project. Pursuant to D/M's
contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in
accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for
additional compensation which Rosedin Electric may have rights to assert pursuant to its
Subcontract with D/M. Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract,
Rosedin Electric is required to join with D/M and to cooperatively pursue our respective claims
relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Rosedin Electric, pursuant to the requirements of the
Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims,
identify all claims that Rosedin Electric may have arising out of the actions and decisions of the
GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon
as possible. Any such claims will be reviewed by D/M and, pursuant to the requirements of
D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's
claims against the GSA.

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896    Pittsburgh, PA  15236-0896    412-384-1287
mtambroso@dickcorp.com



If you have any questions about this letter or the claims process, please contact the undersigned.

Sincerely,

Dick/Morganti, a Joint Venture

Michael T. Ambroso

MTA/lsn
cc:    Vince Petito
       Ron Brookfield
       Bill Higgins

**DICK**

*CORPORATION*

*Building Excellence for Over 80 Years!*

**Michael T. Ambroso**
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

<u>VIA FACSIMILE #510-264-9105</u>
<u>and First Class Mail</u>
John Khau
Vice President
Boyett Door & Hardware
2404 Tripaldi Way
Hayward, CA 94545

RE:     San Francisco Federal Building
        Subcontractor Claims

Dear John:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Boyett Door & Hardware has previously informed D/M that it believes that Boyett Door & Hardware has entitlement under Subcontract Agreement No. 21058-147 (the "Subcontract") to seek additional compensation for its unanticipated costs incurred as a result of certain events and conditions which occurred during construction of this Project. As D/M has previously informed you, D/M (on behalf of itself and its affected subcontractors) is pursuing claims for additional compensation against the GSA based on the actions and decisions of the GSA and its agents on this Project. Pursuant to D/M's contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for additional compensation which Boyett Door & Hardware may have rights to assert pursuant to its Subcontract with D/M. Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract, Boyett Door & Hardware is required to join with D/M and to cooperatively pursue our respective claims relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Boyett Door & Hardware, pursuant to the requirements of the Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims, identify all claims that Boyett Door & Hardware may have arising out of the actions and decisions of the GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon as possible. Any such claims will be reviewed by D/M and, pursuant to the requirements of D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's claims against the GSA.

If you have any questions about this letter or the claims process, please contact the undersigned.

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896    Pittsburgh, PA 15236-0896    412-384-1287
mtambroso@dickcorp.com



Sincerely,

Dick/Morganti, a Joint Venture

Michael T. Ambroso

MTA/lsn
cc:    Vince Petito
       Ron Brookfield
       Bill Higgins

**DICK**
*C O R P O R A T I O N*

*Building Excellence for Over 80 Years!*

**Michael T. Ambroso**
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

VIA FACSIMILE #510-264-4925
and First Class Mail
Gene Concannon
Project Manager
Performance Contracting, Inc.
23485 Connecticut Street
Hayward, CA 94545

RE:     San Francisco Federal Building
       Subcontractor Claims

Dear Gene:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Performance Contracting, Inc. has previously informed D/M that it believes that Performance Contracting, Inc. has entitlement under Subcontract Agreement No. 21058-118 (the "Subcontract") to seek additional compensation for its unanticipated costs incurred as a result of certain events and conditions which occurred during construction of this Project. As D/M has previously informed you, D/M (on behalf of itself and its affected subcontractors) is pursuing claims for additional compensation against the GSA based on the actions and decisions of the GSA and its agents on this Project. Pursuant to D/M's contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for additional compensation which Performance Contracting, Inc. may have rights to assert pursuant to its Subcontract with D/M. Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract, Performance Contracting, Inc. is required to join with D/M and to cooperatively pursue our respective claims relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Performance Contracting, Inc., pursuant to the requirements of the Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims, identify all claims that Performance Contracting, Inc. may have arising out of the actions and decisions of the GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon as possible. Any such claims will be reviewed by D/M and, pursuant to the requirements of D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's claims against the GSA.

If you have any questions about this letter or the claims process, please contact the undersigned.

Sincerely,

Dick/Morganti, a Joint Venture

Michael T. Ambroso

MTA/lsn
cc:    Vince Petito
       Ron Brookfield
       Bill Higgins



*Building Excellence for Over 80 Years!*

**Michael T. Ambroso**
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

<u>VIA FACSIMILE #860-298-2009</u>
<u>and First Class Mail</u>
Alan Paperny
General Counsel
Permasteelisa Cladding Technologies, Ltd.
123 Day Hill Road
P.O. Box 767
Windsor, CT  06095

RE:    San Francisco Federal Building
       Subcontractor Claims

Dear Alan:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Permasteelisa Cladding Technologies, Ltd. has previously informed D/M that it believes that Permasteelisa Cladding Technologies, Ltd. has entitlement under Subcontract Agreement No. 21058-108 (the "Subcontract") to seek additional compensation for its unanticipated costs incurred as a result of certain events and conditions which occurred during construction of this Project.  As D/M has previously informed you, D/M (on behalf of itself and its affected subcontractors) is pursuing claims for additional compensation against the GSA based on the actions and decisions of the GSA and its agents on this Project.  Pursuant to D/M's contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for additional compensation which Permasteelisa Cladding Technologies, Ltd. may have rights to assert pursuant to its Subcontract with D/M.  Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract, Permasteelisa Cladding Technologies, Ltd. is required to join with D/M and to cooperatively pursue our respective claims relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Permasteelisa Cladding Technologies, Ltd., pursuant to the requirements of the Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims, identify all claims that Permasteelisa Cladding Technologies, Ltd. may have arising out of the actions and decisions of the GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon as possible.  Any such claims will be reviewed by D/M and, pursuant to the requirements of D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's claims against the GSA.

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896    Pittsburgh, PA  15236-0896    412-384-1287
mtambroso@dickcorp.com

**DICK**
C O R P O R A T I O N

If you have any questions about this letter or the claims process, please contact the undersigned.

Sincerely,

Dick/Morganti, a Joint Venture

Michael T. Ambroso

MTA/lsn
cc:     Vince Petito
        Ron Brookfield
        Bill Higgins

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896    Pittsburgh, PA  15236-0896    412-384-1287
mtambroso@dickcorp.com

# DICK
### C O R P O R A T I O N

*Building Excellence for Over 80 Years!*

**Michael T. Ambroso**
*Assistant General Counsel &*
*Assistant Secretary*

July 24, 2007

VIA FACSIMILE #510-785-7711
and First Class Mail
Ann Nejasmich
General Counsel
Marelich Mechanical Co., Inc.
24041 Amador Street
Hayward, CA  94544-1201

RE:    San Francisco Federal Building
       Subcontractor Claims

Dear Ann:

As a subcontractor to Dick/Morganti ("D/M") on the above referenced Project, Marelich Mechanical Co., Inc. has previously informed D/M that it believes that Marelich Mechanical Co., Inc. has entitlement under Subcontract Agreement No. 21058-104 (the "Subcontract") to seek additional compensation for its unanticipated costs incurred as a result of certain events and conditions which occurred during construction of this Project. As D/M has previously informed you, D/M (on behalf of itself and its affected subcontractors) is pursuing claims for additional compensation against the GSA based on the actions and decisions of the GSA and its agents on this Project. Pursuant to D/M's contract with the GSA, D/M's claims against the GSA are being presented and prosecuted in accordance with the procedures directed in that contract.

D/M believes that its claims against the GSA on this Project relate to and involve the claims for additional compensation which Marelich Mechanical Co., Inc. may have rights to assert pursuant to its Subcontract with D/M.  Pursuant to subsection (d) of Article Thirty-Eighth of the Subcontract, Marelich Mechanical Co., Inc. is required to join with D/M and to cooperatively pursue our respective claims relating to the actions the GSA and its agents on this Project.

By this letter, D/M is hereby requesting that Marelich Mechanical Co., Inc., pursuant to the requirements of the Subcontract, acknowledge the requirement to jointly and cooperatively pursue these claims, identify all claims that Marelich Mechanical Co., Inc. may have arising out of the actions and decisions of the GSA and the GSA's agents on this Project, and to present those identified claims to D/M as soon as possible.  Any such claims will be reviewed by D/M and, pursuant to the requirements of D/M's contract, will be submitted to the GSA and will be prosecuted in conjunction with D/M's claims against the GSA.



If you have any questions about this letter or the claims process, please contact the undersigned.

          Sincerely,

          Dick/Morganti, a Joint Venture

          Michael T. Ambroso

MTA/lsn
cc:     Vince Petito
       Ron Brookfield
       Bill Higgins

Dick Corporation
Contractors, Construction Managers & Design Builders
P.O. Box 10896     Pittsburgh, PA 15236-0896     412-384-1287
mtambroso@dickcorp.com

Exhibit G

## CERTIFICATION

I certify that the aforementioned claim is made in good faith; that the supporting data is accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which Performance Contracting, Inc., believes the Government is liable; and that I am duly authorized to certify the claim on behalf of Performance Contracting, Inc. Excluded from this Certification are any items that are equal to or less than $100,000.00 or any items that cannot be passed through as claims to the Government Services Administration.

Dated: June 29, 2007

Robert Dean
Performance Contracting, Inc.
Operations Manager

2010-020-DOC-Claim 051007.doc

Exhibit H

liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(b)  The Contractor agrees to include, and require inclusion of , this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services expected to exceed the simplified acquisition threshold); however, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent.

(End of Clause)

8      FAR 52.233-1 DISPUTES (DEC 1998)

(a)  This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613).

(b)  Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c)  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.  A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant.  However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph (d)(2) of this clause.  A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act.  The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in reasonable time.

(d)(1)  A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision.  A claim by the Government against the Contractor shall be subject to written decision by the Contracting Officer.

(2)(i)  The Contractor shall provide the certification specified in paragraph (d)(2)(iii) of this clause when submitting any claim exceeding $100,000.

(ii)  The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

(iii)  The certification shall state as follows:  "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify   the claim on behalf of the Contractor."

(3)  The certification may be executed by any person duly authorized to bind the Contractor with respect to the claim.

(e)  For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request.  For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

0146

**SECTION I2 - PAGE 12**

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) If the claim by the Contractor is submitted to the Contracting Officer or a claim by the Government is presented to the Contractor, the parties, by mutual consent, may agree to use alternative dispute resolution (ADR). If the Contractor refuses an offer for ADR, the Contractor shall inform the Contracting Officer, in writing, of the Contractor's specific reasons for rejecting the offer.

(h) The Government shall pay interest on the amount found due and unpaid from (1) the date that the Contracting Officer receives the claim (certified, if required); or (2) the date that payment otherwise would be due, if that date is later, until the date of payment. With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Contracting Officer initially receives the claim. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6 month period as fixed by the Treasury Secretary during the pendency of the claim.

(i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.

(End of clause)

9     FAR 52.236-13  ACCIDENT PREVENTION (NOV 1991)

(a) The Contractor shall provide and maintain work environments and procedures which will –

   (1) safeguard the public and Government personnel property, materials, supplies, and equipment exposed to Contractor operations and activities; (2) avoid interruptions of Government operations and delays in project completion dates; and (3) control costs in the performance of this contract.

(b) For these purposes on contracts for construction or dismantling, demolition, or removal of improvements, the Contractor shall—

   (1) Provide appropriate safety barricades, signs, and signal lights;

   (2) Comply with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910; and

   (3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for the purposes are taken.

(c) If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of the solicitation.

(d) Whenever the Contracting Officer becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request immediate initiation of corrective action. This notice, when delivered to the Contractor or the Contractor's representative at the work site, shall be deemed sufficient notice of the noncompliance and that corrective action is required. After receiving the notice, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to promptly take corrective action, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. The

**SECTION 12 – PAGE 13**

Current through FAC-97-23 and GSAM, Chge. 01          Revision date 04/13/01

Exhibit I



A Joint Venture

May 17, 2004
Letter No. 21058-1399

U. S. General Services Administration
450 Golden Gate Avenue
San Francisco, CA  94102

Attn:       Constance Russell, Contracting Officer

Re:         New San Francisco Federal Office Building
            Project No. NCA00049
            Contract No. GS-09P-02-KTC-0002

Subject:    Response to Cure Notice

Dear Ms. Russell:

We are in receipt of the GSA's notice to cure dated May 5, 2004.  We want to assure you that
Dick/Morganti, JV (D/M) understands the concerns raised by the GSA in that letter.  This letter, along
with its enclosures, will supply the GSA with the four specific deliverables requested by your May 5,
2004 correspondence.  The following are D/M's responses to the issues raised in GSA's letter.

I. <u>Concrete Quality Issues</u>:

At the outset, D/M acknowledges the GSA's contentions relating to form construction and the
resultant vertical concrete finish quality.  D/M is particularly sensitive to these issues because the
D/M team members have a wealth of experience building large, complex GSA projects on time, on
budget and with the level of quality acceptable to GSA.  In fact, the D/M team members have
received numerous awards in the past from GSA, other federal agencies and additional entities for
both excellence in construction generally and concrete construction in particular.  Therefore, **D/M
can unequivocally assure the GSA that it can and will deliver the concrete work on the project
at the level of quality required by the contract.**

The specific steps which D/M has and will implement to ensure that the GSA's requirements are
satisfied in regards to concrete formwork and the resultant vertical concrete finish, include, but are
not limited to:

1. Webcor's retention of a formwork engineer to examine current formwork systems
   and practices and recommend changes designed to cure previous formwork
   alignment, leakage, and finish problems.
2. A demand that D/M's concrete subcontractor replace certain personnel, including two
   foremen and Daniel Payne, who have been identified as being associated with
   previous quality problems. (Note that Daniel Payne's duties on the project have been
   assumed by Eric Peterson.)  Also, D/M has required that the subcontractor's upper
   management become more engaged in the project.   This latter demand has resulted
   in Webcor's vice-president of operations being on site full-time for the last two

1068 Mission Street  San Francisco, California 94103  Phone (415) 522-1320  Fax (415) 522-1366

weeks and for the foreseeable future, the addition of a full time QC inspector, and an increase in the number of assistant superintendents Webcor has assigned to the job.

3.  D/M's assignment to the project of two new assistant superintendents and a new inspector who will be exclusively devoted to managing the concrete work. These individuals will verify the quality of the formwork prior to all concrete pours (see paragraph 4, below) and no pour may commence without the approval of at least one of these individuals.

4.  The institution of **a revised Quality Control Plan** (see enclosed) which not only reflects D/M's role as quality coordinator on the project, but specifically addresses previous quality issues by providing the newly assigned assistant superintendents with project specific checklists regarding formwork preparation and quality, as well as mandating additional rebar inspections, a full time surveyor to verify pre- and post-concrete pour formwork locations and other oversight of the concrete work on the project. In addition, D/M is considering retaining other concrete formwork engineers to independently examine and evaluate the formwork issues on the project and to recommend any changes which will enhance productivity and/or quality. Among the individuals or firms under consideration for this work are Shilstone & Associates of Dallas, Texas.

5.  D/M has assigned a new project executive team that will be on site starting May 18, 2004. While these staff changes are not specifically made to address concrete quality issues, these are changes intended to promote better coordination and administration on the project.

As you can see from your review of the foregoing, D/M is not only meeting its contract obligations, but in certain cases is exceeding the requirements of the contract in order to respond to the issues raised in the GSA's May 5th letter. We are confident that, with these additional measures, the GSA will have no reason to question the quality of the concrete work on the project.

In summary, D/M agrees that the contract specifies the level of quality required for concrete construction. D/M has in the past, and will continue to, take all actions necessary to achieve that level of quality. D/M respectfully disagrees, however, with the assertion in GSA'a letter that the contract requires that D/M achieve a "Class A Finish" to meet its obligations. Specification Section 3100 ("Concrete Formwork") Part 1.1 (A), as well as Specification Section 3300 ("Cast in Place Concrete") Part 1.1 (D) both call for D/M to provide a "Smooth Form Finish". Nevertheless, it should be pointed out that D/M and GSA's Architect/Engineer personnel seem to be in agreement as to what installed concrete finish work meets the contract requirements on this project.

II.  <u>Project Completion Date Issues</u>:

As can be seen from the above, D/M considers that fulfilling its contractual obligations to the GSA is a matter of utmost importance. Therefore, **D/M wants to assure the GSA that it can and will perform the construction services required by the contract.** As with the concrete issues discussed in the GSA's letter, if D/M needs to modify its means and methods or supplement its personnel in order to meet its contractual obligations, then it will do so.

Certainly, D/M is aware that the original contract completion date for this project was November 12, 2005. As the GSA is aware, when D/M updated the approved schedule to account for certain GSA caused events and the rebar congestion problem (see D/M letter 21058-1399) which have occurred on this project, the schedule projected a completion date of August 2006, which was unacceptable to both the GSA and D/M. In order to mitigate project delays and to recover as much of this time as possible, D/M first accelerated its concrete performance by adding additional men to the size of the

work crews and instituting a plan to double shift its crews on the project. However, while mitigating some of the delay, this methodology negatively impacted the productivity of the workers involved and also seemed to impact the quality of construction required by the contract. Therefore, D/M revised its acceleration plans and is currently running its concrete crews on a 12-hour shift schedule and double shifting its rebar and crane crews, which increases the amount of work produced on a given day while meeting the level of quality required by the contract.

Based upon the foregoing accelerated shift schedule, as well as other management changes recently implemented by D/M, we are enclosing our **Recovery Schedule which realistically demonstrates how D/M will achieve project completion while meeting the level of quality construction required by the contract.** You will note that the enclosed schedule shows an impacted project substantial completion date of February 8, 2006. Please be advised that this change to the substantial completion date is not due to any previously discussed quality problems encountered with the concrete work on the project, which have been mitigated as described above. Rather, the revised substantial completion date results from unforeseeable causes beyond the control and without the fault of D/M, which have occurred since the effective date of the Notice to Proceed. While D/M has addressed these issues through previous correspondence and, therefore, will not detail them here, these causes include, but are not limited to:

1. Unforeseen groundwater conditions referred to in Information Bulletin ("IB") #10 (at least 19 days);
2. The addition to the project of over approximately 125 tons of reinforcing steel described in IBs #5 and 7 (at least 28 days); and
3. The fire on S line, which delayed the project by at least 15 days.


III. Conclusion

Please be advised that D/M continues to look for methods to improve the substantial completion date shown in our recovery schedule, such as D/M's retention of a structural engineer to determine if the current amount of reshoring on the project can be safely decreased in order to substantially improve the start dates of successor activities. (It should also be noted that the revised substantial completion date reflects the acceleration of work undertaken by D/M to make up for lost time caused by the rebar congestion problems.) However, the fact that the current delay to the substantial completion date arises from unforeseeable causes beyond the control and without the fault or negligence of D/M leads to the following conclusions:

1. A termination for default would be improper and unjustified under FAR 52.249-10(b) and therefore, not in the GSA's interest; and
2. The original contract completion date can only be met through significant acceleration expense to the GSA.

D/M and its constituent members are proud of the fact that they are not only constructing this project for the GSA, but are also currently performing on over a dozen other federal government contracts. Obviously, this relationship is beneficial to all parties, including the GSA.

Of course, no written submission can completely cover all of the issues presented by a project of this magnitude or anticipate all questions which may be raised by the material transmitted herewith. Therefore, we suggest that a meeting occur after you and your staff have reviewed the enclosed, so that we can more fully explain the steps we are taking to respond to the GSA's concerns and answer

any questions you may have. Hopefully, this meeting will be the first step in the constant communication between us necessary to successfully complete this important project.

D/M trusts that GSA will agree that, with this letter and the attached information, D/M has met each of the four requests set forth in GSA's May 5, 2004 letter.

Very Truly Yours,

**Dick/Morganti, JV**

Don F. Cooper
President, Building Division

Enclosures
CC: J. Sebastian
   R. Brookfield
   AON
   File

Exhibit J

**DICK**
CORPORATION

*Building Excellence for Over 80 Years!*

*Michael T. Ambroso*
*Assistant General Counsel &*
*Assistant Secretary*

June 13, 2007

Shelita Harper
Contracting Officer
General Services Administration
PBS, Property Development Div., 9PCE
450 Golden Gate Ave., 3rd Floor West
San Francisco, CA  94102-3434

RE:    San Francisco Federal Office Building
       Contract No. GS-09P-02-KTC-0002
       Claim Under Contract Disputes Act

Dear Ms. Harper:

Dick/Morganti, A Joint Venture, on behalf of one of its subcontractors (Webcor Construction, Inc.), hereby submits a claim pursuant to the Contract Disputes Act, 41 U.S.C. Section 601, et seq.  The explanation of the entitlement for this claim, as well as an identification of Webcor's claimed damages, are contained in the attached binder (two copies attached).  Please note that Dick/Morganti's signed Certification for this Claim is attached to this letter.

The attached claim requests compensation for the damages incurred by Webcor as a result of the rebar congestion and additional concrete finish requirements on this Project.  Please note, however, that Dick/Morganti and other subcontractors also incurred delays and additional costs as a result of these problems for which we believe the GSA is responsible.  Dick/Morganti reserves the right to submit claims for additional compensation, on behalf of itself and its other subcontractors, arising out of these and other events on the Project.  These other claims will be submitted as soon as possible.

Dick/Morganti respectfully requests a Contracting Officer's Final Decision on this submitted claim within sixty (60) days, as specified in the Contract Disputes Act.

**DICK**
CORPORATION

Shelita Harper
Contracting Officer
General Services Administration
June 13, 2007
Page 2

Please contact the undersigned with any questions.

Sincerely,

DICK CORPORATION

Michael T. Ambroso

MTA/lsn
enclosure
cc:    Bill Higgins (w/o enclosure)
      Joel Heusinger, Esq. (w/o enclosure)
      Ken Jones, Esq. (w/o enclosure)
      Vince Petito (w/o enclosure)

CLAIM CERTIFICATION

DICK/MORGANTI, A JOINT VENTURE

UNITED STATES FEDERAL OFFICE BUILDING

SAN FRANCISCO, CALIFORNIA

GSA Contract No. GS-09P-02-KTC-0002

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

SIGNATURE: *William L. Higgins*

NAME: *William L. Higgins*

TITLE: *Exec. V. Pres & COO*

DATE: *6/13/07*

Exhibit K



August 13, 2007

Dan Martin
Dick/Morganti
P.O. Box 10896
Pittsburg, PA 15236-0896

Regarding:    New San Francisco Federal Office Building
              GSA Project No. NCA00049
              GSA Contract No. GS-09P-02-KTC-0002

Subject:      Webcor Construction COR 60

Dear Mr. Martin,

The Government is in receipt of your letter dated June 13, 2007 regarding a Claim
Pursuant to the Contract Disputes Act, 41 U.S.C. Section 601, for the above mentioned
project.  At this time, you are hereby notified that the Government requires an additional
60 days to reconsider your claim and issue a decision.

Sincerely,

Shelita Harper
Contracting Officer
Property Development Division, 9PCE

cc:
       Meg Haggerty, 9L
       Maria Ciprazo, GSA
       Monsy Agleham, GSA
       David Proctor, Hunt
       File