1    J. Morrow Otis (CSB #039311)
Steven L. Iriki (CSB # 142533)
2    Matthew E. McCabe (CSB #136541)
OTIS CANLI & IRIKI, LLP
3    625 Market St., 4th Floor
San Francisco, CA  94105-3306
4    Telephone: (415) 362-4442
Facsimile: (415) 362-7332
5    E-mail: JMO@ocilaw.com

6    Attorneys for Plaintiff and Third-Party Defendant
PERFORMANCE CONTRACTING, INC.

7

8                UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11

12

13    UNITED STATES OF AMERICA for the use and      Case No.  3:07-CV-02564-CRB
benefit of WEBCOR CONSTRUCTION, INC. dba
14    WEBCOR BUILDERS, and WEBCOR            **DECLARATION OF STEVEN L.**
CONSTRUCTION, INC. dba WEBCOR             **IRIKI**
15    BUILDERS,

           Plaintiffs,                   DATE:    December 19, 2007
16                                     TIME:     3:00 p.m.
      vs.                                  JUDGE:    Hon. Charles R. Breyer
17                                                   (Courtroom 8)

18    DICK/MORGANTI, a joint venture; DICK
CORPORATION; THE MORGANTI GROUP;
19    AMERICAN CASUALTY COMPANY OF
READING, PENNSYLVANIA; NATIONAL
20    UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA; and DOES 1-10, inclusive,

21

           Defendants.
22

23    AMERICAN CASUALTY COMPANY OF
READING, PA; NATIONAL UNION FIRE
24    INSURANCE COMPANY OF PITTSBURGH,
PA,
25

       Third-Party Plaintiffs,
26

27                                     -1-

1   vs.

2   BOYETT CONSTRUCTION, INC., a California
corporation; MARELICH MECHANICAL CO.,
3   INC., a California corporation; PERFORMANCE
CONTRACTING GROUP, INC. dba
4   PERFORMANCE CONTRACTING, INC., a
Delaware corporation; PERMASTEELISA
5   GROUP USA HOLDINGS CORP., a Delaware
corporation fdba PERMASTEELIS CLADDING
6   TECHNOLOGIES L.P., a Delaware limited
partnership, fdba PERMASTEELISA CLADDING
7   TECHNOLOGIES, LTD.; ROSENDIN
ELECTRIC, INC., a California corporation;
8   THIRD PARTY DOE DEFENDANTS 1
THROUGH 20.
9

10             Third Party Defendants.

11

12   I, Steven L. Iriki, declare as follows:

13       1.       I am a member of the State Bar of California and am a member of the law firm

14   Otis Canli and Iriki, LLP, the attorneys of record for plaintiff and third-party defendant

15   Performance Contracting, Inc. ("PCI") in the above-captioned case. If called upon, I could and

16   would competently testify to the matters stated herein.

17       2.       On or about June 29, 2007, PCI served a copy of its claim for equitable

18   adjustment relating to the General Services Administration Building located at the corner of 7th

19   and Mission Streets in San Francisco, California on Dick/Morganti and its sureties. The claim

20   was in the amount of approximately $7,612,331.83.

21       3.       On October 19, 2007, a status conference and hearing was held before the

22   Honorable Charles Breyer, U.S. District Court Judge Presiding, on Dick/Morganti's motion to

23   stay the above-captioned case. A true and correct copy of the transcript of the proceedings is

24   attached hereto as Exhibit A.

25

26

27

DECLARATION OF STEVEN L. IRIKI                                    Case No. 3:07-CV-02564-CRB
2010-038-Status.Conf - Iriki Decl.121007.doc

1    4.    On December 10, 2007, I received a copy of Dick/Morganti's global claim.  A

2    true and correct copy of the narrative portion of the claim without exhibits is attached hereto as

3    Exhibit B.

4        I declare under penalty of perjury under the laws of the United States of America that the

5    foregoing is true and correct.  Executed on December 11, 2007, at San Francisco, California.

6

7

8                        Steven L. Iriki

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**DECLARATION OF STEVEN L. IRIKI**                        **Case No. 3:07-CV-02564-CRB**
2010-038-Status.Conf - Iriki Decl.121007.doc

EXHIBIT A

COPY    1

                                              PAGES 1 - 26

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

        BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

        UNITED STATES OF AMERICA,     )
        FOR THE USE AND BENEFIT       )
        OF WEBCOR CONSTRUCTION,       )
        INC.,                         )
                                      )
                   PLAINTIFF,         )
                                      )
          VS.                         )        NO. CR 07-2564 CRB
                                      )
        DICK MORGANTI, ET AL.,        )
                                      )
                   DEFENDANTS.        )
        _____ )

                                 SAN FRANCISCO, CALIFORNIA
                                 FRIDAY, OCTOBER 19, 2007

                         **TRANSCRIPT OF PROCEEDINGS**

        **APPEARANCES:**

        FOR AMERICAN            HALLINAN & WINE
        CASUALTY:              345 FRANKLIN STREET
                               THIRD FLOOR
                               SAN FRANCISCO, CALIFORNIA  94102
                        BY:    **PATRICK SARSFIELD HALLINAN**
                               ATTORNEY AT LAW

                               PECKAR & ABRAMSON
                               455 MARKET STREET
                               21ST FLOOR
                               SAN FRANCISCO, CA  94105
                        BY:    **RAYMOND MARION BUDDIE**
                               ATTORNEY AT LAW
                        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

        REPORTED BY:           JAMES YEOMANS, CSR #4039, RPR
                               OFFICIAL REPORTER
                        COMPUTERIZED TRANSCRIPTION BY ECLIPSE

2

1    **APPEARANCES:   (CONTINUED)**

2    FOR PERFORMANCE            OTIS CANLI & DUCKWORTH
     CONTRACTING                180 MONTGOMERY STREET
3    GROUP, INC.:               SUITE 1240
                                SAN FRANCISCO, CA  94104
4                        BY:    **STEVEN L. IRIKI**
                                **ATTORNEY AT LAW**
5
     FOR MARELICH               CHAMBERLAIN HRDLICKA WHITE WILLIAMS
6    MECHANICAL CO.:            & MARTIN
                                191 PEACHTREE STREET, NE
7                               34TH FLOOR
                                ATLANTA, GA 30303
8                        BY:    **SETH ROGER PRICE**
                                **ATTORNEY AT LAW**
9
     FOR ROSENDIN               STANTON KAY & WATSON
10   ELECTRIC, INC.:            101 NEW MONTGOMERY STREET
                                5TH FLOOR
11                              SAN FRANCISCO, CA  94105
                         BY:    **STEVEN F. BROCKHAGE**
12                              **ATTORNEY AT LAW**

13   FOR PERMASTEELISA          HEYMAN DENSMORE LLP
     CLADDING TECHNOLOGIES:     21550 OXNARD STREET
14                              SUITE 450
                                WOODLAND HILLS, CA  91367
15                       BY:    **ROGER P. HEYMAN**
                                **ATTORNEY AT LAW**
16

17

18

19

20

21

22

23

24

25

```
1    FRIDAY, OCTOBER 19, 2007                    10:00 A.M.

2              (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

3         THE CLERK:  CASE 07-2564, THE UNITED STATES OF AMERICA

4    VERSUS DICK MORGANTI.

5              APPEARANCES, COUNSEL.

6         MR. HALLINAN:  GOOD MORNING, YOUR HONOR.

7    PAT HALLINAN AND RAY BUDDIE FOR DICK MORGANTI.

8         MR. BUDDIE:  GOOD MORNING, YOUR HONOR.

9         MR. IRIKI:  GOOD MORNING, YOUR HONOR.

10    STEVEN IRIKI FOR PERFORMANCE CONTRACT.

11         MR. HEYMAN:  GOOD MORNING.

12    ROGER HEYMAN FOR PERMASTEELISA.

13         MR. PRICE:  SETH PRICE FOR MERRILL LYNCH.

14         MR. NAGLE:  BILL NAGLE FOR WEBCOR.

15         MR. BROCKHAGE:  STEVE BROCKHAGE FOR ROSENDIN ELECTRIC.

16         THE COURT:  WELL, LET'S SEE, I HAVE A COUPLE OF

17    QUESTIONS.

18              I GUESS, I SHOULD ASK WEBCOR PCI.  THE AGREEMENT THAT

19    YOU SIGNED CERTAINLY STRONGLY SUGGESTS THAT YOU WOULD BE

20    BOUND -- THAT YOU WOULD BE REQUIRED TO STAY ANY ACTION THAT YOU

21    HAVE PENDING, THE RESOLUTION OF ANY CLAIM THAT MORGANTI HAS

22    WITH -- AGAINST GSA, HOW DO YOU -- IN YOUR RESPONSES -- WELL,

23    THESE AREN'T REALLY RELATED?

24         MR. NAGLE:  THE RESPONSE THEY BREACHED THE AGREEMENT,

25    OUR PLEADINGS STAND WE HAVE BREACHED THE AGREEMENT, SO THEY
```

1    DON'T HAVE THE RIGHTS, THAT'S NO LONGER ENFORCEABLE.

2         THE COURT:  RUN THAT BY ME AGAIN.  YOU'VE HAVE AN

3    AGREEMENT, YOU HAVE A CONTRACT?

4         MR. NAGLE:  RIGHT.

5         THE COURT:  AND THE CONTRACT PROVIDES, AMONG OTHER

6    THINGS, THAT INSOFAR AS YOU HAVE A DISPUTE AS TO HONORING THE

7    TERMS OF THE CONTRACT, YOU'RE GOING TO STAY THAT DISPUTE

8    PENDING A RESOLUTION OF ANY RELATED MATTERS THAT THE CONTRACTOR

9    HAS WITH GSA.

10        SO YOU SAY, WELL, WE DON'T HAVE TO FOLLOW BECAUSE

11   THERE'S NO WHAT?  THERE'S A BREACH?

12        MR. NAGLE:  THERE'S A BREACH FROM THE VERY INCEPTION,

13   THEY REFUSED TO PASS UP THE CLAIMS AND --

14        THE COURT:  OF COURSE, THEY'RE SAYING THEY ARE PASSING

15   UP THE CLAIMS.

16        MR. NAGLE:  THEY'RE SAYING THEY'RE GOING TO PASS UP

17   ONE, THERE'S ANOTHER SUB-SET OF CLAIMS, 61 THROUGH 65, THEY

18   HAVEN'T DONE ANYTHING ABOUT.

19        THE COURT:  LET'S JUST TAKE THE ONE THEY PASSED UP.

20   LET'S JUST DEAL WITH THAT.  AS TO THAT, WHAT DO YOU SAY?

21        MR. NAGLE:  NO, BECAUSE AS TO THAT ONE THEY BREACHED

22   THAT ONE A LONG TIME AGO.  THEY HAVE A TIME PERIOD WHICH TO DO

23   IT, THEY BREACHED THAT, SO WE'VE BEEN DAMAGED BY THAT.

24        WE'RE NO LONGER ENTITLED TO GET INTEREST ON THAT

25   BECAUSE OF THE BREACH.  WE ALREADY HAVE DAMAGES AS PLED IN OUR

1  COMPLAINT.

2       THE COURT:  THAT MAYBE TRUE, THAT WOULD BE PART OF

3  YOUR CLAIM AGAINST THEM.  I GUESS, I'M MISSING THIS.  AND I

4  HAVE TO TELL YOU, THIS IS ALL -- YOU ALL ARE SOPHISTICATED

5  BUILDERS, SURETIES AND SO FORTH AND SO ON, NOT THE FIRST TIME

6  THIS KIND OF ACTION HAS BEEN BROUGHT.

7       YOU AGREE IN THE ACTION TO STAY IT PENDING A

8  RESOLUTION OF, QUITE A BROAD STAY AS I READ IT.  IT'S NOT

9  ONLY -- IT'S NOT ONLY THE SUBMISSION OF THE CLAIM, IT'S NOT

10  ONLY THE ADJUDICATION OF THE CLAIM, IT'S THE APPEAL.  I DON'T

11  KNOW, HOW LONG DOES THAT TAKE, YEARS?

12       MR. IRIKI:  YOUR HONOR --

13       THE COURT:  THAT SORT OF CUTS IN THEIR FAVOR, TO TELL

14  YOU THE TRUTH.

15       MR. NAGLE:  THAT'S THE PROBLEM, WE'VE BEEN DAMAGED NOW

16  FOR MONTHS.  THAT PROCESS COULD TAKE YEARS.  THEY SAT ON IT, SO

17  THEY'RE GAINING ON THE BACK OF ALL THE CONTRACTORS HERE BY

18  PROLONGING THIS PROCESS.

19       MR. IRIKI:  YOUR HONOR, STEVEN IRIKI FOR PERFORMANCE

20  CONTRACTING.  I THINK, IN RESPONSE TO YOUR QUESTION I WOULD

21  HAVE TWO ANSWERS.

22       FIRST, A LOT OF MY CLIENT'S CLAIM IS NOT AGAINST THE

23  GSA, DOES NOT INVOLVE THE GSA, IT'S AGAINST DICK MORGANTI.

24       THE COURT:  I UNDERSTAND.  THAT CLAIM YOU SAID, FOR

25  EXAMPLE, I'M SUPPOSED TO BE PAID ON A WEEKLY BASIS, OR

1    BIWEEKLY, OR BIMONTHLY, WHATEVER IT IS, THEY DIDN'T DO IT,

2    THAT'S ONE CLAIM, RIGHT?

3            **MR. IRIKI:**  YES, YOUR HONOR.

4            **THE COURT:**  SO YOU SAY THEY DIDN'T DO IT, WHAT ARE

5    THEY GOING TO SAY?

6            MY GUESS IS, ALTHOUGH, I DON'T KNOW, MY GUESS IS,

7    YEAH, LET'S ASSUME THEY DIDN'T BECAUSE I CAN'T BELIEVE THEY

8    COME IN AND SAY THEY DIDN'T, THEY DID, SO THEY'LL SAY THAT'S

9    RIGHT, WE DIDN'T AND THE REASON WE DIDN'T WAS BECAUSE WE

10   WEREN'T BEING PAID IN A TIMELY BASIS BY GSA OR WHATEVER IT IS,

11   AND THERE WERE ALL OF THESE ISSUES.

12           AND SO WE COULDN'T, MAYBE THAT'S THE ARGUMENT,

13   ALTHOUGH I DON'T KNOW, WE COULDN'T PAY YOU EVERY TWO WEEKS OR

14   MAYBE THEY'LL EVEN DISPUTE WHATEVER IT WAS, BUT I'M HAVING A

15   HARD TIME SEEING AT THIS STAGE WHY THEY WOULDN'T ABLE TO MAKE

16   AN ARGUMENT OR MAYBE THEY WOULDN'T, THAT IT'S NOT RELATED.

17           **MR. HALLINAN:**  YOUR HONOR -- IT'S ALL RELATED.  AND

18   THESE BEING SOPHISTICATED BUILDERS, THESE ARE SOME OF THE

19   BIGGEST BUILDERS IN THE COUNTRY, THEY KNEW EXACTLY WHAT THEY

20   WE'RE GETTING INTO.

21           EVERY FEDERAL PROJECT OF ANY SIZE ENDS UP WITH THESE

22   SAME DISPUTES BECAUSE THE CONTRACTING OFFICER IS LOOKING OUT

23   FOR SPENDING MONEY FOR THE GOVERNMENT AND DOESN'T OKAY CHANGE

24   ORDERS, WHICH ARE VIRTUALLY INVARIABLE IN THESE KIND OF

25   PROJECTS.

1        AND THEY SIGNED THAT AGREEMENT, IT WAS MATERIAL TO US

2    BECAUSE WE NEED THEM AND THEY NEED US.  THAT'S ONE OF THE

3    THINGS THAT I DON'T REALLY -- I HAVE TROUBLE GRASPING BECAUSE

4    THEY NEED DICK MORGANTI TO HELP THEM GET THEIR MONEY AND THEN

5    THEY'RE SUING US.  THEY PUT US AT LOGGER HEADS AND INSTEAD OF

6    GETTING OUR HELP THEY GET OUR OPPOSITION.

7        WELL, THAT CONDITION THAT WE PUT IN THERE WAS

8    SPECIFICALLY TO MEET EXACTLY WHAT THESE PEOPLE ARE TALKING

9    ABOUT.  AND THEIR CLAIMS THAT DICK MORGANTI OWES THEM APART

10   FROM THE GOVERNMENT.  THOSE ARE PART OF OUR POSITION AGAINST

11   THE GOVERNMENT THAT WE WANT TO COLLECT THROUGH THE PROCESS OF

12   CONTRACT, OF THIS CONTRACT RESOLUTION.

13       WE DON'T -- WE WERE A GENERAL CONTRACTOR WHO PUT

14   TOGETHER THE SUBCONTRACTORS, WE DIDN'T DO THE WORK.  WHAT

15   HAPPENED IN THIS CASE IS THE GOVERNMENT GAVE US A SET OF PLANS

16   TO WORK OFF OF WHICH WERE DEFECTIVE.

17       **THE COURT:**  YOU DON'T HAVE TO TELL ME THIS,

18   MR. HALLINAN, I ACTUALLY READ THE MEMO, AND IT HAD, AT LEAST, A

19   PLAUSIBLE RING --

20       **MR. HALLINAN:**  YES.

21       **THE COURT:**  -- TO IT.  I'VE HAD ENOUGH EXPERIENCE

22   DEALING WITH THE GOVERNMENT, IN PARTICULAR GSA.  AND WHO KNOWS

23   THE MERITS OF ANY PARTICULAR CLAIM, I DON'T.  THEY RISE AND

24   FALL ON THE PARTICULAR CLAIM.

25       BUT THERE WASN'T ANYTHING EXTRAORDINARY ABOUT THE

1  CLAIM THAT THE PLANS AND SPECIFICATION WERE TOTALLY INADEQUATE,

2  RIPE WITH ERROR, REQUIRING MASSIVE CHANGE ORDERS, THROUGH THE

3  INCOMPETENCE OF THE CONTRACTING PARTY, THAT HAD, AT LEAST, IT

4  WAS NOT IMPLAUSIBLE, LET ME PUT IT THAT WAY.

5        HAVING PASSED ON THE MERITS, I DON'T KNOW I EVER

6  PASSED ON THE MERITS BECAUSE OF THIS WHOLE OTHER PROCESS,

7  THAT'S PROBABLY NIGHTMARISH IN ITS OWN WAY, IT'S CERTAINLY

8  BYZANTINE AND KAFKAESQUE BEING THAT'S YOUR CHOICE.  YOU MADE

9  YOUR BED YOU HAVE TO LIVE WITH THAT.

10        **MR. HALLINAN:**  BUT THEY LOSE.

11        **MR. IRIKI:**  I WOULD LIKE --

12        **THE COURT:**  WAIT A MINUTE.  I'M HAVING COLLOQUY WITH

13  MR. HALLINAN, I'LL GO BACK.

14        **MR. HALLINAN:**  THEY LOSE NOTHING, JUDGE, WHATEVER.

15        **THE COURT:**  I DON'T KNOW.  THEY ARGUE THAT, I THINK,

16  IN SOME RESPECTS THEY LOSE SOMETHING THEY COULD, WHICH IS

17  NUMBER ONE, A SPEEDIER RESOLUTION OF THEIR CLAIM THEN

18  OTHERWISE.

19        NUMBER TWO, THEY MAKE THE ARGUMENT, RIGHT OR WRONG,

20  THAT THESE ARE CLAIMS THAT ARE NOT CLAIMS THAT ARE GOING TO BE

21  OR PROPERLY BE COGNIZABLE IN THIS PROCESS WITH THE GOVERNMENT.

22        SO WHAT I LOOKED AT, JUST SORT OF CUT THROUGH SO YOU

23  UNDERSTAND WHERE I'M COMING FROM, I THOUGHT, LOOK, THIS IS WHAT

24  I'LL DO.

25        I'LL STAY IT UNTIL LIKE NOVEMBER -- WELL, I'LL STAY

1    IT.  I'LL REQUIRE AS A CONDITION OF THE STAY THAT THE GLOBAL

2    CLAIM BE SUBMITTED TO THE CONTRACTING OFFICER ON OR BEFORE

3    NOVEMBER 30TH.  YOU SAID YOU CAN DO IT NOVEMBER OR DECEMBER, SO

4    THAT GIVES YOU ONE DAY AWAY FROM THE OUTER LIMIT, BUT

5    NOVEMBER 30TH.

6         I THINK, YOU CAN DO IT BY THIS TIME, IT'S AN OLD --

7    YOU DON'T INDICATE YOU CAN'T, SO I'M GOING TO CONDITION THE

8    STAY UPON SUBMISSION OF A GLOBAL CLAIM BY NOVEMBER 30TH.  I

9    THEN AM GOING TO HAVE YOU PEOPLE COME BACK IN, THEN EVERYBODY

10   WILL SEE WHAT THE CLAIM IS.

11        THE EXTENT THAT THE CLAIM APPEARS TO BE GENUINELY

12   RELATED I'LL HAVE TO MAKE SOME DETERMINATION WHAT THAT MEANS TO

13   THE CLAIM THAT MORGANTI PUTS FORWARD TO THE GOVERNMENT, I

14   THINK, I HAVE TO STAY IT.

15        I THINK THAT'S ENTIRELY APPROPRIATE, UNDER THE TERMS

16   AND CONDITIONS OF THE SUBCONTRACTORS' AGREEMENT WITH MORGANTI,

17   SEEMS VERY EXPLICIT THERE.  I DON'T HAVE TO READ IT TOO BROADLY

18   TO SEE WHETHER OR NOT IT WOULD BE STAYED.

19        TO THE EXTENT IT'S REALLY INDEPENDENT OF IT AND

20   WOULDN'T INVOLVE THESE SAME ISSUES, THESE ARE TOTALLY

21   COLLATERAL.  SOME ISSUES OUT THERE THAT HAVE NOTHING TO DO WITH

22   THE GOVERNMENT, MORGANTI'S CLAIM, NOT INCLUDED IN MORGANTI'S

23   CLAIM MAY NOT BE, I DON'T KNOW, JUST BECAUSE IT'S INCLUDED

24   DOESN'T MEAN IT'S PROPERLY INCLUDED.

25        IT'S POSSIBLE IT WOULDN'T BE INCLUDED, POSSIBLE

1    WOULDN'T BE MORE APPROPRIATELY INCLUDED AT THAT POINT.  AT

2    LEAST, THE PARTIES, THE OTHER PARTIES CAN TAKE A LOOK AT IT.

3         IT'S NOT A SECRET THEY'LL LOOK AT IT AND IF THEY

4    BELIEVE THAT IT'S NOT RELATED TO THE SUBMISSION OF THE CLAIM

5    AGAINST THE GSA, THEN THEY CAN MAKE THEIR ARGUMENT FOR RELIEF

6    FROM THE STAY.

7         NOW, I WOULD ONLY SAY THAT I AM REJECTING THE ARGUMENT

8    THAT BECAUSE THE CONTRACT HAS BEEN BREACHED THIS TERM DOESN'T

9    APPLY, THAT I DON'T -- THAT ARGUMENT I REJECT.

10        BUT, I THINK, IT'S A FAIR GAME TO GO AFTER ANY OF

11   THESE PARTICULAR CLAIMS, IF THEY CAN MAKE AN ARGUMENT THAT IT'S

12   NOT RELATED.  SO THAT'S WHAT MY THOUGHT PROCESS IS.  I CUT YOU

13   OFF, PCI, GO AHEAD.

14        **MR. IRIKI:**  SOME POINTS I WOULD LIKE TO RAISE, YOUR

15   HONOR.  I THINK, THE MOST IMPORTANT POINT FOR DENYING THE STAY

16   OR SCRUTINIZING THE MOTION VERY CAREFULLY IS DICK MORGANTI HAS

17   UNCLEAN HANDS IN THIS INSTANCE.

18        THEY'VE BEEN WORKING ON THIS CLAIM FOR TWO YEARS,

19   STILL HASN'T BEEN SUBMITTED.

20        **THE COURT:**  LET ME ASK YOU THIS:  WHY WOULD THEY

21   NOT -- WHY -- LET ME UNDERSTAND THIS.  YOU SAY THEY HAVE

22   UNCLEAN HANDS?

23        **MR. IRIKI:**  YES, YOUR HONOR.

24        **THE COURT:**  WHY?

25        IS IT IN THEIR INTEREST TO DELAY THE FILING OF THE

1  CLAIM OR THE PROSECUTION OF THE CLAIM?

2         THEY'RE THE PEOPLE WHO WANT THE MONEY, NOW THEY SAY

3  THAT WITH THAT MONEY THEY'LL GIVE YOU WHATEVER THEY THINK IS

4  APPROPRIATE UNDER THE CONTRACT, BUT WHY WOULDN'T THEY BE

5  INTERESTED IN GETTING PAID?

6         MR. IRIKI:  BECAUSE THEY'RE THE ONES THAT MISMANAGED

7  THIS PROJECT, THEY'RE THE ONES WHO ARE RESPONSIBLE, NOT THE

8  GSA, FOR WHAT HAPPENED TO THIS PROJECT.  THEY HAVE LOST

9  MILLIONS AND MILLIONS OF DOLLARS TO THIS PROJECT, THEY MADE A

10  CONSCIOUS --

11         THE COURT:  THAT MAYBE TRUE.

12         MR. IRIKI:  -- THEY MADE A CONSCIOUS DECISION, YOUR

13  HONOR, TO STONEWALL THE SUBCONTRACTORS, CUT THEM -- CUTOFF

14  PAYMENT SEVERAL MONTHS AGO.

15         THE COURT:  I'M ASKING YOU WHY?  WHY IS IT?

16         MR. IRIKI:  THEY'RE SHIFTING THE LOSS AND BURDEN OF

17  FINANCING THIS PROJECT TO THE SUBCONTRACTORS.

18         THE COURT:  BUT WHY?

19         WHY WOULDN'T THEY, TELL ME THEIR ECONOMIC REASON OR

20  THEIR BUSINESS REASON FOR NOT PURSUING THE CLAIM AGAINST THE

21  GOVERNMENT?

22         YOU SAY THEY HAVE UNCLEAN HANDS, THEY DELAYED, AND I'M

23  TRYING TO FIGURE OUT, I DON'T KNOW WHETHER THAT'S RIGHT OR NOT,

24  I'M JUST TRYING TO FIGURE OUT WHY THEY DO IT.

25         MR. IRIKI:  BECAUSE I THINK IN THE END THEIR CLAIM

1    AGAINST THE GOVERNMENT IS LIKELY TO FAIL AND FALL APART.

2            **THE COURT:**  THEY ARE AFRAID ON THE MERITS OF THE

3    DISPUTE, THEY'RE AFRAID THEY'RE GOING TO LOSE?

4            **MR. IRIKI:**  THE REASON I SAY THAT IS THIS:

5            THEY HAD WHAT'S CALLED A DESIGN ASSIST CONTRACT.

6    UNDER THEIR CONTRACT THEY WERE RESPONSIBLE FOR, BEFORE THE

7    PROJECT EVEN STARTED, REVIEWING THE PLANS COMPLETELY AND

8    POINTING OUT ANY ERRORS, OMISSION OR PROBLEMS THAT MAY ARISE

9    WITH THOSE PLANS.

10           NOW, THEY'RE SAYING, LOOK, WHAT HAPPENED ON THIS

11   PROJECT, YOUR HONOR, IS THAT THERE WERE PROBLEMS IN THE VERY

12   BEGINNING WITH THE CONCRETE REBAR WORK AND THE DESIGNS WERE

13   INCOMPLETE.  WELL, YOU KNOW WHAT?  THAT'S THEIR FAULT.

14           THAT'S DICK MORGANTI'S FAULT, NOT THE GSA'S FAULT.

15   UNDER THIS CONTRACT THEY WERE RESPONSIBLE FOR SAYING TO THE GSA

16   BEFORE THE PROJECT BEGAN, LOOK, YOU HAVE A PROBLEM HERE WITH

17   THIS, IT'S GOING TO AFFECT THE CONSTRUCTABILITY OR -- AND/OR

18   IT'S GOING TO AFFECT THE SCHEDULE OF THIS PROJECT.  SO THEY'RE

19   GOING TO LOSE IN THEIR CLAIM AGAINST GSA.

20           **THE COURT:**  OKAY.  WHEN, BY THE WAY, WHAT DO YOU

21   ANTICIPATE THE FINAL ADJUDICATION, AT LEAST, THE APPELLATE

22   PROCESS OF THIS CLAIM?

23           **MR. HALLINAN:**  WHAT DO WE?

24           **THE COURT:**  YOURSELF.  YOU'RE THE CONTRACTING

25   OFFICERS, HE'S SUPPOSE TO RESPOND WITHIN 60 DAYS, UNLESS YOU

1    NEED MORE TIME.  OF COURSE, YOU NEED MORE TIME.

2         MR. HALLINAN:  WE HAVE 90 DAYS TO GO DIRECTLY TO THE

3    BOARD TO ASK THE BOARD TO ORDER THE CONTRACTING OFFICER TO

4    EITHER WRITE THE LETTER OR TO -- OR TO TAKE A POSITION THAT

5    IT'S DENIED AND WE CAN THEN GO BEFORE THE BOARD, BUT WE ARE

6    INTERESTED IN GOING AS FAST AS WE CAN.

7         THE COURT:  ARE YOU GIVING ME, CAREFUL IN YOUR

8    RESPONSE BECAUSE I'M GOING TO HOLD YOU TO IT, ARE YOU SAYING TO

9    ME, THAT YOU WILL DEMAND OF THE CONTRACTING, I DON'T KNOW

10   CONTRACTING, I DON'T KNOW THE LAW IN THIS AREA, YOU WILL DEMAND

11   THAT THEY RESPOND, THE CONTRACTING OFFICER RESPOND, AND I DON'T

12   KNOW WHAT THAT TIME PERIOD IS, 60 DAYS, 90 DAYS FROM A

13   PARTICULAR DATE, LET'S SAY, YOU FILE YOUR CLAIM ON

14   NOVEMBER 30TH.

15        NOW, AS I UNDERSTAND THE LAW THAT IS SET OUT, I DON'T

16   KNOW WHETHER MY UNDERSTANDING IS CORRECT, THEY HAVE 60 DAYS TO

17   RESPOND, WITHIN WHICH TIME THEY CAN SEEK ADDITIONAL TIME.  AND

18   YOUR TELLING ME THAT BECAUSE THIS IS -- RATHER THIS IS OLD SOME

19   SENSE, YOU'RE SAYING THAT YOUR CLIENT IS GOING TO TAKE THE

20   POSITION THAT THEY'RE NOT GOING TO GIVE THE CONTRACTING OFFICER

21   ADDITIONAL TIME, THEY'RE GOING TO DEMAND THAT THERE BE A

22   RESPONSE WITHIN 90 DAYS OF SOME PARTICULAR DAY?

23        MR. HALLINAN:  WHAT I'M SAYING, WE WILL PUSH EVERY

24   BUTTON WE CAN TO GET A HEARING.

25        THE COURT:  THAT'S A BUTTON?

1    **MR. HALLINAN:** IF THEY SAY TO US WE'RE CLOSE TO A

2    SETTLEMENT WITH YOU, IT WILL BE NEXT WEEK OR NEXT MONTH, WELL,

3    IF THE COURT WANTS WE CAN COME BACK HERE AND TELL THE COURT

4    WHAT THE SITUATION IS, BUT WE WANT TO GO.

5    **THE COURT:** MAYBE THAT'S WHAT I SHOULD DO.

6    **MR. NAGLE:** MY BIGGEST CONCERN IS THE TIME HERE. WE

7    HAVE ATTACHED A SUPPLEMENTAL BRIEF, THEY ATTACHED A LETTER FROM

8    THE GSA DATED AUGUST 13TH 2007 SAYING WE NEED ANOTHER 60 DAYS.

9    AUGUST 13TH THEY GET THIS LETTER THEY DON'T DO

10   ANYTHING ABOUT IT, 60 DAYS HAS ALREADY RUN, THERE STILL NOTHING

11   BEEN DONE ABOUT IT.

12   **THE COURT:** YOU SEE NOW IT'S A LITTLE DIFFERENT, NOW

13   I'M SITTING HERE, AND I CAN REMEMBER MR. HALLINAN AND WHEN HE

14   COMES BACK HERE IN A PARTICULAR TIME IF THEY HAVEN'T DONE

15   ANYTHING AND THEY DON'T HAVE WHAT I WOULD CONSIDER A REALLY

16   STRONG REASON FOR DELAY, THEN I YELL AT HIM, I YELL AT HIM.

17   BUT HE CAN TAKE THAT, HE'S TAKEN THAT FOR YEARS. HE'S

18   OCCASIONALLY YELLED AT ME. ACTUALLY, WE GET ALONG VERY WELL

19   FOR MANY YEARS AND HIS REPRESENTATIONS TO THE COURT ARE

20   ACCURATE. AND BUT AT THIS POINT I WILL PUT PRESSURE ON

21   MORGANTI TO PROSECUTE THE CLAIM.

22   IF YOU'RE RIGHT, AND I HAVE NO VIEW OF THAT, IF YOU'RE

23   RIGHT, THEN THEY'LL BE A RESOLUTION EARLIER RATHER THAN LATER.

24   IF THEY'RE RIGHT THERE WILL BE ULTIMATELY A RESOLUTION IN THEIR

25   FAVOR, WHICH WILL BE IN YOUR FAVOR.

1       SO I CAN'T SIT AROUND HERE PREDICTING WHO'S GOING TO

2   WIN AND WHO'S GOING TO LOSE.  ESPECIALLY SOME PROCESS, I THINK,

3   IT'S ABSOLUTELY BYZANTINE.  I CAN SAY THAT THERE IS THIS

4   PROCESS THAT'S SET OUT, PROCESS YOU HAVE TO FOLLOW AND I'LL BE

5   RIGHT ON TOP OF IT.

6       I ASSURE YOU I'M NOT GOING ANYWHERE AND I WILL

7   REMEMBER WHAT EVERYBODY HAS SAID.  THIS IS AN INTERESTING CASE

8   AND HOLD PEOPLE TO TIMETABLES.

9       SO I DON'T KNOW, YOU KNOW, I AM CONCERNED THAT IN

10  PART, I'M CONCERNED THAT THE SUBS DO SUPPORT, TO THE EXTENT

11  THAT THEY FEEL APPROPRIATE TO SUPPORT THE GENERAL IN THE

12  PROSECUTION OF THE CLAIM, YOU KNOW, THESE SORT OF THE ARGUMENTS

13  THAT YOU MAKE, WHICH MAYBE ABSOLUTELY CORRECT, THEY HAVE A

14  DESIGN ASSIST CONTRACT AND SO FORTH.

15      ACTUALLY, THAT'S GOING TO BE THE ARGUMENT MAYBE GSA IS

16  GOING TO MAKE, SOMEBODY ELSE IS GOING TO MAKE.  I DON'T KNOW

17  IT'S PARTICULARLY HELPFUL TO OR -- TO BE ATTACKED FROM BOTH

18  SIDES IN THIS BATTLE.  THE MERITS WILL PREVAIL ONE HOPES, BUT

19  AT ANY RATE, THEY'RE GOING TO HAVE THEIR BATTLE WITH GSA.

20      IT'S NOT GOING TO BE A SWEETHEART DEAL WITH GSA.

21  OBVIOUSLY, THEY'VE TAKEN AN ADVERSARIAL POSITION, THEY BELIEVE

22  THEY'RE OWED MONEY.

23      IF IT TURNS OUT THAT THROUGH THEIR NEGLIGENCE THAT'S

24  SIMPLY AN ALLEGATION THEY FAILED TO EXECUTE THEIR

25  RESPONSIBILITIES UNDER THE CONTRACT, THEN THEY'LL LOSE.  THEN

1    THEY'LL LOSE.  YOUR CLAIMS ARE STILL VIABLE.

2         **MR. IRIKI:**  YOUR HONOR, ONE THING I WOULD LIKE TO

3    POINT OUT --

4         **THE COURT:**  SURE.

5         **MR. IRIKI:**  -- TO COMMENT.  MR. HALLINAN HAD AND TRIED

6    TO PAINT THIS PICTURE, A HOPEFUL PICTURE THAT THE GENERAL

7    CONTRACTORS AND SUBCONTRACTORS WILL ALL COME TOGETHER AND

8    THEY'LL ALL COOPERATE AND IT WILL BE ALL KUMBAYA.

9         THIS IS A SITUATION, YOUR HONOR, IN WHICH SEVERAL

10   MONTHS AGO, A YEAR AGO, DICK MORGANTI STOPPED MAKING CONTRACT

11   PAYMENTS TO NEARLY, I BELIEVE, ALL THE SUBCONTRACTORS HERE.

12        THIS ISN'T A SITUATION WHERE YOU HAVE ONE, OR TWO, OR

13   A FEW ITEMS IN DISPUTE, THIS IS A SITUATION WHERE THEY JUST

14   STOPPED PAYING EVERYBODY.  AND, I BELIEVE, EVERYONE HERE, ALL

15   THE PARTIES HERE HAVE OUTSTANDING CONTRACT BALANCES.

16        AND I BELIEVE, YOUR HONOR, THERE'S AT LEAST TWO MORE

17   PARTIES THAT ARE GOING TO END UP IN COURT, AND IT'S VERY

18   INTERESTING IN THEIR BRIEFING THEY TALKED ABOUT HOW THEY HAD TO

19   HIRE A REPLACEMENT SUBCONTRACTOR ALLEGEDLY FINISH MY CLIENT'S

20   WORK AND THAT SUBCONTRACTOR WAS BURGLARIZED.

21        YOU THINK THE ONE SUBCONTRACTOR THEY WOULD PAY IS

22   BERGER BROTHERS, SINCE WHATEVER BERGER BROTHERS BUILT THEM THEY

23   COULD TURNAROUND AND ALLEGEDLY GIVE IT TO MY CLIENT AND SAY

24   YOUR RESPONSIBLE FOR THIS.  AS IT TURNS OUT THEY DIDN'T PAY

25   BERGER BROTHERS EITHER.

1          THE COURT:  BERGER BROTHERS ISN'T HERE COMPLAINING.

2          MR. IRIKI:  I UNDERSTAND THEY JUST RECENTLY FILED

3    SUIT, THE CASE BEEN ASSIGNED TO JUDGE WHITE.  IT'S PROBABLY

4    GOING TO WIND ITS WAY TO THIS COURTROOM EVENTUALLY.

5          THE COURT:  OR LET JUDGE WHITE HANDLE IT.

6          MR. IRIKI:  SO THIS IS NOT A SITUATION WHERE EVERYONE

7    GOING TO COME TOGETHER.

8          THE COURT:  I DON'T KNOW WHAT'S GOING TO HAPPEN, I

9    DON'T THINK I CAN PREDICT.  AND I DON'T THINK EVERYBODY IS

10   GOING TO TAKE A DIFFERENT VIEW OF WHAT MAY HAPPEN.

11         THE ONLY THING I DO KNOW WHAT WILL HAPPEN, WHAT WILL

12   HAPPEN IS THAT I WILL STAY THE PROCEEDING.  I WILL CONDITION ON

13   THE GLOBAL CLAIM BEING FILED ON OR BEFORE NOVEMBER 30TH.

14         I THEN WANT THE PARTIES TO COME BACK HERE ON, I'LL

15   GIVE YOU A DATE IN DECEMBER, TO LET ME KNOW WHETHER OR NOT

16   THEIR CLAIM ARGUABLY IS RELATED OR NOT RELATED TO THAT WHICH

17   APPEARS IN THE GLOBAL CLAIM.

18         BECAUSE IF IT'S NOT RELATED THEN I DON'T THINK THE

19   STAY WOULD BE APPROPRIATE AS TO THAT PARTICULAR CLAIM.  IF IT

20   IS RELATED MY VIEW THE STAY WOULD BE APPROPRIATE.

21         AND THEN WE'LL TAKE IT ONE STEP AT A TIME, WE'LL SEE

22   WHERE IT IS AFTER THE CLAIM IS FILED, THEN WE'LL SEE WHERE IT

23   IS IN TERMS OF THE PROSECUTION OF THE CLAIM.

24         I'LL PROBABLY CONTINUE IT TO SOME -- AT THAT POINT

25   I'LL SEE YOU IN DECEMBER, I'LL PROBABLY CONTINUE IT TO FEBRUARY

1    OR MARCH AND SEE EXACTLY WHAT'S HAPPENED.

2              GET A REPORT FROM MORGANTI THAT THIS HAS HAPPENED,

3    THIS HAS HAPPENED.  IF I -- AND THEN GET YOUR COMMENTS ON IT

4    AND IF I BELIEVE THEY HAVEN'T VIGOROUSLY PROSECUTED THEIR

5    CLAIM, THEN I MAY GRANT RELIEF FROM THE STAY.

6              SO THAT'S ABOUT WHERE WE ARE.

7              **MR. HEYMAN:**  ROGER HEYMAN FOR PERMASTEELISA.  I JUST

8    WANTED TO ADDRESS SOMETHING NO ONE HAS ADDRESSED YET, WHICH IS

9    THE LAW, IT WAS ADDRESSED IN MY BRIEF.

10             BUT IT'S OUR POSITION, I WANT TO ASK THE COURT TO

11   CONSIDER IT IF THE COURT ALREADY HAS NOT, THAT REGARDLESS OF A

12   PROVISION IN THE CONTRACT THAT SAYS IT WILL STAY PENDING THE

13   DISPUTE RESOLUTION, THE CASES SAY THAT THE ONLY EXCEPTION TO

14   THE PROMPT PROSECUTION OF A MILLER ACT IS WHERE THERE'S

15   EXPLICIT WAIVER OF THE MILLER ACT.  NO ONE CLAIMED THERE'S AN

16   EXPLICIT WAIVER.

17             NOW, UNDER THE STATUTE IT HAS TO BE A SEPARATE WRITING

18   AFTER WORK COMMENCES, SO NO EXPLICIT WAIVER.  THE CONTRACT AS

19   WRITTEN VIOLATES THE MILLER ACT STATUTE AND THE INTERPRETATION

20   OF THAT STATUTE BY THE COURTS, WHICH IS THAT THE MILLER ACT

21   PROVIDES FOR PROMPT RESOLUTION OF SUBCONTRACTOR CLAIMS EVEN

22   WHILE THE PRIME CONTRACTORS PROSECUTING ITS CLAIM AGAINST THE

23   GOVERNMENT.

24             AND IN PERMASTEELISA'S BRIEF I CITED ALL THOSE CASES,

25   THEY WERE ALL CIRCUIT COURT OF APPEALS CASES, INCLUDING THE

1   NINTH CIRCUIT COURT OF APPEAL.

2          AND THERE'S EXPLICIT LANGUAGE IN THOSE CASES THAT

3   EXPLICITLY SAY THAT THE REMEDY FOR THE SUBCONTRACTOR UNDER THE

4   MILLER ACT, AND THE FACT THAT A PRIME CONTRACTOR HAS A CLAIM

5   FOR THE SAME AMOUNT PENDING UNDER THE DISPUTE CLAUSE OF A PRIME

6   CONTRACTORS DOES NOT AFFECT MILLER CASES.

7          **THE COURT:** DOES IT SAY I DON'T HAVE THE DISCRETION TO

8   STAY?

9          **MR. HEYMAN:** YES.

10         **THE COURT:** I DON'T EVEN HAVE THE DISCRETION?

11         **MR. HEYMAN:** THEY SAY --

12         **THE COURT:** I'M SORT OF WRONG FROM THE GETGO, IS THAT

13  IT?

14         **MR. HEYMAN:** I DON'T WANT TO SAY THAT.

15         **THE COURT:** YOU CAN SAY IT. I DON'T TAKE IT

16  PERSONALLY.

17         **MR. HEYMAN:** YES.

18         **THE COURT:** THEN I WILL TAKE A LOOK AT THAT FURTHER.

19  TAKE A LOOK AT IT FURTHER, I HAVEN'T LOOKED AT IT.

20         **MR. HEYMAN:** THE PEMBROOK CASE, THE CALDWELL CASE ARE

21  THE KEY CASES, BUT I CITED ON PAGE THREE OF OUR BRIEF A SERIES

22  OF OTHER CASES.

23         ON A PRACTICAL MATTER I ASSUME THAT DICK MORGANTI WILL

24  SERVE A COPY OF THEIR CLAIM ONCE IT'S FILED ON EACH OF

25  SUBCONTRACTORS SO WE CAN LOOK AT IT.

1          MR. HALLINAN:  SURE.

2          THE COURT:  AND I NOTICE THE STAY IS ONLY AGAINST THIS

3    CASE AND WEBCOR PURPOSE PERMASTEELISA HAS NOT YET FILED BECAUSE

4    OF IT'S TIME LINE UNDER THE MILLER ACT.

5          WE HAVE A LITTLE BIT MORE TIME TO WAIT BEFORE 90 DAYS

6    RUNS SO WE HAVE TIME, BUT WE DO INTEND TO FILE, AT LEAST, GET

7    THE MILLER ACT FILED, SO WE DON'T VIOLATE THE STATUTE.  FILE A

8    NOTICE OF RELATED ACTION.

9          MR. HEYMAN:  I WILL.

10          MR. NAGLE:  ROSENDIN IS IN THE SAME POSITION.

11          THE COURT:  AS TO EVERYBODY JUST FILE A NOTICE OF

12    RELATED ACTION.

13          MR. BUDDIE:  YOUR HONOR, IF I MAY, THEY COULD SIMPLY

14    FILE AS A CROSS-CLAIM IN THIS ACTION.

15          THE COURT:  LET HIM DO WHATEVER THEY WANT.

16          MR. NAGLE:  THANK YOU.

17          THE COURT:  ALL RIGHT.  I WILL TAKE COUNSEL, I'LL TAKE

18    A LOOK AT THAT AGAIN.

19          MR. HEYMAN:  THANK YOU, YOUR HONOR.

20          THE COURT:  BECAUSE I RATHER NOT BE WRONG FROM THE

21    GETGO.

22          MR. NAGLE:  ONE MORE POINT THAT HASN'T BEEN ADDRESSED

23    AGAINST ROSENDIN, THAT THE CONTRACT SAYS THAT THE STAY WOULD

24    RELATE TO CLAIMS BETWEEN THE OWNER AND THE GENERAL CONTRACTOR,

25    IT SAYS NOTHING ABOUT CLAIMS AGAINST THE SURETY ON THE MILLER

1   ACT BOND.

2         THERE'S NOTHING IN THE CONTRACT THAT PROHIBITS THE

3   SUBCONTRACTORS FROM PROCEEDING, NOT AGAINST DICK MORGANTI, BUT

4   AGAINST THE SURETIES.  CERTAINLY HAVEN'T SIGNED AWAY, ASSUMING

5   YOUR HONOR IS CORRECT ON THE STAY WITH REGARD TO DICK MORGANTI,

6   THESE SOPHISTICATED PARTIES, AND DICK MORGANTI'S VERY

7   SOPHISTICATED, THEY COULD HAVE INCLUDED STAYS AS TO THE BONDING

8   COMPANY AS WELL BUT THEY DID NOT.

9         **THE COURT:**  I DON'T KNOW.  THAT RAISES THE ISSUE OF

10  WHAT ARE THE DERIVATIVE RESPONSIBILITIES, RELATIONSHIP BETWEEN

11  THE TWO WHETHER DEFENSE AGAINST ONE THE CONTRACTORS ISN'T

12  AGAINST ONE WOULD AFFECT THE SURETIES AND I'M SURE IT'S

13  COMPLICATED, IT'S NOT JUST A SIMPLE, WELL, THAT'S A SURETY,

14  THAT'S THE PARTIES.

15        SO THEY HAVE DIFFERENT NAMES OR DIFFERENT ENTITIES, SO

16  GO AFTER THEM, I DON'T KNOW.  I MEAN, I'M NOT GOING TO GET

17  THERE YET.  IF I HAVE TO GET THERE THEN I'LL GET THERE, BUT I

18  THINK IT'S A VERY GOOD IDEA FROM A PRACTICAL IDEA.

19        I DON'T KNOW HOW GOOD IT IS, IT'S A PRACTICAL IDEA TO

20  ACQUIRE THE CLAIM TO BE FILED ON OR BEFORE THE 30TH.  THEY

21  DON'T FILE ON OR BEFORE THE 30TH THE STAY WILL BE AUTOMATICALLY

22  LIFTED.  I'M JUST TELLING YOU GET THAT CLAIM ON BY THE 30TH OF

23  NOVEMBER, IF NOT, THE STAY DISAPPEARS.

24        **MR. NAGLE:**  JUST TO CLARIFY WITH RESPECT TO

25  PERMASTEELISA AND ROSENDIN, THE STAY WOULD NOT APPLY TO THE

1    MERE FILING OF OUR ACTIONS?

2         **THE COURT:**  NO, I WOULD ALLOW TO YOU FILE, THAT'S A

3    QUESTION OF I WILL ALLOW YOU TO FILE.

4         **MR. NAGLE:**  THANK YOU.

5         **THE COURT:**  I HAVE NO IDEA WHETHER -- IT GETS RATHER

6    COMPLICATED AS TO WHETHER OR NOT BY VIRTUE OF THE STAY WHAT

7    HAPPENS TO THE STATUTE OF LIMITATION, WHAT HAPPENS TO DIFFERENT

8    RIGHTS AND SO FORTH.  THOUGH, YOU CAN FILE, YOU FILE THE CLAIM,

9    I WON'T PROHIBIT YOU FROM FILING THE LAWSUIT.

10        HOWEVER, IN EFFECT THE STAY WILL PRECLUDE OR WILL

11   EXCUSE MORGANTI FROM FILING A RESPONSE TO THE LAWSUIT; SO IN

12   OTHER WORDS, THEY DON'T HAVE TO TAKE ANY FURTHER ACTION BY

13   VIRTUE OF THE FILING OF THE COMPLAINT.

14        **MR. HALLINAN:**  MAY I ASK ONE QUESTION ABOUT THIS STAY

15   BEING WIPED OUT?

16        THIS OMNIBUS APPLICATION WHICH WE INTEND TO FILE,

17   WHICH WE'VE ALREADY DISCUSSED WITH GSA, WE GOT A DATE TO FILE

18   IN MARCH OR TO HEAR ON WHAT WE'VE ALREADY FILED.  IT'S

19   SUBSTANTIAL AND REQUIRES THAT ALL OF THE SUBS GET THEIR

20   INFORMATION TO US.

21        NOW, SOME OF THE SUBS HAVEN'T DONE IT AND WHAT I WANT

22   TO -- WHAT I'M ASKING IS THIS, JUDGE:  BEFORE YOU WIPE OUT THE

23   STAY CAN WE HAVE AN APPEARANCE?

24        **THE COURT:**  NO, BUT WHAT YOU CAN DO, IS YOU CAN SEEK

25   AN EXTENSION OF THE STAY BY MOTION AND, YOU KNOW, IF YOU HAVE

1    SOME, AGAIN, CAN'T PREDICT THE FUTURE, YOU MAY HAVE AN

2    ARGUMENT, BUT ABSENT GRANTING OF THE MOTION THE STAY IS OUT.

3    SO THE BURDEN IS REALLY ON YOU.

4              **MR. HALLINAN:**  FINE.

5              **THE COURT:**  TO DEMONSTRATE WHY FURTHER EXTENSION

6    SHOULD BE GRANTED.

7              **MR. HALLINAN:**  THAT'S FINE.

8              **MR. NAGLE:**  YOUR HONOR, I HAVE A CONCERN ABOUT THAT

9    BECAUSE IF THIS KEEPS GETTING EXTENDED OUR CLIENTS --

10             **THE COURT:**  I HAVEN'T EXTENDED ANYTHING.

11             **MR. NAGLE:**  BUT I'M JUST LOOKING AT THE FUTURE.

12             **THE COURT:**  WE CAN'T DO THAT.

13             **MR. NAGLE:**  WHAT MECHANISM CAN WE HAVE TO TRY TO SEEK

14   RELIEF FROM THE STAY IMMEDIATELY UPON WE'RE GOING TO GET THIS

15   CLAIM?

16             **THE COURT:**  WHAT HAPPENS IS THAT THE STAY IS

17   CONDITIONED IF, IN FACT, THE CONDITION HASN'T BEEN MET AND NO

18   FURTHER CONDITIONS HAVE BEEN IMPOSED, THEN YOU JUST GO, YOU

19   JUST PROSECUTE.  YOU'RE RELIEVED FROM THE STAY.

20             I'LL WRITE AN ORDER, I'LL WRITE A STAY ORDER, SO THAT

21   WILL TRY TO BE CLEAR AS TO WHAT IT IS.

22             **MR. NAGLE:**  WHAT I'M CONCERNED ABOUT, OKAY, LET'S SAY

23   THAT --

24             **THE COURT:**  I'M AROUND, AT LEAST, I WILL BE IN THE

25   LATTER PART OF NOVEMBER AND YOU CAN COME IN.

1          MR. NAGLE:   WELL PROBABLY IMMEDIATELY THEN SEEK RELIEF

2    FROM ASPECTS OF THE STAY.

3          THE COURT:   YOU MIGHT.  YOU MIGHT NOT.  I HAVE TO LOOK

4    AT YOUR CLAIM.

5          MR. HALLINAN:   WHY DO YOU FEAR, BE OF LITTLE FAITH

6    WE'RE GOING TO GET CRACKING ON IT.

7          MR. NAGLE:   THIS HAS BEEN GOING ON FOR MONTHS.

8          THE COURT:   ANY RATE, WE DON'T HAVE TO HEAR IT, WE'LL

9    SEE WHAT HAPPENS.

10          THANK YOU VERY MUCH.

11          MR. PRICE:   MARELICH WOULD NEED THE SAME RELIEF FROM

12    ROSENDIN, WE NOT YET PERFECTED.

13          THE COURT:   NO PROBLEM, GRANTED.

14          MR. IRIKI:   IN THE STAY ORDER THE COURTS SET A FURTHER

15    STATUS CONFERENCE?

16          MR. HALLINAN:   WE NEED A DATE.

17          THE COURT:   DECEMBER I'D LIKE YOU ALL TO COME IN, YOU

18    ALL FREE ON THE 24TH, IT'S A MONDAY?

19          I'LL HAVE YOU COME IN.  WELL, I DON'T WANT TO DO THAT

20    TO YOU.  I HAVE A TRIAL, I'M JUST TRYING TO FIGURE OUT, I

21    THINK, CAN I HAVE YOU COME IN ON THE 19TH IN THE AFTERNOON AT

22    3:00 P.M.?

23          MR. HALLINAN:   THAT'S FINE BY US.

24          THE COURT:   DECEMBER 19TH 3:00 P.M.

25          MR. HALLINAN:   THANKS VERY MUCH.

1          MR. IRIKI:  THANK YOU.

2      MR. HALLINAN:  THANK YOU.

3              (PROCEEDINGS ADJOURNED.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 2ND DAY OF NOVEMBER, 2007.


JAMES YEOMANS, CSR, RPR

EXHIBIT B



# Dick/Morganti Joint Venture

# Claim for Equitable Adjustment San Francisco Federal Office Building Project

## Contract No. GS-09P-02-KTC-0002



UNITED STATES OF AMERICA
NEW SAN FRANCISCO FEDERAL OFFICE BUILDING

Submitted on
# November 30, 2007

# Volume I
# Claim Narrative

# DICK/MORGANTI JOINT VENTURE CLAIM FOR EQUITABLE ADJUSTMENT

## FOR THE

## SAN FRANCISCO FEDERAL BUILDING PROJECT

### CONTRACT NO. GS-09P-02-KTC-0002

**November 30, 2007**

Table of Contents

Section A.        Executive Summary

Section B.        Project Description, Contract History and Background

                  1. The San Francisco Federal Office Building Project

                  2. Design/Assist and Construction Phases of the
                  Contract

Section C.        Statement of Entitlement Issues

                  1. Rebar Congestion

                  2. Concrete Finish

                  3. Support Steel For Flat-Lock Panels (F-L Lines)

                  4. Window Wall/Concrete Camber

                  5. GSA Directed Tenant Improvements (IB Nos. 52, 53,
                  56 and 61)

                  6. Cumulative Impact from GSA's Defective / Deficient
                  Design and GSA's Directed Changed and Added Work

Section D.        Schedule Analysis and Delays to the Work

Section E.        Subcontractor Claims

Section F.        Pending Dick/Morganti Board Appeals

Section G.        Damages

Section H.        Conclusion

                  Certification

# SECTION A - EXECUTIVE SUMMARY

This document contains the claim for equitable adjustment of Dick/Morganti, A Joint Venture, on the San Francisco Federal Building (the "Project"). It sets forth the contractual entitlement for the additional compensation which will be sought from the GSA by Dick/Morganti and its subcontractors.

As described in detail in this document, the GSA's design documents for this Project were full of deficiencies, errors and omissions. Given that Dick/Morganti had a right to rely on the accuracy, completeness and constructability of the GSA design documents when it submitted its lump sum bid, and subsequently signed its Contract, the magnitude of the defects and deficiencies in the design documents resulted in a breach of GSA's contract obligations. The major examples of the deficiencies, errors and omissions in the design documents are identified and detailed in this document. Those major issues are discussed under the following sections of the claim – Rebar Congestion; Concrete Finish; Support Steel for Flat-Lock Panels (F-L Lines); Window Wall/Concrete Camber; and GSA Directed Tenant Improvements (IB #'s 52, 53, 56 and 61). These identified problems each represent serious problems in the GSA design documents or significant GSA-directed changed/added work which was not reflected in the Contract documents and specifications. Dick/Morganti and its subcontractors incurred substantial added expenses and delays in performing their contract work while dealing with these design defects/deficiencies, and in incorporating the changed/added work into the Project.

Additionally, Dick/Morganti and its subcontractors were forced to incur significant additional costs and delays as a result of the shear magnitude of design defects and deficiencies on the Project. Dick/Morganti submitted over 4,000 RFI's on this Project. Approximately 3,600 of those RFI's were caused by or were addressing errors and omissions in the GSA's design

documents. Other indications of the magnitude of the design defects and deficiencies on the Project are the amount and necessity for the changed and added work to the Dick/Morganti Contract. To date, the GSA has issued approximately $8,700,000 of change orders to the Contract. Additionally, Dick/Morganti has approximately $10,000,000 in open or disputed change order requests on the Project. Dick/Morganti and is subcontractors incurred substantial additional administrative and field support costs, as well as the significant costs of labor inefficiencies and delays, in handling and absorbing the cumulative amount of design defects and deficiencies on this Project.

Also included in this claim document is a schedule analysis performed by an experienced outside scheduling consultant. The Project was recognized by the GSA as substantially complete on February 28, 2007, 473 days after the Contract substantial completion date of November 18, 2005. During the Project, the GSA had issued a total of 59 days of time extension to the Contract substantial completion date. As explained in the claim document, the schedule analysis focused on explaining the causes for the delays to the Project. In summary, the schedule analysis demonstrates that the 473 day delay in achieving substantial completion is excusable, and that 406 of those days are compensable for Dick/Morganti, as being caused by the actions and/or inactions of the GSA and its agents.

Dick/Morganti incurred staggering financial losses in completing this Project. While not yet know for certain, Dick/Morganti has reason to suspect that every one of its major subcontractors also incurred substantial losses on this Project. These huge cost overruns and losses are the result of the problems identified in the attached claim document. Those problems were caused by, or are the responsibility of, the GSA.

In the near future, Dick/Morganti will be presenting the GSA with its claimed damages, as well as the claims and damages of its subcontractors. While Dick/Morganti and its subcontractors are certainly interested in a prompt settlement of these claims, any resolution will only occur with an equitable payment from the GSA on these claims.

## SECTION B – PROJECT DESCRIPTION, CONTRACT HISTORY AND BACKGROUND

1.    **The San Francisco Federal Office Building Project.**

The new San Francisco Federal Office Building is an eighteen-story office building located at Seventh and Mission Streets in downtown San Francisco, California (the "Project"). The owner of the Project is the United States General Services Administration (the "GSA" or the "Government"). The lead design architect hired by the GSA was Morphosis. SmithGroup Incorporated was the GSA's project executive architect. Arup furnished structural engineering services, as well as mechanical, electrical and plumbing design services for the GSA's design group on the Project. Dick/Morganti, a Joint Venture, was the general contractor for the Project.

The Project consists of a 605,000 square foot complex with four primary components: The Tower; a four-story office Annex; a free-standing café with public access; and a partially-below-grade day-care center accessed through the Tower. Each of these primary features lends distinct architectural and structural challenges to the construction of the Project.

The 240-foot tall, 18-story Tower consists generally of a steel reinforced concrete structural frame with floor-to-ceiling window systems. The building relies on natural ventilation to cool the upper thirteen floors and the majority of work areas are illuminated by natural daylight. A perforated stainless steel scrim operates as a sunscreen and is located outboard of the window system on the South side of the Tower structure. This scrim is attached to the building by a structural tube steel framework. The exterior wall of the Tower Core B, between column lines F and L, also includes a flat-lock sheet metal system, in addition to the stainless steel sunscreen which is located outboard of the flat-lock sheet metal system at this location.

The Tower also is mechanically ventilated and contains a 90-foot high ground floor lobby area. The upper floors each open into three-story lobbies to work in tandem with the skip-stop

elevator system. The skip-stop feature of the elevator system basically means that, with respect to certain elevations of the building, certain elevators do not stop on every floor.

The Tower rests on a footprint 340 feet long and 65 feet wide and each floor typically is fitted with workstations along its perimeter, and meeting rooms and private offices around its interior core. The workstations and rooms are glass-enclosures and are cooled by air flowing from the building exterior through openings on the Tower's windward elevation. The air flow is vented through the opposite building façade.

While the basement through the fifth floors of the Tower have non-typical layouts, a number of the rest of the floors in the Tower, on levels six through eighteen, have typical, repetitive layouts. That is, the upper floors have the same structural layout having the upturned beams and the wave ceiling features. The Annex is a four-story typical structural metal building with metal deck and lightweight concrete. The Day Care building is a typical single story structural metal building as well. The pavilion is another typical single story structural metal building, but was independent or unattached from the other buildings.

The Tower window walls are equipped with manually operable windows, as well as a building automation system to manage HVAC needs. The exposed concrete slabs are supported by an upturned beam system.

## 2.    Design/Assist and Construction Phases of the Contract

Dick/Morganti's Contract with the GSA on this Project consisted of two work phases, a design/assist phase and a construction phase. Dick/Morganti's scope of work during the design/assist phase consisted of providing a constructability review, recommendations on building components and materials, and a proposed construction schedule based on the initial GSA design for the Project. The construction phase of the Contract consisted of Dick/Morganti

building the Project in accordance with a specific set of drawings and specifications prepared by the GSA's design team.

The GSA began the development of the Contract with Dick/Morganti on this Project by issuing Solicitation Number GS-09P-02-KTC-0002, Request for Proposal to prospective bidders on January 25, 2002 ("RFP"). The GSA incorporated by reference in the Solicitation four volumes of plans, specifications, narratives and reports. Included in the RFP was a scope of services for the Base Contract for Design Assist Services and Option for Construction Services, (Phase 1) (remediation/excavation of the site), and a scope of services for the Construction Services (Phase 2) (Building Construction). (Ex. 1.)

In Amendment 1 to the Solicitation dated February 11, 2002, the GSA issued revised plans and specifications and responded to certain contractor-submitted questions. (Ex. 2.) One of the GSA's responses was that the GSA's design architect and engineers would remain the "Architect of Record" for the Project and would produce the Construction Documents on which the contractor would base its pricing, construction plans and work scope. Consequently, the contractor was not required to provide an architect/engineer as part of its proposed team. (Ex. 2, p. 0019.)

On February 15, 2002, the GSA issued its Amendment No. 0002 to the Solicitation in which it separated Site Excavation from the Option for Construction Services and included that work in the Base Contract for Design Assist Services and Site Excavation. (Ex. 3.) This Amendment clearly identified the duration of the Base Contract for Design Assist Services and defined the scope of work as including Constructability Review, Design Resolution, Site Excavation Design, and Hazardous Materials Abatement Plan. (Ex. 3, pp. 0035-0037.)

On February 26, 2002, the GSA issued Amendment No. 0003 which added or replaced 425 pages of specifications, 229 full size drawings and 161 small drawings in the revised plans. (Ex. 4.) In Amendment No. 0005, issued by the GSA on March 8, 2002, the GSA again revised the Scope of Services and requirements for the excavation and hazardous material abatement plan. (Ex. 5.) Amendment No. 5 noted clearly the GSA's position concerning the separate nature of the design assist services and the option for construction services. It provided: *"Note: While the Base Contract for Design Assist and Site Excavation Services is separate from the Option for Construction Services, the GSA reserves the right, but not the obligation, to exercise the Option at any time during the performance of the Base Contract."* (Ex. 5, p. 0617.)

The award of Contract No. GS-09P-02-KTC-0002 (the "Contract") by the GSA to Dick/Morganti was made on May 6, 2002. (Ex. 6.) In the award, the GSA noted that funds for the Contract were not available at that time and that the GSA's obligations under the Contract were contingent upon the availability of funds from which payment could be made. The GSA accepted Dick/Morganti's base bid of $3,572,000.00 for the design/assist and the site excavation portion of the Contract. (Ex. 7.) Of that amount, $597,000 was for the design/assist work.

Dick/Morganti did not receive a notice to proceed with the design/assist and site excavation work on the Contract until August 16, 2002. (Ex. 8.) However, in a good faith effort to assist the GSA in its efforts to lower the projected Project costs to a range that was within the GSA's budget for the Project, and with the encouragement of the GSA personnel, Dick/Morganti commenced its work on the design/assist phase of the Contract and attended the first construction /design meeting with the GSA and its representatives and designers on May 23, 2002. Dick/Morganti believed that it could provide valuable input to the GSA by early involvement in the Project.

From May 23, 2002 through August 29, 2002, Dick/Morganti participated in design/assist efforts and, on September 16, 2002, provided the GSA with Dick/Morganti's report on constructability of the Project documents and design drawings that had been issued by the GSA as of August 16, 2002. (Ex. 9.) As requested by the GSA, Dick/Morganti's main contributions during the design/assist period involved its efforts to assist the GSA in controlling costs by offering value engineering suggestions to bring the Project estimated cost into the range of the GSA's budget. At no time did Dick/Morganti assume any design responsibility to supplement or complete the Project design, the preparation of which was the responsibility of the GSA's own design team. In fact, the GSA made clear during the initial proposal phase that Dick/Morganti did not need to have a design professional on its Project team because the design work was being handled by the GSA's design team.

The major points addressed by Dick/Morganti in its constructability report were equipment and materials availability, material/equipment lead time, labor availability, means and methods, and conflicts. Among the concerns raised by Dick/Morganti at this time was the incomplete nature of the GSA's August 16, 2002 design documents.

In September 2002, the GSA reviewed, approved and returned to Dick/Morganti the site excavation work plans required under the Contract specifications. (Ex. 10.) Dick/Morganti continued to perform its design/assist services by meeting with the GSA and its agents and, in October, 2002, the GSA issued a substantially revised set of construction drawings and specifications which added significant quantities of material to the Project design and increased estimated costs by over $8 million. (Ex. 11.) The GSA developed an action plan which Dick/Morganti then followed through December 2002 with respect to the design/assist and design resolution efforts. Again, as requested by the GSA, Dick/Morganti's contributions during

this time period were in the areas of cost control and value engineering suggestions, including advice on building components.

In November 2002, the GSA issued yet another set of revised drawings and plans for the Project that were known as the "GMP Drawings" because they were thought to comprise the basis on which a Guaranteed Maximum Price would be developed by Dick/Morganti for the construction option, should the GSA exercise that option under the original Contract. (Ex. 12.) Dick/Morganti continued working with the GSA and its design team during November and December 2002 in order to develop value engineering suggestions, equipment recommendations, and comments on building components.

On January 24, 2003, the GSA informed Dick/Morganti that the GSA would decline to exercise the option for construction services contained in the base contract with Dick/Morganti and that the GSA would, through an open solicitation, solicit other fixed price proposals for the construction of the Project, unless Dick/Morganti agreed to construct the Project for a fixed lump sum price within the GSA's budget. (Ex. 13.) The GSA gave Dick/Morganti twenty-four hours within which to agree to construct the Project at the GSA's budget price.

Dick/Morganti responded to the GSA's ultimatum by agreeing in principle to construct the Project for a fixed lump sum price within the GSA's budget, subject to finalizing the scope of work and subject to resolution of the open and pending value engineering proposals, equipment suggestions, building component suggestions, and other matters affecting the scope and potential cost of performing the work. Over the following weeks, Dick/Morganti, the GSA, and the GSA's agents worked to resolve the scope issues and other pending issues so that a fixed lump sum price could be proposed by Dick/Morganti.

As part of the effort to define the scope of work to be included in Dick/Morganti's fixed lump sum price for construction, the GSA issued on February 14, 2003, a completely revised set of construction documents for the Project and informed Dick/Morganti that a fixed lump sum proposal was needed by February 18, 2003. (Ex. 14.) Consequently, Dick/Morganti and its subcontractors obtained the GSA's revised and reissued drawings and construction documents, took off the quantities and work scope, and priced the work indicated on those revised drawings. A price was proposed by Dick/Morganti that was within the GSA's budget, but the price was based strictly on the quantities and scope of work indicated in the February 14, 2003 construction drawings and Contract documents.

As part of Dick/Morganti's effort to provide a fixed lump sum price based on the February 14, 2003 construction documents and drawings, it was necessary for Dick/Morganti and the GSA to resolve the outstanding scope issues. These issues were resolved in one of three ways. First, many of the scope issues were resolved by the GSA's revised February 14, 2003 drawings and construction documents themselves, in the sense that work not indicated by the February 14, 2003 Contract documents was not priced by Dick/Morganti, and was not included within the scope of the work included in Dick/Morganti's price.

Second, certain value engineering proposals and scope changes that were not resolved in time to be included in the February 14, 2003 Contract documents were negotiated and resolved by PS-09 (the GSA's Contract Modification awarding Dick/Morganti the construction phase of the Project). (Ex. 15.) The attachments to PS-09 clarified the scope of work and certain items that were included in Dick/Morganti's fixed lump sum price for construction.

Third, work items and issues that had been discussed or proposed during the design assist phase of the Project, but were neither incorporated into the February 14, 2003 drawings or in the

attachments to PS-09, were taken out of consideration and were not priced by Dick/Morganti or included in its Contract scope of work.  Consequently, the scope of work description contained in PS-09 modified the language of the original construction option contained in the base Contract option for construction services to clarify that the scope of work included within Dick/Morganti's fixed lump sum price was limited to the work indicated in the revised February 14, 2003 construction documents.

The revision to the scope of work contained in PS-09, together with the changes in payment method on the Contract from guaranteed maximum price to fixed lump sum, were intended to clarify that work neither indicated in the February 14, 2003 construction documents nor described in the attachments to PS-09 was not within the scope of Dick/Morganti's fixed lump sum price for construction of the Project.

On February 25, 2003, the GSA executed Amendment PS-09 to the Contract in which the GSA modified the scope of the construction services to reflect that the Dick/Morganti's pricing was based on constructing the Project *in accordance with the Contract, including but not limited to the Construction Documents, dated February 14, 2003*.  Subsequently, on February 28, 2003, the GSA issued modification PO-10 to the Contract exercising its option for the construction services described in PS-09.  (Ex. 16.)

On March 18, 2003, the GSA issued to Dick/Morganti a Notice To Proceed with respect to the construction phase services of the Contract as prescribed by PS09 and the attachments.  (Ex. 17.)  Under the terms of the Notice to Proceed, Dick/Morganti was given five days, or until March 24, 2003, to proceed with the Contract.  Under the terms of the Contract, Dick/Morganti was required to substantially complete construction of the Project within 970 calendar days after the GSA's Notice To Proceed.  Given the date of GSA's Notice to Proceed, the original

substantial completion date for the Contract was November 18, 2005. Dick/Morganti immediately mobilized to commence work on the construction phase upon receipt of the GSA's Notice To Proceed.

Notwithstanding the GSA's demand for a fixed price, lump sum contract arrangement based solely on the plans and specifications as set forth in PS-09 and PO-10, the GSA during the course of the Project construction, repeatedly relied on information discussed and information contained on preliminary drawings (but not contained on the February 14, 2003 Contract drawings), to reject change order requests of Dick/Morganti and its subcontractors. The GSA's practice in this regard continued well into the duration of the Project and was the basis for the GSA's rejection of a significant number of change order requests (and the substantial costs incurred) by Dick/Morganti and its subcontractors in performing changed and extra work that was neither indicated in the February 14, 2003 Contract drawings and specifications nor set out in the attachments to PS-09 and PO-10.

Dick/Morganti continued to press its position with the Contracting Officer in regard to the GSA's contention that Dick/Morganti was somehow responsible for performing work that was discussed during the Design/Assist phase, but not included in the Contract documents. Not until August 5, 2005, however, did the Contracting Officer finally abandon the GSA's position in this regard. In his letter of 5 August 2005, the Contracting Officer wrote:

> Regarding the issue of design assist, it was agreed that the design assist phase of the contract was performed to produce a working set of construction drawings. Those drawings were issued on February 14, 2003. These drawings are the basis for all discussions regarding change orders – handled as construction drawings on any conventional construction project. Change order issues will not be summarily dismissed

because of a perception that Dick should have been aware of an issue prior to issuance of these drawings. (Ex. 18.)

Even though the GSA's Contracting Officer came to the position outlined in his letter of 5 August 2005, above, the GSA never reversed its previous rejections of numerous change order requests on the basis that Dick/Morganti should have included the work in question based on discussions which took place during the Design/Assist phase. Those change orders remain unpaid by the GSA at this time.

In this claim, Dick/Morganti seeks an equitable adjustment of the Contract price and time of performance, Contract interpretation, remission of liquidated damages unilaterally assessed by the GSA, payment for changed and added work, and payment of Contract balance. Dick/Morganti's consolidated claim is being submitted pursuant to the disputes provisions in the Contract, FAR 52.233-I, the changes provision in the Contract, FAR 52.243-4 and GSAR 552.243-71 (see Amendment IV to the Contract, Attachment V) and the Contract Disputes Act 41 U.S.C. §§ 601 – 613.

## SECTION C - STATEMENT OF ENTITLEMENT ISSUES

Through the course of the Project construction, the GSA extended the Contract completion date on several occasions in response to changes or delays that were not the responsibility of Dick/Morganti. Those GSA time extensions, however, did not address the delays and additional costs incurred by Dick/Morganti and its subcontractors as a result of the substantial defects and deficiencies in the GSA's design for the Project, the significant disputed work which Dick/Morganti and its subcontractors were forced to perform by the GSA, and the large number of change order requests either rejected by the GSA or only paid in the amounts unilaterally dictated by the GSA. Due to the number and extent of changes made by the GSA to the Project design during the work, and due to the incomplete and defective nature of much of the building design, Dick/Morganti's scope of work and required time for construction were drastically, persistently and repeatedly enlarged as a result of the GSA's unilateral change order process and drawing revisions which persisted throughout the life of the Project construction phase.

The cumulative impact of the GSA's defective design and its frequent and drastic changes to the work rendered the Project an ever-worsening experience for Dick/Morganti and its subcontractors who were forced by the GSA to continue performing costly changed and extra work without adequate and timely payment, without adequate time extensions, and in the face of the repeated and nearly continual, unjustified threat of default termination.

The most significant issues and problems which demonstrate the entitlement of Dick/Morganti and its subcontractors to additional time and compensation on the Project are set forth in the following sections of this document.

1. **Rebar Congestion**

On this Project, Dick/Morganti subcontracted the construction of the steel reinforced structure to Bay Area Reinforcing ("BAR") and Webcor, Inc. ("Webcor"). BAR was subcontracted to supply and install the steel reinforcement ("rebar") for the concrete structure, (Ex. 19), and Webcor was subcontracted to supply, form, install, and finish the concrete for the structure of the Project. (Ex. 20.) Both BAR and Webcor believe that the GSA's design of the rebar and concrete structures on the Project was incorrect, defective and was not in accordance with applicable codes and standards governing the GSA's design efforts and responsibilities. Those design deficiencies and problems caused substantial additional costs and delays to the performance of not only BAR and Webcor, but had a profound effect on Dick/Morganti and essentially every follow-on subcontractor and trade that performed work on this Project.

BAR and Webcor both have submitted requests for additional compensation and time as a result of the rebar and concrete design problems. Webcor's claim was certified and submitted to the Contracting Officer on June 13, 2007 and is currently awaiting the Contracting Officer's Final Decision. BAR's request for additional compensation and time was originally submitted on July 26, 2005 as a change order request to the GSA. That BAR change order request was denied by the GSA on October 10, 2006. (Ex. 21.) BAR's claim relating to the rebar congestion issues is being finalized and, once submitted to Dick/Morganti, it will be submitted to the Contracting Officer for a Final Decision.

Based on their requests for compensation, both BAR and Webcor contend that the GSA's design of the steel reinforced and structural concrete components of the Project was deficient and defective for a number of reasons. The Webcor claim and the BAR change order request set out in more detail the factual bases for these issues and Dick/Morganti refers the GSA to those

documents. The Webcor and BAR requests for additional compensation are based on the GSA's failure to adhere to the standards and codes prescribed by the Contract documents. The Subcontractors contend that the GSA's design of the reinforcing steel failed to accurately disclose and represent the conditions created by the tolerances and congestion that were a direct product of the GSA's failure to comply with the standards and codes prescribed by its own specifications.

Under the terms of the Contract between Dick/Morganti and the GSA, the GSA was, among other things, responsible for the design of the building foundations and major structural components, including the design of the steel reinforced and structural concrete components of the building. In fact, Dick/Morganti was instructed to prepare its bid and to price this portion of the work based upon the work actually depicted in the February 14, 2003 Contract documents and drawings that were issued by the GSA for pricing and construction of the Project. Dick/Morganti did precisely that. That is, Dick/Morganti did _not_ price work that was _not_ shown on the drawings or specified in the plans and specifications with respect to the steel reinforced and structural concrete components of the Project.

The design documents at issue in regard to the steel reinforced and structural concrete components of the Project are the specifications found at Sections 3100, 3200, and 3300 of the Contract specifications, among others, along with the associated structural steel and concrete drawings. (Ex. 1, pp. 0679-0717.) These documents were provided by the GSA to Dick/Morganti for the purpose of Dick/Morganti's lump sum pricing of the steel reinforced and structural concrete portions of the Project. As changes were made and design issues arose in regard to these plans and specifications, such design changes ultimately were resolved and determined by the GSA's design team. They were not the responsibility of Dick/Morganti. That

is, the GSA had responsibility for the deficiencies in its design documents. Dick/Morganti relied upon the completeness and accuracy of the GSA's steel reinforced and structural concrete design documents in preparing and proposing its price for constructing the Project.

The GSA's design of the steel reinforced and structural concrete components of the Project was a prescriptive design in that it set out in detail the manner in which to perform and the materials to be used in performing the work. It was not a performance specification. Dick/Morganti had no discretion to deviate from these directions; rather, Dick/Morganti was required to follow the GSA's design in constructing these elements of the Project. Consequently, the GSA's design obligations carried with them the implied warranties of accuracy, completeness and constructability as dictated by the *Spearin* doctrine.

Further, as is apparent from a review of the drawings, the structure for this building has a very unique design insofar as it relates to the steel reinforced and structural concrete components of the building. It is not "standard" in any sense of the word. Among other things, the open atrium and diagonal beams intersecting horizontal and vertical beams in the same locations required the focus and attention of the GSA's design team in order to assure constructability of the design. The junctions of the foundation beams supporting the building were particularly problematic. The structural design of the building included inclined columns on the south side of the building extending downward at an angle from the sixth floor of the building to the foundation level. The structural walls and framing of the building required compliance with multiple seismic and load resisting requirements and involved heavy use of reinforced steel in key resistant elements including the pile caps, grade beam intersections, basement walls, sheer wall link beam boundary zones, and inclined columns intersecting with floor framing and diagonal beams.

The specifications applicable to construction of these reinforced components of the building, including the concrete form work and cast-in-place concrete work, are contained in specification Section 3100 pertaining to concrete formwork (Ex. 1, pp. 0679-0686), and Section 3300 pertaining to cast-in-place concrete (Ex.1, pp. 0693-0717). In addition, Section 3100-1.2(A) incorporates by reference and requires conformance with the latest editions of all applicable provisions of the ACI, ASTM, and CRSI codes and standards, unless more stringent standards were specified. The drawings applicable to the structural concrete components of the work are included in the structural drawings provided by the GSA.

Section 3200 of the specifications governs the materials to be used for the reinforcing steel and concrete for the structural components of the building. (Ex. 1, pp. 0687-0692.) The instructions and details contained in the drawings and specifications applicable to the steel reinforced and structural concrete components and the building foundations for the Project bear all the indicia of design specifications. This is true of the steel reinforced concrete beams, the steel columns, steel and concrete beams and other support members of the building. The specifications contain detailed measurements, tolerances, materials descriptions, and elaborate instructions on how to perform the Contract work. As such, they constitute prescriptive design specifications and carry with them the *Spearin* implied design warranties.

The Contract between Dick/Morganti and the GSA incorporated by reference and expressly identified the standards and tolerances applicable to the design and placement of the steel reinforcing elements for the structural concrete components of the Project. The portions of the ACI and CRSI standards identified by the GSA as binding are set out in Sections 3100, 3200, and 3300 of the specifications. The ACI and CRSI codes and standards set out in great detail the

obligations of the GSA's design team in regard to designing, engineering and detailing the structural elements of this Project.

Section 3100-1.2 of the concrete framework specifications provided that "except as modified herein, and/or detailed on the drawings, all work included in this section shall conform to the applicable provisions of the following codes and standards (latest addition) except where more stringent requirements are specified." (Ex. 1, p. 0679.) Section 3100 of the specifications lists specific Sections of the ACI standards applicable to the work including ACI 301, ACI 347, ACI 117, and others. (Ex. 1, p. 0679.) Similarly, Section 3200 of the concrete reinforcement specifications contains the same language incorporating additional portions of the ACI, ASTM, AWS, CRSI, and other codes and standards. (Ex. 1, p. 0687.) A long list of additional standards and code Sections are prescribed in Section 3300 of the specifications. (Ex. 1, pp. 0693-0695.) These standards and codes identified in the above specifications are referenced throughout the GSA's design specifications for the steel reinforced and structural concrete requirements on the Project.

The BAR request for compensation and the Webcor claim previously submitted to the GSA demonstrate that the GSA's design of many portions of the steel reinforced concrete components resulted in severe rebar congestion and tight tolerances that adversely impacted the constructability of the Project and, consequently, resulted in substantial delays on the Project and significant unanticipated costs for Dick/Morganti and its subcontractors. The BAR and Webcor claims describe the severe rebar congestion problems that occurred throughout the joints and connections of major portions of the Project from the basement through the eighteenth floor, the most severe congestion having occurred between the basement and floor six. Those claims also

identify the major areas of the building affected by the most severe occurrences of rebar

congestion as the following:

| Basement | 2nd Floor | Floors 3 through 6 |
|---|---|---|
| 1. F&L Line Boundary | 1. Core Boundary | 1. Core Boundary |
| 2. F&L Line Walls | 2. Core Walls | 2. Core Walls |
| 3. Core Boundary | 3. Core Link Beams | 3. Core Link Beam |
| 4. Core Walls | 4. A&S Line Boundary | 4. A&S Line Boundary |
| 5. Core Link Beams | 5. A&S Line Walls | 5. A&S Line Walls |
| 6. A&S Line Boundary | | 6. L to PF and F to D Beams at Line Three |
| 7. A&S Line Walls | | 7. Q to S and C to A Beams at Line Four |

The BAR request and the Webcor claim are based on the rebar congestion experienced by

them in the above areas. BAR and Webcor conclude that the rebar congestion was the direct

result of the failure of the GSA's design team to conform the drawings and specifications to the

requirements of the contractually specified codes and standards. The precise codes and standards

called out by the GSA in its plans require that the design indicate and disclose areas of rebar

congestion that may affect constructability or impact the means and methods used to construct

the GSA's specified design.

Dick/Morganti and its subcontractors based their bids and pricing for the Project on the

plans, specifications, and drawings furnished by the GSA in its February 14, 2003 Contract

documents. In doing so, Dick/Morganti and its subcontractors relied upon the information

available in the February 14 drawings and specifications. Based upon that information,

Dick/Morganti and its subcontractors developed their plans for executing the construction of the Project and determined a fixed lump sum price for construction of the elements detailed by the GSA's design.

Specifically, Dick/Morganti and its subcontractors relied upon the representations and standards set forth in the February 14 drawings and specifications in the pricing of the steel reinforced and structural concrete portions of the work. The representations and standards included the ACI, CRSI and other codes and standards specified by the GSA. These codes and standards are expressly incorporated into and made a part of the GSA's Contract documents and are binding upon both the GSA and Dick/Morganti in the course of their respective performance of Contract obligations.

BAR's and Webcor's work was greatly impacted by the rebar congestion that the subcontractors attribute to the GSA's design failures. These impacts are described in detail in the BAR request and the Webcor claim.

Had the GSA properly indicated the tight tolerances and congested nature of its reinforcing steel design, Dick/Morganti, BAR and Webcor would have planned for and priced their work much differently. Based on the GSA's failure to indicate such congestion, which failure was contrary to the Contract standards and requirements, neither Dick/Morganti nor its subcontractors were given the opportunity to consider such problems in the planning, scheduling and pricing of their work. Rather, Dick/Morganti and its subcontractors relied on the accuracy and sufficiency of the GSA's design in regard to the reinforcing steel and structural concrete components of the Project.

As a result of the GSA's defective and deficient design information, Dick/Morganti's work was delayed and made much more difficult and costly to perform. The schedule impacts to

Dick/Morganti of the GSA's defective design are described in the schedule analysis included with this narrative. The cost impacts to Dick/Morganti will be detailed in a subsequent submission to the Contracting Officer on this issue.

**2.    Concrete Finish**

As detailed in the Webcor claim previously certified and submitted to the GSA on June 13, 2007, Dick/Morganti's concrete subcontractor contends that the GSA, through its demands and directives, constructively changed the concrete finish requirements and specifications from those included in the February 14, 2003 Contract documents. In so doing, Webcor contends that the GSA required Webcor to provide a much higher level of concrete finish (a "Class A" finish) on the Project than required by the Contract documents, all at substantially increased costs.

Where the GSA constructively changes the work requirements set out in the Contract documents, such change is compensable. Similarly, the GSA's rejection of conforming work, resulting in costs to investigate the alleged nonconformity, also constitutes a compensable, constructive change to the Contract. Here, Webcor contends that the GSA rejected work that conformed to the Contract documents and as agreed upon by Dick/Morganti, Webcor, and the GSA after execution of the Contract and prior to commencing the concrete work on the Project.

The ACI standards set out and define various levels or classes of finish for concrete surfaces, including Class A, B, C, and D finishes. Use of these classifications is an accepted and normal practice in the design industry in specifying the quality and level of concrete finishes in various types of buildings and applications. This is done to avoid ambiguities and vague specifications that make it difficult to assess or determine compliance. The GSA's Contract documents, however, do not designate _any_ particular class of finish for the concrete on the Project.

Instead, as detailed in the Webcor claim document, the GSA's Contract specifications only require a level of concrete finish that is a "smooth form finish." (Ex. 1, p. 0693.) "Smooth form finish" is defined by the Contract specifications as requiring nothing more than a "smooth uniform appearance to the concrete without mottles and color variations caused by non-uniform absorption of moisture." (Ex. 1, p. 0681.) This standard – absent clarification as to what constitutes "smooth" – is vague and deficient at best. The Contract specifications, however, incorporate various provisions of industry standards with regard to concrete work including ACI 117-90, Section 4 (Tolerances for Concrete Construction and Materials) and ACI 347, Section 3.4, which apply to the concrete work at issue here.

Based on the specified industry standards, building specifications typically designate a class of finish that is required for the work. These classes are defined in ACI 117-90, Section 4.5.4. Class A finish is defined as being "for surfaces prominently exposed to public view where appearance is of special importance." Class B is defined as "coarse-textured concrete-formed surfaces intended to receive plaster stucco, or wainscoting." Class C finish is defined as the "general standard for permanently exposed surfaces where other finishes are not specified." And, Class D finish is defined as "minimum quality surface where roughness is not objectionable, usually applied where surfaces will be concealed."

Where, as here, the GSA fails to designate a different class of finish, a Class C finish is required by the ACI 117 standard which was incorporated by reference into the Contract. (Ex. 1, p. 0693.) Webcor asserts that it understood the specification to require a Class C finish. Together with ACI 347, Section 3.4, the industry standard applicable to the concrete walls at issue here would have permitted up to one-half inch "abrupt or gradual irregularities" in the formed surfaces. In fact, that is the Contract interpretation relied upon by Dick/Morganti's

concrete subcontractor, Webcor, in its initial review of the Project because the GSA did not

specify any other or any special surface finish or texture.  Absent any such specification, Webcor

contends that no knowledgeable bidder would reasonably conclude that a Class A finish was

required for any portion of the Project.  Among other things, a Class A finish is much more

difficult and expensive to construct as compared to a Class B or Class C finish.  Additionally, the

highly unusual slag-cement concrete mixture specified by the GSA for use in this building

further complicated and made even more difficult the finishing process.

    Another critical standard in regard to the GSA design team's specification of concrete

finishes is ACI 117 which is incorporated by reference into the Contract.  (Ex. 1, p. 0693.)  In the

preface to Specification Checklist for ACI 117-90, ¶ P2, the ACI Committee specifically

addressed the need for the designers to make adjustments to the needs of a particular project.  It

provided as follows:

> Building codes establish minimum requirements necessary to protect the public.
> Some of the requirements in this Standard Specification may be more stringent
> than the minimum in order to insure the level of quality and performance that the
> Owner expects the structure to provide.  Adjustments to the needs of a particular
> project should be made by the Architect / Engineer's decision on each item as
> mandatory requirement in the Project Specification.

    Quite clearly, no such specification or decision was included in the Contract documents

to demand a Class A finish or anything other than a Class C finish.  Nevertheless, the GSA and

its agents issued directives requiring a Class A concrete finish and would not accept Webcor's

work until Webcor demonstrated that a Class A concrete finish was in place.  In fact, the GSA

threatened Dick/Morganti with default and notified Dick/Morganti to remedy the fact that the

concrete finishes being installed on the Project initially were not Class A finishes. (Ex. 22.) In that demand letter, the GSA stated, erroneously, that "GSA contracted for Class A finish and we expect to receive it." (Ex. 22.)

The impacts and extra work incurred by Webcor in providing the Class A finish are detailed and set forth in its claim previously submitted and certified by Dick/Morganti to the GSA's Contracting Officer. That claim is currently awaiting a Final Decision from the Contracting Officer.

What makes the GSA's directives and actions demanding a Class A finish even more egregious is that Webcor and Dick/Morganti went to great lengths to define, with the concurrence of the GSA, the concrete finish that the GSA would accept on this Project without regard to the ambiguous Contract specifications. Dick/Morganti, Webcor, and the GSA's architect met on several occasions prior to the commencement of the concrete work to discuss this matter. After initial discussions, the parties personally inspected and viewed a nearby project at 200 Brannan Street in San Francisco previously constructed by Webcor with a Class B finish. At this meeting and viewing, the parties confirmed the finish that would be expected and provided by Dick/Morganti and Webcor for the concrete on this Project. The GSA's architect approved this quality of finish, and photographs of the 200 Brannan Street concrete finishes were taken to establish and memorialize the level of finish that would be required. Copies of those photos are included in the Webcor claim previously submitted to the GSA.

The absence of a specified and recognizable class for formed concrete finish in the GSA's Contract documents was the source of discussions between the GSA and Webcor, both prior to and following Contract award. The fact that the Contract documents incorporate by

reference and specifically provide that ACI 117 Section 4 governs the concrete finish work on the Project, by definition, requires no more than a Class C finish as defined by ACI 117.

As a result of negotiations among the parties prior to commencement of the work, Webcor contends that it agreed to provide a Class B finish as specified by ACI 117 and ACI 347.

Contrary to this agreement and the Contract documents, the GSA subsequently directed Dick/Morganti and Webcor to achieve a Class A finish. The GSA representatives repeatedly instructed and ordered Dick/Morganti and Webcor to install a Class A finish on all areas exposed to public view on this Project. As demonstrated in Webcor's claim, neither the specifications nor the ACI standards explicitly incorporated into the Contract specifications require a Class A finish on any part of the structural concrete work.

The GSA's design documents and specifications failed to identify any particular class of finish in reference to the ACI requirements. As explained in the Webcor claim, the absence of any such specifications, coupled with the indication in ACI 117-90 that a Class C finish is required for permanently exposed surfaces where other finishes are not specified, establishes that the GSA's requirement of a Class A finish is a constructive change to the Contract. Absent a specification requiring a special surface finish or texture where appearance was of special importance, there is no basis either in industry practice or in the Contract documents for the GSA's requirement of a Class A finish.

Additional details of the GSA's imposition of the Class A concrete finish requirement are included in the Webcor claim previously forwarded to the GSA by Dick/Morganti. The schedule impacts to Dick/Morganti of this additional requirement are described and illustrated in the schedule analysis included as part of this narrative. The cost impacts to Dick/Morganti of this added work will be addressed in a later submission detailing Dick/Morganti's cost impacts.

3. **Support Steel for Flat-Lock Panels (F-L Lines)**

This portion of Dick/Morganti's claim involves the exterior walls located between grid lines F and L at the Tower Core B location of the Project. The GSA's February 14, 2003 Contract documents specify on the drawings the use of a "flat-lock sheet metal system over sheet membrane underlayment." There is no question that (a) the specified flat-lock sheet metal system is part of the exterior wall for that portion of the building, and (b) Dick/Morganti had no design responsibility in relation to the exterior walls and the flat-lock sheet metal system specified at the Tower Core B location between grid lines F and L on the February 14, 2003 Contract drawings.

In some limited areas of work or portions of the building, Dick/Morganti was given certain design responsibility in regard to performance specifications contained in the February 14, 2003 Contract documents. Notwithstanding Dick/Morganti's limited design responsibility for such specified portions of the work, the GSA retained responsibility for the design of everything not specifically designated as Dick/Morganti's responsibility or not indicated as a performance specification. Dick/Morganti did not estimate the cost of work that was not shown or detailed in the Contract documents and for which Dick/Morganti was not given design responsibility because there was no basis for estimating what the GSA would prescribe for the design of the missing work items. This omitted work was not a part of Dick/Morganti's Contract responsibility and, presumably, the design of these missing items would be provided by the GSA later, and then added to the Contract by change order.

The GSA drafted the Contract documents and, in so doing, set the parameters of the respective parties in regard to design responsibilities. Any ambiguities in the lines of demarcation of design responsibility are the fault and responsibility of the GSA. For example,

the GSA design team designed the structure while certain adjunct designs were the responsibility

of the Contractor, Dick/Morganti. While this division of responsibility may at times be

confusing and even illogical, the GSA created and is responsible for any ambiguities in the lines

dividing the design responsibilities of the parties.

Dick/Morganti was assigned no *design* responsibility for the framing and support for flat-

lock sheet metal panels on the Project. Although Dick/Morganti had design responsibility for

certain interior cabin walls and ceilings, there were no flat-lock sheet metal panels attached to the

interior cabin walls. The GSA retained responsibility for design of the structural and exterior

walls, interior walls involving heavy or complex installations, and the support systems for the

flat-lock sheet metal panel systems used on portions of the Tower Core B at issue. The Contract

provided in clear terms the line of demarcation in this regard.

The GSA assigned the following responsibility to Dick/Morganti for *interior building*

*walls* known as the "cabin walls" or "cabin enclosures," in Section 09100, paragraph 1.1.A.4 of

the specifications.

"Designing of interior framing systems including stud walls, furring, suspended framing,

and Cabin ceiling framing."

Specification Section 09100, paragraph 1.3.C further provided design criteria for the interior

cabin wall and ceiling systems.

"C. Interior Wall Systems:

1. Design to provide for movement of components without damage, failure
of joint sealant, undue stress on fasteners, or other detrimental effects when
subject to seasonal or cyclic day/night temperature ranges.

2. Design system to accommodate construction tolerances, deflection of
building structural members, clearances of intended openings."

(Ex. 1, p. 1004.)  The GSA, however, made no assignment of design responsibility to Dick/Morganti for the structural support of the flat-lock sheet metal panel systems in the area of the building in dispute.  Similarly, Dick/Morganti had no responsibilities for the design of _any_ of the structural support for the building elements such as the tube steel framing – either interior or exterior.  The wall types provided in the architectural floor plans as well as Contract drawings A-840 (Ex. 23) and A-841 (Ex. 24) also indicate that Dick/Morganti's design responsibilities do not include the support structure for the flat-lock sheet metal panels.

Thus, the design of the portions of the work at issue – flat-lock Panels at Tower Core B, grid lines F to L – was not Dick/Morganti's responsibility.  That is, this work was not part of the design of the interior wall or ceiling framing for the interior cabins in the building.

Moreover, the GSA provided no information in the February 14, 2003 Contract documents, plans and specifications as to the content or nature of the support required for the flat-lock panels or in terms of design or performance requirements for structural support of the flat-lock sheet metal system in the disputed area of the exterior walls.  Thus, not only did Dick/Morganti have no design responsibility, it had no responsibility to _price_ any supporting construction work or materials because none were indicated in the Contract documents for the area in dispute.  Otherwise, Dick/Morganti would have been required to speculate as to precisely what the GSA may require and to attempt to price a truly unknown scope of work for a fixed, lump sum price.

The absence of support for the flat-lock panels in the February 14, 2003 Contract drawings is demonstrated by the drawing changes made by the GSA _after_ Dick/Morganti brought to the attention of the GSA design team the need for some indication of the required flat-lock panel support in the Tower Core B, GL F-L, portion of the building.  A comparison of the

February 14, 2003 version of detail 27 on Drawing A-820, (Ex. 25), with the revised version issued with IB 26, (Ex. 26), clearly demonstrates the changes made by the GSA designers to add the missing support for the flat-lock panels in the disputed area.

A cursory review of the drawing A-820 (Ex. 25) also demonstrates that various and differing types of support for wall systems were prescribed by the GSA in the February 14 Contract drawings, while no support was prescribed for wall systems in other areas. Thus, the drawings showed differing types of support in some areas, but indicated no support in the area of dispute, aside from the tubular steel framing depicted in the structural drawings.

The flat-lock sheet metal system referred to on the drawings applicable to the exterior walls at Tower Core B, between grid lines F and L from the 5th floor elevation to the roof elevation, is shown attached to the structural steel members. No other framing is shown as support for the sheet metal system and its sheet membrane underlayment at this location. In this sense, the GSA's February 14, 2003 specifications and drawings were not complete because they failed to indicate the manner and materials to be used in supporting the flat-lock sheet metal system at on this portion of the building.

As Dick/Morganti and its subcontractors began preparations for commencement of the flat-lock panel work, Dick/Morganti requested the design details for the flat-lock sheet metal system and sheet membrane underlayment so that the work could be appropriately planned and priced. (Ex. 27.) In response, the GSA ordered Dick/Morganti to install what was in essence *a double wall* of parallel light gauge steel framing studs, R-19 insulation, and gypsum board, as additional support for the flat-lock sheet metal system in this location. (Ex. 26.) Subsequently, the GSA denied Dick/Morganti's request for equitable adjustment for this previously unspecified work and not only required that Dick/Morganti perform the work added by the GSA in IB 26, but

also required Dick/Morganti to obtain and pay for the _design_ for this portion of the work. All this caused substantial additional costs to Dick/Morganti and delayed the completion of the Project substantially.

None of the supporting materials for the flat-lock sheet metal systems was either specified in the Contract documents or included by Dick/Morganti in its fixed price bid for this portion of the building. Consequently, the GSA's directive to Dick/Morganti to design, furnish and install these materials was a material change to the Contract which both delayed the completion of the building and increased substantially the cost of performing the work. The GSA's response to Dick/Morganti's inquiries on this issue ignored and violated the GSA's agreement that it would provide the design of this system and this portion of the work. Pursuant to the Contract provisions, Dick/Morganti therefore is entitled to an equitable adjustment in Contract price and time of performance as a result of this change ordered by the GSA.

The GSA had not completed the design of these exterior walls when it issued the February 14, 2003 Contract drawings on which Dick/Morganti and its subcontractors were obligated to base their pricing for the building. Dick/Morganti estimated and priced the work shown on the drawings applicable to the Tower Core B exterior walls between grid lines F and L. The drawings and specifications did not show any support for the flat-lock sheet metal system other than the structural steel framing designed by the GSA.

On September 30, 2003, Dick/Morganti brought to the GSA's attention this deficiency in the GSA's design by submitting RFI 806. (Ex. 27.) The RFI noted that the Contract drawings (Exs. 28, 29 and 30), showed flat-lock sheet metal panels behind a sunscreen for the full height of the Tower between grid lines F and L. Dick/Morganti explained in the RFI that the architectural and structural drawings for this portion of the exterior wall for the Tower Core B

showed the flat-lock systems supported by a tube steel frame.  (Exs. 31, 32 and 33.)  The flat-lock support was neither specified nor clearly shown in the drawings, and Dick/Morganti inquired as to whether light gauge studs were required on this portion of the exterior wall for the flat-lock system support.  Light gauge studs were shown on a drawing for a different portion of the building as infill between the tube steel framing.

On October 15, 2003, the GSA responded to RFI 806 and indicated that light gauge framing was required as infill between the tube steel structure.  (Ex. 27.)  In their response to the RFI, however, the GSA provided no design details for use in estimating or pricing these new and additional requirements for the flat-lock sheet metal system construction at this location.  Dick/Morganti again requested clarification of the make-up of the "sheet membrane underlayment" in November 2003 when it submitted RFI No. 1053.  The GSA's response again failed to indicate the required design details.  (Ex. 34.)

Then, on February 24, 2004, the GSA issued Instructional Bulletin No. 26 which included several architectural, structural, and electrical revisions to the drawings.  (Ex. 35.)  The GSA design team was in the practice of "clouding" changes on the revised drawings issued to Dick/Morganti with an Instructional Bulletin by circling or otherwise identifying the revised portions of such drawings.  Additionally, the GSA's design team was to log each revision to a drawing on the revised drawing so that each change could be keyed to the portion of the drawing being revised.

When the GSA issued Bulletin 26, it clouded and logged the changes to the various drawings included in the Bulletin by use of a small triangle and note in the title block of each drawing, _except_ for the revision to the flat-lock sheet metal system detail drawing that related to the Tower Core B exterior wall between grid lines F and L.  (Ex. 26.)  The change to detail 27

shown on drawing A-820 as revised by IB 26 was neither clouded nor logged on the revised drawing. Rather, the GSA design team clouded the roof detail directly above the added double-wall of metal studs and insulation.

Upon further review of Drawing A-820, Dick/Morganti discovered that, contrary to the version of Detail 27 on Drawing A-820 included in the February 14, 2003 *Contract documents*, the revised IB No. 26 version of Detail 27 included a double wall of metal stud framing, insulation, and gypsum board support as infill framing between the tube steel supports for the flat-lock sheet metal system specified at the Tower Core B exterior wall between grid lines F and L. This revision to Detail 27 was neither clouded nor identified with a triangular symbol or note in the title block of the drawing. (Ex. 26.) This omission is a clear indication that the GSA fully understood the importance of the omission and did not want to bring it to the attention of Dick/Morganti.

The IB No. 26 revisions to Detail 27 on Drawing A-820 clearly add a substantial support system for the flat-lock sheet metal panel system and sheet membrane underlayment in the disputed areas of the Project. As is apparent from a review of the *revised* Detail 27, the changes made in IB 26 to the flat-lock sheet metal system specified for the area in dispute, are extensive. (Compare Exs. 36 and 37.)

In general, and with respect to floors 6 through the roof of Tower Core B between column lines F and L, the original Contract drawings (February 14, 2003 set) provide extremely limited detail about the flat-lock metal panel system and the perimeter wall system of which it is a component. In particular, the plans, Sections and elevations on the A-300 series of drawings, with the exception of a single note that provides *some* description of the system, are not of

sufficient detail to enable a bidder to fully understand the requirements of the details of this construction. (Ex. 29, 30 and 32.)

It is impossible to discern from the plans, Sections, or elevation drawings on the A-300 series of drawings whether the perimeter wall has *two rows of studs*. Although there is one note referring to the flat-lock sheet metal system on such drawings, that note reveals nothing about the number of rows of studs or even the presence of gypsum board sheathing. Rather, it simply states "flat-lock sheet metal system over sheet membrane underlayment." (Exs. 29, 30 and 32.)

Drawing A-800 contains several details for the perimeter wall where the flat-lock sheet metal system is located. Some of the details on Drawing A-800 refer to "flat-lock sheet metal system over sheet membrane underlayment over gyp sheathing." (Ex. 38.) Of the details shown on Drawing A-800 that contain this precise note, only one is referenced on the portions of the plans and elevation drawings that describe construction requirements in the area near the area in dispute. That detail is Detail 40, and it depicts only *one* row of studs. (Ex. 39.) This also undermines the GSA's position in regard to these drawings which is that *two* rows of studs are required.

It must be noted, however, that the above-mentioned, unreferenced details on Drawing A-800 do not apply to floors 6 through the roof of Tower Core B, between column lines F and L because the plan, Section and elevation drawings do not associate them with the area in dispute. Thus, information from these unreferenced details, including Detail 40, is not appropriate for consideration in pricing work that does not refer to and is not associated with these details. Further, the plan drawings list wall types for many of the interior walls, but do not list wall types for the perimeter walls.

Nor do the Contract *specifications* indicate the design for the support for the flat-lock metal panel system for the exterior walls in the area in dispute. In fact, the materials specified in the sheet metal flashing and trim specification for flat-lock sheet metal panels are the sheet metal and the support clips for the panels. No requirement for a double row of studs at the flat-lock panels is articulated in this specification Section. Furthermore, this specification Section notes that the flat-lock panels are to be fabricated "as indicated on the drawings." (Ex. 1, p. 0848.) There is no indication on the drawings of the size or profile of the panels. Consequently, the specification itself is defective in that sense.

Metal stud framing is specified in Section 09100 "Metal Support Assemblies." Nowhere, however, in such Section is there a requirement for a double row of studs at the perimeter walls. This specification requires the contractor to design interior framing systems for the cabin enclosures, but contains no similar requirement for the perimeter framing systems. (Ex. 1, pp. 1003-1011.) Nor does this specification provide any specific requirements for the support of the perimeter flat-lock metal panels.

Dick/Morganti was first informed of the support requirements for the flat-lock sheet metal panels at the area in dispute on October 15, 2003, in the GSA design team's response to RFI 806. (Ex. 27.) No earlier document exists that delineates a requirement for the installation of a double row or studs and gypsum board sheathing at this location.

The flat-lock metal panel system is insufficiently detailed on the architectural drawings, especially considering that the specification requires the contractor to fabricate the sheet metal as indicated on the drawings. (Ex. 1, p. 0848.) Moreover, the stud wall requirements are not clear from the drawings. No detailed wall Section is provided for the area in dispute from which a

requirement for two continuous rows of studs, along the perimeter where the flat-lock is located, could be gleaned.

The specifications provide no additional information regarding support of the flat-lock panel system, its attachment, or the stud framing requirements. The concept of two rows of studs at this location was introduced for the first time by the GSA in response to RFI 806, eight months after construction commenced.

Upon realizing the potential magnitude of the changes required by IB 26 revisions to Drawing A-820, and specifically Detail 27, Dick/Morganti proceeded to price the additional and changed work. Between the time of the GSA's response to RFI 806 and Dick/Morganti's submission of the change order request relating to this issue, Dick/Morganti had numerous conversations with the GSA and its design team to discuss and try to resolve this situation and its impacts. Dick/Morganti attempted to explain the void in the documents and the amount of work added by the GSA's interpretation of the Contract drawings.

On June 6, 2005, Dick/Morganti forwarded to the GSA an explanation of the changes and resulting increases in Dick/Morganti's scope of work. (Ex. 40.) Dick/Morganti noted that the revision to Drawing A-820 and Detail 27 was the first and only indication of the GSA's intended design for the support for the flat-lock sheet metal system in the Tower Core B portion of the building exterior walls. Dick/Morganti further noted the fact that the GSA design team's failure to note the changes on the revised drawing was rather disingenuous and requested either direction to proceed or provision of amended Contract documents that would not constitute a change from the work indicated in February 14, 2003 Contract documents. (Ex. 40, p. 1.)

Dick/Morganti provided the GSA with a rough order of magnitude for the changes in the flat-lock sheet metal system indicated in IB 26 in the amount of $2,500,000, and further noted

that performance of the work added by IB 26 in regard to the flat-lock system at this location would have schedule impacts as well as cost impacts. (Ex. 40.) Dick/Morganti informed the GSA that, following direction to proceed from the GSA, Dick/Morganti would prepare a proposal outlining in detail the cost and schedule impacts from these changes. (Ex. 40.)

The GSA's June 9, 2005 response to Dick/Morganti's letter of June 6, 2005, is instructive. The GSA directed Dick/Morganti to proceed with the work, but to do so at Dick/Morganti's own cost. The GSA's position, notwithstanding the stark and blatantly obvious contrast between the scope of work identified in the February 14, 2003 Contract documents from that prescribed in IB 26, was that the "Government considers the referenced Issue/RFI to be already a requirement of the Contract. As such, the Contractor is hereby directed to proceed with the work as indicated in the response to RFI 806." (Ex. 41.) Rather than taking a good faith approach to dealing with the incomplete nature of the design expressed in the GSA's February 14, 2003 Contract documents, the GSA basically directed Dick/Morganti to incur these substantial added costs in performing the directed work and to "pursue a Request for Equitable Adjustment" if Dick/Morganti did not like the GSA's position on this issue. (Ex. 41.)

Understandably, Dick/Morganti responded to the GSA's June 9, 2005 directive with a further plea for a good faith response from the GSA. On July 7, 2005, Dick/Morganti again demanded a change order for this new and out-of-scope work. (Ex. 42.) By letter of July 12, 2005, Dick/Morganti also transmitted its pricing for the additional work in relation to this portion of the flat-lock sheet metal system to the GSA. Dick/Morganti's cost estimate was in the amount of $1,874,533.62. Dick/Morganti reserved its rights to time impacts in the event the added work affected the Project's completion date. (Ex. 43.)

During the period between the GSA's issuance of their response to RFI 806 and the commencement of work on the flat-lock sheet metal panel system in the disputed area, Dick/Morganti negotiated with its subcontractor, PCI, regarding the price and design for procurement and installation of the additional work and materials required to meet the GSA's demands for the flat-lock sheet metal system support. PCI took a very strong stance that the work was extra work never shown or indicated in the Contract drawings or other documents, and that all work associated with efforts to comply with RFI 806 and the relevant changes made by IB # 26 constituted changed and extra work to which PCI was entitled to money and time. (Ex. 44.)

Ultimately, Dick/Morganti was forced by the GSA to engage a designer to provide a detailed design for the support system for the flat-lock sheet metal panels in the area in dispute. Also, Dick/Morganti, at significant added and unanticipated cost to itself, engaged Berger Brothers to complete the installation of the changed and extra work required in the disputed area.

### The GSA's Positions Conflict With the Documents That Prescribe the Flat-Lock Panel Support System.

The GSA responded to Dick/Morganti's July 9 letter with a barrage of misstatements. The GSA's letter of July 13, 2005, first states that "Detail 40B on Sheet A-339 calls out the exterior *Core B* wall as being clad by a Flat-Lock Sheet Metal System." It continues, stating that "Detail 40 calls out that wall as being a Flat-Lock Sheet Metal System on a Sheet Membrane Underlayment *over Gypboard sheathing supported by 150 mm x 16 Ga. Metal Studs*." (Emphasis added.) (Ex. 45.) A review of the version of Drawing A-339 included in the February 14, 2003 Contract documents, however, reveals that the GSA's emphasized language, above, does not appear anywhere on the Drawing. Neither does Drawing A-339 address all of the floors mentioned in the GSA's letter. (Ex. 30.)

The GSA's July 13 letter also mentions Drawing A-204 and states that "at every instance where the Flat-lock Metal System is detailed, the gypboard and metal studs are shown as the infill supports; and as such, the drawings clearly convey the inclusion of the gypboard and metal studs as the design intent in a consistent manner." (Ex. 45.) Of course, nothing could be further from the truth. In actuality, there are no drawings on which the exterior walls on the Tower Core B portion of the building are detailed to show gypboard and metal studs as the infill supports. In fact, _nothing_ is shown as support for the system in this area other than for the tube steel framing. (Ex. 28.)

The fact that on a portion of the building exterior walls, other than in the area in question, the flat-lock sheet metal system is described as being supported by gypboard sheathing does not equate to a prescription that the same design is indicated for the Tower Core B area at issue. In fact, the flat-lock system in the disputed area is located much closer to the tube steel framing than in other areas of the Project. Consequently, neither Dick/Morganti nor its subcontractors had any reason to believe that the support system designed for the interior walls or other portions of the Project would even work in the disputed area. Rather, it was quite likely that a different support system would have been prescribed by the GSA.

The GSA Attempted to Conceal the Addition, in IB 26, of Flat-Lock Support for the Area In Dispute.

The GSA's explanation of IB 26 changes in Detail 27 on Drawing A-820 is similarly specious and disingenuous. In its letter of July 13, 2005, the GSA describes this change as having been provided "to convey information on how the roofing system is terminated at the roof cap" and "how the roofing cap was to be extended over the Flat-lock Sheet System." (Ex. 45.) Of course, the GSA design team's addition of two rows of metal studs, gypsum board sheathing, and insulation on the exterior walls was not necessary in order to depict the roof system details.

The GSA goes on to state in its July 13 letter that the "revised detail did not add the metal stud & gypboard framing infill as claimed by the contractor." To the contrary, even a cursory comparison of the February 14, 2003 A-820 Drawing, Detail 27, with the IB 26 version of the same detail, clearly indicates that substantial changes were made and that the GSA design team was "filling in" the missing design for the flat-lock system support for this area of the building. (Exs. 36 and 37.)

> The GSA's Reference to Drawings Applicable to Interior Walls, For Which
> Dick/Morganti Has No Design Responsibility, Does Not Support The GSA's Position.

The GSA also references in its letter of July 13, 2005, Drawing A-339, Detail 40B which references another detail on yet another Drawing, A-800 Detail 19. The latter Detail is irrelevant to the exterior framing at the core of the building, and Dick/Morganti had no design responsibility for the exterior framing in any event. Contrary to the GSA's statement, the Detail does not indicate that the flat-lock system wraps around the window wall as a continuous system. In fact, the flat-lock sheet metal "system" is not defined in the Contract documents as a "system" with gypsum board sheathing and light gauge metal framing as the support for an entire *system*. In fact, what the GSA is now claiming constitutes one continuous "system" is described variously and supported either differently or not at all, depending upon the location of each flat-lock sheet metal application depicted by the drawings.

The only locations on the entire Project where a flat-lock sheet metal system over sheet membrane underlayment on gypsum sheathing is shown to include two rows of metal studs is in very limited and specialized areas of application where standpipes are located within a wall assembly. (Ex. 46.) If anything, these details further demonstrate the fact that *different* designs for the flat-lock sheet metal support were shown *for different areas* of the Project using this flat-lock sheet metal "system." Some interior areas indicated that the flat-lock sheet metal system

would be installed over gypboard sheathing, some involving standpipes within a wall assembly indicated a double wall support system, and some – such as the exterior walls on the South side of the Tower Core B at issue in this claim – failed to provide *any* detailed design for support of the "system" other than the tube steel framing. The February 14, 2003 Contract documents do not indicate what the GSA had designed for support in the Tower Core B portion of the flat-lock panel system.

The Specifications Expressly Defer to and Direct the Contractor to the Drawings for the Requirements for Fabrications of the Flat-Lock Sheet Metal System.

The *specifications* applicable to flat-lock sheet metal panels do not support the GSA's position on this issue. The applicable specifications are contained in Section 07620 "Sheet Metal Flashing and Trim." (Ex. 1, pp. 0845-0850.) (Although flat-lock is neither flashing nor trim, the GSA included the specifications applicable to flat-lock panels in this Section of the specifications.) The specifications contain no requirement for a double row of studs at the flat-lock sheet metal system locations is specified in this Section. In fact, the Section specifically directs the contractor that the panels are to be fabricated "*as indicated on the drawings*." There is no indication on the drawings, however, of the size or profile of the panels. Consequently, the GSA's specifications are deficient and fail to provide sufficient information to permit the fabrication of such panels.

Similarly, the metal stud framing is specified in Section 09100 "Metal Support Assemblies." However, nowhere in that section is there a description of a requirement for a double row of studs at the perimeter walls. This specification requires that the contractor design *interior cabin* framing systems, but contains no similar requirement for the walls in the disputed area. Moreover, this Section provides no requirements specific to support of flat-lock sheet metal panels. (Ex. 1, pp. 1003-1011.)

On July 14, 2005, Dick/Morganti responded to the GSA's statements and directives and requested that the Contracting Officer issue a final decision on the interpretation of the Contract scope of work in regard to the support for the flat-lock sheet metal system at the Tower Core B exterior wall. (Ex. 47.) Dick/Morganti responded further via its July 19, 2005 letter to the GSA. (Ex. 48.) On July 27, 2005, the Contracting Officer issued a Final Decision denying Dick/Morganti's claim in regard to the meaning of and scope of work indicated in the Contract documents. (Ex. 49.) Dick/Morganti thereafter timely appealed this Final Decision and such appeal currently is pending before the Civilian Board of Contract Appeals, Appeal No. 420.

Not only did the GSA constructively change this portion of the work by adding an entire exterior wall support system for the flat-lock metal panel system, the GSA's design team also refused to provide a design when Dick/Morganti pointed out the omission through submission of RFI 806 in 2003. Dick/Morganti continued to request a design from the GSA design team, but all efforts to that effect were of no avail, and Dick/Morganti was required to actually provide the design details for the flat-lock sheet metal panel support system for the area in dispute.

As a result of the GSA's position on this issue, Dick/Morganti was required to incur the costs of engaging a design consultant to provide the missing design information for the subject exterior flat-lock panels. The initial design was submitted February 1, 2005 and rejected on March 25, 2005 by the GSA. A second submittal was sent May 9, 2005 and rejected by the GSA on June 9. The third submittal was provided on August 4, 2005 and returned by the GSA on August 17, 2005 marked "approved as noted."

Due to the presence of the scaffolding in the area of the lobby and Tower Core B for installation of the infill framing, insulation and gypsum board, no other work on the Project could be performed in the areas directly under the scaffolding. The only reason for erecting and

using scaffolding in the disputed area was to perform the additional work ordered by the GSA pursuant to its response to RFI 806 and the work added in IB No. 26 – the installation of the double-wall system of metal studs and gypboard sheathing to support the flat-lock sheet metal panel system.

Once the additional work ordered by the GSA was completed in January 2006, Dick/Morganti and its subcontractors removed the scaffolding and commenced installation of the actual flat-lock sheet metal system from swing stages. Once the scaffolding was removed, the interior work on the Project adjacent to and under the scaffolding system could be recommenced. This GSA directed added and extra work significantly delayed and increased the cost to Dick/Morganti and its subcontractors in constructing the Project. The schedule impacts to Dick/Morganti of this changed and extra work are described and illustrated in the schedule analysis included as part of this narrative. The cost impacts to Dick/Morganti of this changed and extra work will be addressed in a later submission detailing Dick/Morganti's cost impacts.

## 4.    Window Wall / Concrete Camber

Dick/Morganti and its subcontractors were required to perform additional, unanticipated and extra work in order to remedy the problems caused by the GSA's inaccurate and erroneous design information relating to the window wall openings.   The erroneous design information included the GSA's calculations of deflection in the beams and structural components of the building that would interact with the windows.   Dick/Morganti and its subcontractors incurred substantial additional costs and delay to the Project completion due to the additional and unanticipated work caused by the GSA's inaccurate and erroneous design information.

Pursuant to the Contract, the GSA was charged with responsibility for the design of the building structure, including the reinforced steel concrete elements. The GSA's structural design

responsibility included the design of the floor supports, including the camber and other aspects of the floor supports, as well as the window openings.

As part of the Contract, Dick/Morganti was responsible for the windows which had to fit in the GSA-designed window openings. A part of Dick/Morganti's considerations in formulating the window design and placement was the relative camber and amount of deflection that the GSA-designed floor beams were expected to demonstrate after removal of the concrete forms and the placement of certain loads during the construction process. This information was a function of the GSA's structural engineering calculations and was based on the GSA's design of the structural elements.

The information provided by the GSA regarding the performance of the structural elements of the building impacted the placing of the concrete and windows in the Tower Core A and C areas of the Project, as well as other locations. The information regarding the window wall, window openings, floor beam camber, and performance of the concrete beams supplied by the GSA for use in constructing the window wall and installing the glazing in certain areas of the Project, was materially deficient.

Early in the Project, on May 21, 2003, Dick/Morganti, its subcontractors and the GSA's design team met to discuss the coordination of the tolerances used and accepted by each of the disciplines involved in the window wall fabrication and construction. These parties included Dick/Morganti and its window and glazing subcontractor Permasteelisa Cladding Technologies, Ltd. ("PCT"), its structural concrete subcontractor Webcor, Inc. ("Webcor"), and its miscellaneous steel fabricator and supplier, T&M Manufacturing ("T&M"), all from the contractor side. Present on behalf of the GSA were its construction manager, Hunt Construction, and its design team members Morphosis and ARUP. (Ex. 50.)

One purpose of the meetings to coordinate the tolerances was to reconcile the varying tolerances used in industry standards for the different trades involved in this portion of the work. In the course of doing so, it was also necessary for Dick/Morganti and its subcontractors to consider the manner in which the structural concrete beams and window openings would perform in terms of deflection under the varying loads that would exist at the time of installation of the window wall components.  (Ex. 50.)  Among other things, Dick/Morganti's window wall subcontractor PCT, and miscellaneous steel supplier T&M, needed such information in order to complete their shop drawings and submit them to the GSA.

The particular information supplied by the GSA was with reference to the tolerances in the specifications (including Sections 03300 (Ex. 1, pp. 0693-0717) and 08920 (Ex. 1, pp. 0959-0986)).  The GSA had not coordinated the specified tolerances for the steel, concrete, and other components prior to release of the construction drawings and specifications.  Consequently, it was necessary for the subcontractors governed by these specifications to meet with the GSA and to coordinate their interpretation of the tolerances and determine the tolerances that could be used by all of them in order to perform work that would fit properly with the preceding and follow-on work of each subcontractor.

In anticipation of the May 2003 meetings to coordinate tolerances, the GSA provided a structural review for use in the meetings.  In that review, the GSA's engineer specified the manner in which the structure would perform, or move, both in the short term and in the long term.  This structural performance of the building involved determination of the extent and amount of deflection of the concrete beams, floors and other components affecting the placement and fitting of the windows.  In essence, it was necessary to understand the deflection behavior of

the building to assure that the windows would not be crushed by the building's movement and settlement as it was loaded.

On May 30, 2003, the GSA's structural design team issued a revised set of information specifying the "deflections tolerances" being required by the GSA. (Ex. 51.) Again, Dick/Morganti and its subcontractors met with the GSA on June 6, 2003, to review and coordinate the tolerances based on the GSA's revised information concerning deflections and tolerances. (Ex. 52.)

Based on the structural performance information provided by the GSA, Dick/Morganti and its subcontractors proceeded to determine, during the course of their meetings with the GSA, the acceptable tolerances for their work. Both PCT and T&M planned the installation of their systems using these tolerances based on the information provided by the GSA with respect to amount of settlement or "deflection" of the building's structural components that should be expected once the concrete forms were stripped and the shoring removed. The GSA provided information to Dick/Morganti and its subcontractors for use in this process of determining acceptable tolerances for their work.

In theory, the structural frame of each floor was supposedly designed to deflect in elevation once the forms were stripped and the shoring removed. Based on this amount of movement of the building components, Dick/Morganti and its subcontractors then calculated the tolerances that should be used by each trade in order to assure coordination of their work and produce a good "fit for their installed work."

The amount of deflection specified by the GSA and fabricated into the structural frame members, however, did not occur in many of the critical locations affecting the window frame vertical spacing. Contrary to the information provided by the GSA, the vertical deflection in

elevation of the structural elements affecting the window openings, after removal of the concrete forms and shoring, was substantially less that indicated by the GSA design information. The actual deflection differed materially from the information relied upon by Dick/Morganti and its subcontractors in planning their work and in coordinating the tolerances to which each subcontractor would perform its work. In fact, when window installation was attempted, it was clear that the windows would not fit and could not be placed within the agreed tolerances due to the erroneous information provided by the GSA as to the deflection of the beams, floors and other elements affecting the window installation.

When Dick/Morganti brought the camber and deflection problem to the GSA's attention, the GSA did not dispute that the floors did not perform as warranted. Rather, the GSA admitted that the structural elements did not perform as anticipated in the GSA's design, but then attempted to place blame on Dick/Morganti's concrete subcontractor for having used too strong a concrete mix design. (Ex. 53.) However, Dick/Morganti's concrete subcontractor, Webcor, submitted the concrete mix design to the GSA for review and approval prior to commencement of any of the affected work. The mix design for the floors and beams was approved by the GSA and was not altered by Dick/Morganti or its subcontractor. (Ex. 54.) Contrary to the GSA's assertion made in its response to RFI 2810, Webcor's concrete mix design was not a request to "substitute" a mix design for something otherwise specified or required by the GSA's design documents.

On July 11, 2005, Dick/Morganti forwarded RFI 2810 to the GSA for direction on how to proceed with window installation given the fact that camber was still in place on many floors, notwithstanding the forms and shoring had been removed from the concrete. The GSA's response did not dispute that the camber had remained and the floors had not, in fact, deflected

as the structural engineer had calculated.  In its response, the GSA states that the specifications required a 4000 p.s.i. concrete mix for floor beams, and states that the deflection calculations were based on the assumption that a 4,000 p.s.i. mix would be used.  It continues, erroneously stating that the contractor _substituted_ an 8000 psi mix for the upturned concrete beams.  (Ex. 53.)

The GSA again misstated the facts in their response to RFI 2810.  In fact, the mix design submitted by Webcor for this portion of the concrete work was not a request for substitution. The mix design transmittal form even indicates on its face that it is _not a substitution_.  Moreover, the concrete specifications do not state a _maximum_ concrete strength for use in these applications.  There was no deficiency in the concrete mix design submittal in that regard.

Had the GSA been aware that concrete compressive strength was a factor in the deflection of the building, then the GSA should have rejected the submittal or else accounted for that fact in its deflection calculations.  The GSA did not reject the proposed mix design.  In fact, it approved the mix design for use in this application without conveying any concern over the effect of the camber in the beams.  (Ex. 54.)

The GSA's response to RFI 2810 also revealed at least one factor contributing to its errors in regard to the deflection calculations.  Item 5 of the GSA's response indicates that the GSA designer's deflection calculations and camber determinations include dead load deflection including all sunscreen, window wall, access floor, miscellaneous finishes, and load from the high roof truss that sits on E/5 – none of which was or should have been in place at the time of the window installation.  Their calculations also included the effect of long term deflection due to fatigue.

Dick/Morganti and its subcontractors suffered substantial unanticipated impacts, delays and extra costs as a result of the GSA's erroneous deflection information and the impact of the

camber required in the floors and beams. As a direct consequence of the problems caused by the erroneous deflection information provided by the GSA, Dick/Morganti and its subcontractors were required to rework large portions of the window wall. This rework involved the process of surveying the beams and taking elevation shots at each window mullion, analyzing each in AutoCAD to determine the impact on installation, bushing or grinding the excess concrete in order to flatten the openings, and applying the sealant to specification. This was a tedious and labor-intensive effort that brought with it substantial additional costs and schedule impacts to Dick/Morganti and its subcontractors.

The schedule impact from these GSA-caused problems is detailed in the Schedule Analysis portion of this claim. In general, the above additional or rework required that additional time be spent in the affected areas of the Project to accomplish the rework. Although bushing of the window openings was not required on *every* floor, the additional work activities of surveying the floors and window openings, using AutoCAD to review the results, and evaluating the results, were performed with respect to *every floor of the building*. This was a slow, tedious, and unforeseen process.

In addition to the above mentioned additional activities, the GSA's defective design information also caused substantial rework to be performed by Dick/Morganti's window wall subcontractor, PCT (specifically, at Levels 4, 5, and 7 – North façade), in order to mitigate the effects of the excessive camber in the floor beams.

Prior to PCT knowing that the camber was not performing per the original documentation provided by the GSA, their installation proceeded in a typical matter. That is, PCT was dependent on the information provided by the GSA's Engineer of Record during the coordination meetings. PCT proceeded with their installation as previously planned. They

would install 3-meter lengths of the sill at the elevation noted on their shop drawings, and proceed with the next. Their operation proceeded on Levels 4, 5 and 7. This is where PCT discovered that their built-in tolerance would not allow a dependent elevation to set their window units. The sill track at Levels 4, 5 and 7 had to be torn out (removed) and reinstalled to accommodate the unforeseen condition of having to survey, lay out in AutoCAD, and determine the areas that were out of tolerance.

The rework and extra work resulting from these problems increased the cost to Dick/Morganti and its subcontractors of performance of the work and delayed the Project's completion. The schedule impacts to Dick/Morganti resulting from the GSA's erroneous and deficient design information and calculations are described and illustrated in the schedule analysis included as part of this narrative. The cost impacts to Dick/Morganti of this added work will be addressed in a later submission detailing Dick/Morganti's cost impacts.

**5.    GSA Directed Tenant Improvements (IB Nos. 52, 53, 56, and 61)**

Under the GSA's Request for Proposal, Section 1770-1.1, (Ex. 1, p. 0527), Substantial Completion is defined as the date when the Contractor has complied with the Contract's requirements, except for minor deviations, and the Project is sufficiently complete and capable of being occupied and used by the GSA for the intended purpose. On this Project, the GSA impeded Dick/Morganti's efforts to obtain substantial completion by requiring that Dick/Morganti remove previously installed work at various stages of completion in order to adapt the space to the new requirements and design preferences of the ultimate government agency tenants. This work already had been completed by Dick/Morganti and its subcontractors according to the specifications and designs issued by the GSA.

The GSA's mandate that Dick/Morganti remove this conforming work and replace it with new work designed to meet specific tenant needs constitutes direction to perform changed and added work which, to the extent that work delayed substantial completion of the Project, will limit the GSA's right to collect liquidated damages. Additionally, the GSA has yet to pay Dick/Morganti for the entirety of the costs of performing this changed and extra work, contrary to the Contract requirements.

*GSA Stop Work Directives*

During the construction phase of the Project, tenant agencies including the Departments of Labor and of Health and Human Services and the Social Security Administration, requested extensive reconfigurations of the portions of the building intended for their use and occupation. This required the GSA to order Dick/Morganti to stop work, demolish certain existing work, and await the redesign of the tenant spaces and the issuance of new drawings describing the tenant improvements required by these agencies.

On October 3, 2005, the GSA discussed with Dick/Morganti and Hunt the concept of changing the general scope of the Project to incorporate substantial tenant improvement changes. In order to determine the manner in which to proceed, Dick/Morganti and the GSA representatives began daily meetings to explore which aspects of the current Project needed to be halted, which portions of the Project would have to be demolished and rebuilt, and which portions would require redesign by the GSA.

On October 6, 2005, the GSA ordered Dick/Morganti to stop work on a substantial portion of the Project work remaining under its Contract until such time as the spaces were redesigned by the GSA and new drawings were issued for construction. (Ex. 55.) The GSA's

order required that Dick/Morganti stop work in the affected areas but continue working in all areas of the Project adjacent to the areas affected by the stop work order.

As a result of the GSA's order to stop work, Dick/Morganti was required to stop shipment and seek credits for materials previously ordered, but now deleted by the GSA. With respect to materials already delivered or past the point of procurement where a credit could be obtained, Dick/Morganti was required to inventory all such materials and provide the inventory to the GSA to facilitate the GSA's storage of them. The GSA further required that Dick/Morganti prepare a unit cost breakdown detailing the credit to the GSA for the deletion of the work covered by the October 6, 2005 stop work order. Substantial portions of the work then underway were halted and subcontractor progress was stopped in most of the affected areas as a consequence of the GSA's stop-work orders.

The GSA's October 6 letter did not include all the areas of the Project in which Dick/Morganti work was to be stopped or deleted. On October 25, 2005, the GSA issued a second letter deleting additional portions of Dick/Morganti's scope of work in order to facilitate the necessary tenant improvements. (Ex. 56.) Again, the GSA ordered that Dick/Morganti immediately stop work in the affected areas but continue working in all areas adjacent to the areas and work to be deleted or demolished. As in the October 6 order, the GSA's order of October 25 required that Dick/Morganti cancel material pending material procurements, create another material inventory and prepare a credit for the GSA for the deleted scope of work. This, again, halted progress of Dick/Morganti's subcontractors in critical areas of the Project and delayed construction progress thereby delaying completion of the Project.

On November 16, 2005, the GSA directed Dick/Morganti to proceed with the items of work from the GSA's letter of October 25, 2005, which involved the deletion or demolition of

various portions of Dick/Morganti's scope of work. (Ex. 57.) The November 16 letter further detailed additional items of work to be deleted from Dick/Morganti's scope of work. While this letter identified the areas of work deleted from Dick/Morganti's work, the GSA did not provide revised drawings for construction of the affected areas until several months after issuance of the stop work orders. Consequently, work progress in many important areas of the Project was halted for several months.

Also included in the GSA's November 16, 2005 letter was notification of the GSA's intention to issue a PDL (Price to be Determined Later) Contract Modification for the demolition portion of the stop work orders. The GSA requested that Dick/Morganti furnish an itemized unit cost breakdown detailing the costs for the demolition work and the credit to the GSA for the deleted items relating to the stop work orders. The GSA further demanded the Dick/Morganti provide such detailed cost information in less than one week.

_IB 52 and IB 53 Tenant Improvement Changes_

The GSA finally issued IB 52 to Dick/Morganti on February 24, 2006, (Ex. 58), and issued IB 53 on February 27, 2006, (Ex. 59), in which the new construction for the tenant improvements was shown for the first time. The GSA did not, however, issue Dick/Morganti any notice or direction to proceed with the work until March 15, 2006 on work detailed in IB 52. (Ex. 60.) The GSA authorized Dick/Morganti to proceed with the work shown in IB 53 on May 10, 2006. (Ex. 61.)

In its letter of March 1, 2006, the GSA instructed Dick/Morganti to provide a cost proposal as outlined in IB No. 52, but explained its intent to issue a "Price-To-Be-Determined (PDL)" Contract modification with a "Not-To-Exceed" amount in order to provide for commencement of the work per the March 15 direction to proceed. (Ex. 62.) Pursuant to

PC141, (Ex. 60), the GSA authorized Dick/Morganti to proceed on IB 52 work for the Department of Labor tenant improvements for an amount not to exceed $361,000. This was in effect a unilateral determination of price by the GSA that supposedly was to be negotiated to a bilateral modification thereafter.

With respect to IB No. 53 work for tenant improvements for the Department of Health and Human Services, the GSA on May 10, 2006, issued PC 149 as a "Price-to-be-Determined-Later" order for commencement of work as another unilaterally determined price and directed Dick/Morganti to commence work IB No. 53 work. (Ex. 61.) The GSA authorized work to proceed on an amount not to exceed $233,000.

In order to comply with the GSA's directives to perform the tenant improvement work and to minimize any schedule delays caused by these directives, Dick/Morganti was forced to award a time and material contract to Berger Brothers to accomplish the partition wall work involved in these changes. Dick/Morganti also was forced to accelerate its work and to engage Marelich Mechanical to perform the mechanical work associated with the tenant improvements.

Between March and August 2006, Dick/Morganti and the GSA conducted negotiations to resolve the cost and schedule impacts of the stop work orders and the subsequent change orders embodied in IB 52 and IB 53. These negotiations resulted in both bilateral and unilateral modifications being issued by the GSA in connection with Dick/Morganti's costs. These modifications were contained in Modification No. PS170 which provided unilateral amounts for the partition wall work performed by Berger Brothers for IB 52 work and IB 53 work. (Ex. 63.) Consequently, consistent with the GSA's approach to pricing changed and extra work, the GSA offered to pay far less than the actual costs incurred by Dick/Morganti in performing this changed and extra work.

### IB 56 Tenant Improvement Changes

Over the course of an eight-month period of time between April 26, 2006 and December 4, 2006, the GSA issued a third Instructional Bulletin containing new drawings and describing new work required by the GSA for the tenant improvements. All of these changes were issued by the GSA well after the original completion date of the Contract, and their issuance by the GSA in a piecemeal fashion further exacerbated Dick/Morganti's continuing efforts to close out and complete its work on the Project. IB 56 was the third in a series of bulletins detailing the tenant improvements and changes that were required by the GSA's tenants before they would occupy the new building areas. IB 56 involved changes required in the Annex building for spaces to be occupied by the Social Security Administration.

The GSA added to Dick/Morganti's Contract the work described in the eight transmittals that comprise IB 56 at a time when Dick/Morganti's work in the areas affected by IB 56 was essentially completed. Other than minor punch list items, the only area of Dick/Morganti's Contract work in the Annex building that was not complete when IB 56 was issued was the entrance area. The Annex entrance was not yet completed because the construction trades were using the entrance for access to the building until the tenant improvements were completed. Thus, Dick/Morganti maintained the Annex entrance in an unfinished condition until the tenant improvements were completed. But for the continued need for a construction entrance for the tenant improvement work, Dick/Morganti's scope of work for the Annex would have been substantially completed by the time of the GSA's issuance of the changes necessitated by IB 56 and its multiple revisions.

The initial changes required by IB 56 were issued to Dick/Morganti by the GSA on April 26, 2006. (Ex. 64.) The revisions directed by the GSA in IB 56 included changes to work that

Dick/Morganti had just completed pursuant to the GSA's tenant improvement work directives contained in IB 52 and 53. Such changes, therefore, required the demolition and reconstruction of portions of the work previously ordered by the GSA in IB 52 and IB 53. IB 56 also changed substantial portions of Dick/Morganti's previously installed base Contract work.

At the time of the GSA's issuance of IB 56, the drywall walls in the Annex were finished and painted, and the ceilings were installed. Door-side glass was being installed in the Annex doors, and the Annex was scheduled for walk-through with the GSA beginning May 1, 2006, to identify punch list items. Light fixtures were complete and rough balancing of air and water flows was also complete.

The tenant improvements in IB 56 were not completely designed when the GSA issued it. In fact, the April 26, 2006 version of IB 56 contained changes to the architectural drawings, but contained none of the changes to the mechanical, electrical and plumbing work in the Annex that eventually would be ordered by the GSA. The changes required in IB 56 initially added and deleted the walls in several rooms, changed counter spaces and doors, revised hardware requirements, and demolished existing walls in certain areas. These changes also changed the ceiling layout and lighting requirements by necessity due to the changes in the sizes and shapes of the rooms.

The MEP changes and many other aspects of the tenant improvements work added to Dick/Morganti's Contract by the GSA after the original Contract completion date, followed the April 26, 2006 architectural drawings. These revisions or changes to IB 56 began August 15, 2006, with the GSA's issuance of IB 56B which detailed the MEP revisions for this space. (Ex. 65.)

On August 15, 2006, the GSA issued a request for proposal to Dick/Morganti for the MEP revisions detailed in IB 56B. In its RFP, the GSA indicated its intent to issue a Price-to-be-Determined-Later ("PDL") Contract modification with a not-to-exceed amount in the near future. The changes made by the GSA in IB 56B MEP drawings were substantial. They included wholesale revisions to the Annex Level 1 electrical power plans involving changes to ten different rooms, which changes included the addition of isolated grounds to duplex receptacles, adding circuits, and revising existing and installed circuits. IB 56B also added Variable Air Volume dampers with heating coils. It increased the water and air flow requirements, and modified and added ductwork to the air-handling system. These changes required rebalancing of both the air handling and the water supply systems which Dick/Morganti already had performed in its initial completion of these areas.

In August 2006 when IB 56B was issued, Dick/Morganti's base scope of work in the Annex was essentially complete. In order to execute the MEP changes made by the GSA, Dick/Morganti was required to uncover completed work, cut into finished drywall, install new piping, conduit, electrical wiring, etc., and patch the drywall and then prime and repaint the walls in order to complete the required changes. In addition, the lighting plans were revised involving work in fourteen different rooms on Level 1 in the Annex. Changes to the mechanical installations in the Annex involved adding, relocating and removing diffusers, adding and connecting duct work, and relocating equipment to different rooms. This added MEP work also required removal of the previously installed and finished ceiling in order to make the required MEP changes in these areas. Every wall that was added, moved or demolished also required revisions and repairs to the adjacent ceiling areas.

On August 21, 2006, the GSA again directed Dick/Morganti to change the electrical lighting in the Annex. (Ex. 66.) Two days later, on August 23, 2006, the GSA issued an RFP to Dick/Morganti for additional work to be performed under IB 56 including the addition and deletion of wall data outlets. (Ex. 67.) In all, 21 outlets were added and one was deleted. As in the case of other IB56 changes, the August 21 changes required that Dick/Morganti cut into existing finished walls to permit installation of the outlets and outlet wiring and then repair the already completed walls by patching, taping and plastering the drywall, priming, and finish painting the drywall in each of the wall areas where wire, piping, or duct work was either changed, removed or installed.

On September 5, 2006, the GSA again revised IB 56 through the issuance of IB 56BR1 which directed Dick/Morganti to proceed with the mechanical revisions included in IB 56BR1. (Ex. 68.) These changes included the addition of dampers, diffusers and ductwork in areas of the Annex. These changes required removal and reinstallation of the previously finished ceiling in the affected areas and required changes to the existing ductwork.

On September 7, 2006, the GSA further revised its August 15 version of IB 56B and added electrical wiring and other electrical requirements in the Annex. (Ex. 69.) Again, these changes required the demolition and repair of previously completed and finished interior work in the Annex areas affected by the changes.

On September 14, 2006, the GSA requested Dick/Morganti to provide a cost proposal for IB 56B R1 including the supplemental electrical power information provided in a new drawing and clarifications made in the GSA's September 7 letter. (Ex. 70.) This September 14 change added work to Dick/Morganti's Contract including the addition of electrical grounding, changing existing ground wiring, and verifying and documenting that the GSA's furniture contractor's

outlets were properly energized.  In order to make the specified changes to convert receptacles to "isolated grounds," it was necessary to open the wall at each receptacle, run new wire (MC cable) through the walls and into the ceiling spaces, and open the ceiling in order to fish the cable from each receptacle through the ceiling spaces and run it back to the circuit breakers. This process had to be performed for each revised circuit change made in IB 56B R1 in order to convert the receptacles to isolated ground for each circuit.

The next set of changes ordered by the GSA to be priced and included in IB 56 illustrates this recurring change problem.  On December 4, 2006, the GSA clarified and changed the poorly defined electrical work requirements of IB 56/56B which had been issued on September 14.  (Ex. 71.)  The December 4 clarifications identified certain added work and clarified the requirements for installation of previously changed work.  This December work required the addition and relocation of electrical wall receptacles, addition of grounds, deletion of power feeds, re-circuiting of existing receptacles, and relocation of power feeds in areas where the previously installed IB 56 changes already had been completed by Dick/Morganti.

Although it is not identified as additional work in the IB 56 drawings and revisions detailed above, most of the required changes necessitated that Dick/Morganti and its subcontractors demolish and remove large areas of previously completed and finished work in the Annex, including both finished drywall walls and finished ceilings.  In these instances, the areas had to be patched, taped, re-plastered, primed and finish painted, and the ceilings had to be removed and reinstalled in order to complete the additional electrical and mechanical work items ordered by the GSA in IB 56 and its many revisions.  Further, this demolition and repair cycle was repeated multiple times to the same walls and ceilings due to repeated revisions affecting the same work areas.  In these cases, the same walls and ceilings may have been demolished and

repaired on several occasions. This proved to be a very costly, time-consuming, and inefficient process for Dick/Morganti and its subcontractors because of the nature of the changes and the piecemeal manner in which the GSA issued them.

The changes made by the IB 56 series of changes which were ordered by the GSA over an eight-month period of time between April and December 2006, severely disrupted Dick/Morganti's ability to complete the Contract work. In addition to execution of the changed and extra work, Dick/Morganti expended extraordinary amounts of time to coordinate and implement the changes in the field and to price each of the changes. These changes and the manner in which the GSA implemented them also prevented Dick/Morganti and its subcontractors from scheduling and performing their work in a manner that would permit efficient and productive execution of the work. The piecemeal manner in which the changes were ordered by the GSA made coordination and pricing of the changes even more difficult. With each change, revision or clarification, Dick/Morganti would transmit the pertinent documents to its trade subcontractors and then coordinate the work in the field with the subcontractors using the latest information available. The subcontractors constantly were being asked to revise their pricing and reexamine and coordinate their work plans due to the GSA's constant revisions.

The changes implemented by the GSA through IB 56 and its revisions caused substantial costs to be incurred in performing the changed/added work, delayed completion of the work and delayed turnover of the affected areas for tenant occupancy until the changes could be completed. Apart from the effects of the work itself, the changes also affected the air balancing of the Project because the balancing and testing in the building could not be performed until the

walls were reconfigured, holes in the walls necessitated by the changes were repaired, and the ceilings were repaired and reinstalled.

### IB 61 Tenant Improvement Changes

Another series of piecemeal tenant improvement changes were made by the GSA under what it referred to as IB 61. These changes were made by the GSA in August and September 2006. The IB 61 changes began with the August 7, 2006 GSA RFP for changes in drawings I-102A and I-610 describing the layout of the wire-mesh cages and the accompanying door and hardware sizes and requirements that constitute the wire mesh partitions in rooms T0238 and T0212. (Ex. 72.) The initial IB 61 changes rearranged the configuration of the wire mesh partitions in these rooms and changed the door sizes and hardware requirements, but did not contain any changes to the electrical design and layout for the areas. It also involved the furnishing and installation of new locksets and door hardware as directed by the GSA in responses to RFI 3558 and 3558R1 which were associated with IB 61. (Ex. 73.)

Subsequently, on August 23, 2006, the GSA issued revised electrical drawings to be included with the IB 61 changes and changing the electrical work in the Tower Level 2 server rooms and Tower Levels 5, 6, and 7 telecommunications rooms. (Ex. 74.) The August 23, 2006 drawings made substantial changes in the electrical requirements for these areas. This change added and deleted receptacles and identified locations for new breaker panels which were not yet specified. The end purpose for these electrical changes was to add an emergency power backup system for the computer servers for the building known as "uninterruptible power supply" or "UPS."

This August 23 change required the addition of a power inverter (UPS) with batteries for backup power source, new structural floor stands to house the batteries and accessories,

additional breakers and three additional breaker panels to distribute the power to the different equipment, and additional receptacles. Also added were electrical circuits to support GSA equipment in the telecommunications rooms in the Tower Levels 5, 6 and 7.

Dick/Morganti was provided with the GSA's notice to proceed with IB 61 work on September 18, 2006 based on the GSA's construction drawings issued earlier. (Ex. 75.) The work involved changes on levels L2 and L5, L6 and L7 in the Tower.

As had been the case with the earlier tenant improvement changes issued by the GSA, IB 61 did not detail or describe all of the existing and finished work that Dick/Morganti would have to remove or open up and then replace and/or repair in order to make the changes and install the new work described in the IB 61 drawings. In order to make the IB 61 changes, Dick/Morganti had to remove the 2' x 2' concrete-filled access floor panels and install conduit and wire, perform additional under-floor clean-up, replace the concrete flooring panels, cut holes in the flooring to house the receptacles, install the receptacles and other equipment, and repair any damage resulting from the tear-out and installation process.

### Tenant Improvement Impacts

The GSA's tenant improvement changes continued beyond December 2006 and into 2007 with continuing informal orders and directions from the GSA given directly to Dick/Morganti's trade subcontractors on several occasions. The GSA continued to make demands on Dick/Morganti and its subcontractors to re-order and re-sequence work and perform additional work to accommodate the tenant move-in dates and the tenant requirements. These demands included installing and relocating electrical drops to match tenant equipment locations.

Additionally, Dick/Morganti essentially was required to abandon its completion schedule in order to assure the GSA that the tenant spaces would be ready for occupancy in accordance

with the tenants' various furniture delivery schedules and in accordance with the GSA's carpet installation schedules. Dick/Morganti had no practical option but to assent to the GSA's schedule for tenant arrivals and move-ins in order to assure that the GSA would be ready for tenant occupancy in the order in which the tenants were scheduled to occupy the building.

Dick/Morganti also had no choice as a practical matter but to hold off completing work in areas where the GSA had indicated there would be tenant changes. Otherwise, Dick/Morganti would have been performing work that it most likely would have to later tear out and reinstall in order to accommodate tenant changes. Dick/Morganti was aware that tenant changes were going to be coming with respect to areas affected by the GSA's October 2005 stop work and demolition orders. Although the GSA initially had indicated that the tenant improvement drawings and requirements would be available and ready for implementation in October or November 2005, the first of those drawings and instructional bulletins were not issued by the GSA until late February of 2006. This delay greatly impacted Dick/Morganti's procurement efforts for glass and other finish materials.

Dick/Morganti attempted to skip over the areas in which tenant improvement changes were anticipated and subsequently attempted to develop an efficient and cost effective sequence for later completion of the work after the GSA had issued the tenant improvement changes and requirements.

As a consequence of Dick/Morganti's efforts to schedule and complete its work to accommodate the GSA tenants, Dick/Morganti attempted to work with the GSA to complete each tenant space as and when needed by the GSA to meet its obligations to its tenants. The GSA, however, insisted on adding to Dick/Morganti's punch list work the repair of damages caused by the GSA's separate contractors during the carpeting and final tenant preparation and

move-in activities. As a result, the GSA continues to wrongly assert that such repairs are the punch list responsibility of Dick/Morganti rather than of the GSA's separate contractors which actually caused the damages.

The MEP changes issued by the Government in the Tenant Improvement (TI) drawings were based on the original February 14, 2003 Contract drawings, and not on the submitted and approved contractor coordinated drawings. The conflicts in layout and interferences resolved by Dick/Morganti and its subcontractors were not incorporated into the Tenant Improvement revisions issued by the GSA. This required Dick/Morganti and the MEP subcontractors to prepare and coordinate new drawings for the revised areas before materials could be ordered and fabricated.

Time to review, revise and re-coordinate the Tenant Improvement changes further diluted Dick/Morganti's resources and delayed the pricing, fabrication and delivery of materials required to complete the Tenant Improvement changes and extra work directed by the GSA.

*Change Order Resolution of Tenant Improvement Changes*

As was its practice on this Project, the GSA, in implementing its tenant improvements, issued unilateral Contract modifications with prices not to exceed stated amounts when directing Dick/Morganti to proceed with the IB changes. Typically, the GSA's unilateral contract changes were for amounts substantially less than the actual costs Dick/Morganti and its subcontractors were forced to incur in performing the GSA directed work. No agreement has been reached with the GSA with respect to the schedule impact of the tenant improvement changes. The schedule impacts to Dick/Morganti resulting from the GSA's stop work and tenant improvement bulletins are described and illustrated in the schedule analysis included as part of this narrative. The cost

impacts to Dick/Morganti of this changed and added work will be addressed in a later submission detailing Dick/Morganti's cost impacts.

**6.    Cummulative Impact from GSA's Defective/Deficient Design and GSA's Directed Changed/Added Work.**

The GSA's February 14, 2003 Contract drawings and specifications were presented to Dick/Morganti as the basis from which Dick/Morganti was to develop its estimates and to submit its lump sum price for constructing the Project. In developing and presenting the February 14, 2003 Contract drawings and specifications, the GSA represented that those drawings and specifications were accurate, consistent and free from defects. With the limited exception of instances where certain of Dick/Morganti's work was described with a performance specification, the February 14, 2003 Contract drawings and specifications were represented to be complete and to contain all information and directions needed to construct an acceptable, fully functional building. Dick/Morganti relied on the GSA's drawings and specifications in submitting its bid and in signing the Contract for a lump sum price.

Unfortunately, the February 14, 2003 design documents which formed the basis for the Contract were far from accurate, complete or free from defects. Instead, those GSA design documents were riddled with errors and mistakes, and also had a substantial number of instances where the required design information was simply not contained in those GSA drawings and specifications. Additionally, substantial changes and additions to the February 14, 2003 Contract design documents were directed and insisted upon by the GSA during construction. The magnitude of serious defects and deficiencies in the design documents, along with the substantial changed/added work directed by the GSA, caused tremendous unanticipated work, inefficiencies and delays to the construction of this Project, and resulted in huge cost overruns for Dick/Morganti and its subcontractors.

The extraordinary amount of design deficiencies encountered by Dick/Morganti and its subcontractors on this Project is reflected in the extremely large number of Requests for Information ("RFI's") submitted by Dick/Morganti on the Project, and also by the unusually large number of GSA issued change orders and Dick/Morganti Change Order Requests ("COR's") on this Project.  On any project, the RFI system is appropriately used to formalize communication between the design team and the contractor, and for the design team to answer questions about the design documents.  A reasonable number of RFI's does not necessarily indicate a poor design or troubled project.  However, on this Project, the sheer volume of RFI's, as well as their nature, demonstrate the serious and pervasive design problems and errors that caused Dick/Morganti and its subcontractors to incur substantial additional field support and administrative costs, as well as delays.  As the chart below demonstrates, Dick/Morganti encountered numerous RFI's due to deficient design throughout the course of the Project.  Even during the latter part of 2006, long after the work was originally scheduled to be completed, Dick/Morganti was still processing over <u>100</u> RFI requests and responses a month.



RFI's Sent and Received by Month

Additionally, the GSA, to date, has issued change orders to Dick/Morganti totaling approximately $8,700,000 on this Project (excludes any Phase I change orders and GSA's unilateral assessment of liquidated damages).  Also, Dick/Morganti has open and/or disputed COR's currently amounting to over $10,000,000 on this Project.  Those change orders and COR's include 63 Instructional Bulletins ("IB's) (including two IB 56 revisions) issued by the GSA which directed significant changed or added work from that shown in the Contract design documents.

In total, there were over 4,000 RFI's (including RFI revisions) submitted by Dick/Morganti to the GSA's design team on this Project.  As on any project, some of these RFI's addressed suggestions or requests by Dick/Morganti or the subcontractors involving value engineering or other routine matters.  However, the principal reason for the extraordinary volume

of RFI's on the Project was the necessity of correcting design errors, omissions, and deficiencies by the GSA's design team, or to obtain necessary design information which was not contained in the GSA-issued Contract documents.

The large majority of submitted RFI's resulted in additional, unanticipated engineering and design work that Dick/Morganti and its subcontractors were required to perform. This was because, early in the Project, it became obvious to the GSA's design team and to Dick/Morganti that, in order to attempt to minimize delays and impacts to the work caused by design problems, omissions and questions, it was more efficient for Dick/Morganti and its subcontractors to develop and to engineer their own suggested solutions to the design problems, as opposed to those suggested solutions being developed by the GSA's design team. While certainly not in Dick/Morganti's scope of responsibility, it was recognized that this method of developing solutions to design problems was certainly preferable to the extended, inefficient process of waiting on the GSA's design team to understand the problem and to develop workable answers and solutions to design problems, as was experienced in the earlier phases of the Project.

In order to do a fair evaluation of the design deficiencies on the Project, Dick/Morganti reviewed more than 4,000 RFI's on the Project. Dick/Morganti's initial review of those RFI's indicates that approximately 3,600 RFI's on this Project contained design-related questions, sought required design information which was not contained in the Contract documents, or identified a design error which needed to be corrected. Dick/Morganti undertook a detailed analysis of 1,615 of those RFI's in order to classify them into the specific types of design problems represented by each of these RFI's. That review is summarized in the information contained below, along with specific examples of those respective six (6) categories of RFI's.

**Category A**. This category of RFI's involved situations in which the GSA's design documents did not provide the required information with which to construct or install the work in question. These RFI's requested design information that was needed to complete a task on the job, but which information could not be found on the GSA drawings. This includes, but is not limited to, dimensions omitted, dimensions incorrect, architectural drawings changed, but other drawings (e.g. electrical) not being changed in a coordinated fashion. The RFI's in this category totaled   approximately 25% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI 1388 (Ex. 76) Sketch has wrong dimensions for a door opening.  The dimensions provided on another RFI sketch, RFI 1329-SK 1, were incorrect and in need of change.  The corrected information was changed by the RFI response in which a sketch was produced by the GSA design team to show the missing dimension.  The required information was needed before the door could be ordered.

RFI 2379 Relocating Panel HRa/T on 19th level.  (Ex. 77.)  Drawing E-119 showed panel HRa/T located in a spot where structural elements would not allow the panel to mount against the wall as required by the drawing. The GSA's design team response was that the drawing is diagrammatic and the contractor was to relocate the panel next to the door.  Attached sketch RFI 2379-SK1 provides the door location dimensions included to suggest where to place the panel. Then, an alternate location was suggested to install the panel like the other core room that is on the same drawing.

RFI 3559 Crash Gate Power.  (Ex. 78.)  The crash gate power was not provided for in the GSA design.  The hydraulic unit was located earlier, but nothing was on the drawings as to the

identity of its power source. The RFI response stated what panel and circuit to use. This information was needed at time of installation.

RFI 739 Size and Location of Condensate Water Tank. (Ex. 79.) This RFI requests size and location of access opening for underground condensate return water tank, shown on S-100B, on '1' line and east of 'Q' line, see attached sketch, RFI #139-SK1, taken from S-100B. The response attached a hand written sketch with needed dimensions.

RFI 2549 Wing Slab Recess Coverage. (Ex. 80.) Drawings E-167 and E-168 show F-30 light fixtures at the stair landings. However, at Levels 18 and 17.5 stair landings, there is no stair structure above. Therefore, Rosendin could not install the fixtures per referenced Detail #8/Drawing A-780. This RFI was sent to ask whether the design team intended these fixtures to be on A and S-line walls. If so, the appropriate layout needed to be provided. The response from the design team required eleven sketches to provide the missing design information. See RFI A-SK1 through SK6, and RFI E-SK1 through SK5.

**Category B.**    The next category of RFI's illustrating the impact of design problems on Dick/Morganti's work involves RFI's that document conflicts errors, or omissions in the Contract drawings. These RFI's were submitted when the drawing or design detail in question had conflicts with the Contract specifications or other drawings such as Electrical, Mechanical, Plumbing, or Structural. These RFI's were also written when errors or omissions were found on the Contract drawings or design documents. The RFI's in this category totaled approximately 49% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI 985 Two 4" trench drains @ 17/R-S. (Ex. 81.) The plumbing drawing P-100C shows two 4" trench drains located just south of grid line 17 and R-S line. There was no information shown on any of the Architectural and/or structural drawings or Contract documents indicating the exact location (dimensions), elevation of the trench and rim elevation of the drain. The GSA's RFI response was that there was NO trench drain located at this area and the GSA directed the deletion of the pipe connection to this drain. The response shows that the plumbing drawing was in error.

RFI 1252 Do RD-1 & OD-1 Need Relocated. (Ex. 82.) On Bulletin 17 drawing P-102A was issued showing RD-1 and OD-1 located between line 10 and 12 and B and C lines. The new drawing showed the pipe having been moved slightly when compared to its location on the original drawing set P-102A. There was no revision cloud around these drains. The RFI was written to verify which drawing was correct.

RFI 2022R1 Type F72 fixture @ Loading Dock. (Ex. 83.) The fixture circuits called out on the electrical drawing located closest to Column Q, between Columns 6 & 7, designate the use of more emergency power than usual (more lights). This RFI was written to verify whether this was correct. The response said the referenced fixture circuits located closest to Column Q, between Columns 6 and 7 were not correct and needed to change. Thus, the drawing was in error.

RFI 2381 F19/F19a Panel Type. (Ex. 84.) The lighting plan electrical drawings show a fixture type F19 & F19A to be fed from 120/208V panel. The light fixture schedule shows F19 & F19A as 277V. This is a conflict in the documents. The response acknowledges the error in the Light Fixture schedule and indicates that the light is 120V

RFI 2841 Basement T0053/Y0054 Receptacles. (Ex. 85.) Drawing E-100B Rooms T0053 and T0054 shows a single receptacle with a single 20A/1P circuit; however, the Legend (E-001) indicates this symbol to be 20A, 2-pole 6-20R receptacle. This is a conflict in documents. The response was that this was a drafting error and the mentioned receptacles shall be 20A, 124V.

RFI 691 & 691R1 Opening through a shear Wall. (Ex. 86.) The drawings M-101A and M-401A Detail 40 and also S-303A between column lines 2-3 and C-D shows the shear wall opening to be 1000 x1000. This area may be small for the entire required duct to pass through it. This RFI was written to clarify the duct sizes and then it was found that piping also would run through this same space. The design team's response changed the sizes of the duct to reduce in size through the area then transition back to the original size. The RFI 691R1 addresses the pipe issue to divert the pipes to a location within the space provided. Sketches were attached to show where the changes were to be placed. This response made changes beyond just clarifications.

**Category C.** The next category involves RFI's issued where design information was provided, but clarification was needed from the design team. In these cases, much of the information needed to perform the various elements of construction on the job was in the Contract documents. These RFI's were submitted, however, because additional information was still needed to understand, clarify or verify the GSA design team's concept on exactly what was required for the designed work. At times, another detail was required and that detail was provided by a sketch attached to the GSA design team's response. The RFI's in this category totaled approximately 13% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI 2879 Average Duct Temperature Sensor. (Ex. 87.) A review of a submittal 15905-001-002,C1.02 requested an averaging duct temp. sensor in the discharge of a fan. The interpretation of the specification section 15906.3.2.G negates the need for an averaging sensor. The response to RFI 2879 disagrees with the subcontractor stating, "The condition of homogeneous and adequately mixed flow is not satisfied in the fan discharge location." Provide the averaging sensors. The clarification was required to make a substitution.

RFI 3061 KS-1 Requirements. (Ex. 88.) A specification 15440-2.1.R states that KS-1 (sink) is to include garbage disposers. The Electrical drawings do not provide a power source for them or an outlet. Marelich wrote this RFI to obtain clarification of the specification or correction of the error in this location. Contrary to the drawing and specification, the response adds all of the circuits, switches and outlets for the entire Tower. This RFI asked a question and found an omission by the design team also that involved the entire Tower.

RFI 1939 Toilet RM Carrier Mounting P-102B, WC-2 and L-2 carrier anchorage points. (Ex. 89.) Drawing P-102B shows toilet rooms T0262 and T0265 between M and N lines @ 3 and 4 line. This area is a raised access floor. The fixtures require carriers which anchor to a concrete floor. Are these carriers to be mounted to the access floor tiles? If so, please provide details for attaching these carriers to the floor tiles.

Response: The carriers cannot be mounted on access flooring. Anchor all carriers to structural slab. Provide additional anchorage as required due to additional length.

RFI 2735 F51 Light Fixture Mounting Details. (Ex. 90.) Please provide clarification on the mounting of the F51 light fixture. Specifically is the fixture intended to be pendent or cantilevered? Also since the support is above the wire mesh ceiling and fixture is below the ceiling plane, please provide a mounting detail including fixture elevation dimensions.

Response:  Submittal 16500-001-003 architectural comments state "Fixture support arm is intended to be above wire mesh ceiling, and locate fixture below ceiling plane.  Cantilevered or pendant support may be used at the Contractor's discretion.  Contractor to verify length, mounting, and coordinate with other trades...".  Submittal 16500-001-004 architectural comments state "...See previous comments regarding mounting".  Please refer to RFI 2735-A-SK1 attached for an illustration.

RFI 3204 T0035 @ 4.9 line between E & F.  (Ex. 91.)  The exit light shown in lobby #T0035 @ 4.9 line between E & F lines is wall mounted over the door.  The exit light west on F line in the same area is wall mount in concrete next to the door a door header level.  Do you want both exits to match? Please advise.

Response:  Confirm you are referencing drawing 36/A-472B for exit sign location at gridline F shear wall.  Our understanding is that the rough in for this sign is already cast.  Maintain exit sign location centered above hold-open doors near gridline 4.9/F as indicated on A-470B.

**Category D.**   This category of RFI's illustrates the design problems involved with locating and obtaining approval for sleeve penetrations on the Project.  These RFI's were generated and submitted to the GSA's structural engineer for approval to add openings and install sleeves through structural concrete elements. These penetrations could be through beams, concrete walls, steel beams or concrete floors.

The GSA's mechanical engineer had performed some coordination with the GSA's structural engineer and designed openings into the structure for mechanical duct work, but no penetrations were designed or provided by the GSA for the other disciplines:  water, plumbing, fire sprinkler pipe or electrical.  It was left to the MEP subcontractors to design their installation,

layout and locate their sleeves based on criteria established by the structural engineer on the drawings (3 diameters center to center).

However, the limitation guiding MEP penetrations could not be met due to the quantity of piping required to pass through structural walls and beams and space limitations caused by the structure. Designing penetrations through sensitive structural elements such as beams and boundary elements is the responsibility of the different GSA discipline design engineers to coordinate with the GSA's structural engineer and included within the building structural calculations.

Instead, the GSA's design team provided, at best, a diagrammatic design, with no dimensions to grid lines or elevations from finished floor, pipe and conduit detail on the drawings and forced the contractor to detail, design and coordinate their penetrations with the structural engineer. In the case of the basement, resolving penetration required five weeks of the MEP's coordinator's time and several scaled MEP coordination sketches had to be submitted to the GSA designers. A meeting had to be called by the contractor, through Hunt to review the penetration requests, individually, to obtain GSA approval.

In the East and West cores, the boundary elements diagonal reinforcing in the structure between doorways and areas where penetrations were not allowed, referred to as boundary elements, left such small windows for MEP contractors to penetrate that it was impossible to maintain specified spacing between sleeves. It required the scaling of re-bar detailing drawings by the re-bar detailer and several revised layout drawings by the MEP contractors to work out acceptable penetrations and sleeve placements. Final approval for sleeve layout required the GSA's structural engineer to revise specifications and approve reduced spacing between sleeves. The RFI's in this category totaled approximately 6% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI-0476. Conflicts with the rebar. (Ex. 92.) The conflicts along the framed wall involving the spacing of the 4" conduits will be limited to about 6" center-to-center due to the total number of conduits stubbing up in what will be approximately 42" of wall space.

RFI-0504. (Ex. 93.) Inlet elevation for the 6" piping entering from the west side of the sewage ejector pit will not work due to elevation conflicts between pipe routing and grade beams, pile caps and depressed slabs, as shown on the structural drawings.

RFI-0578. (Ex. 94.) A generator exhaust flue in the basement passes through a shear wall and was not shown on structural drawings. The GSA designers responded with dimensions and elevations for the opening and stated that "There will be a drawing in the next structural bulletin to address this."

RFI-0679. (Ex. 95.) At the basement level, it was determined that there was a conflict between the structure, architecture, and the physical requirements of Electrical and Mechanical work in the area. The ceiling height was reduced in this area and the shear wall opening at F-line was lowered in order to let the MEP services pass underneath the sloped beams at column lines G and J. To make the changes for the MEP contractors in this area required changes to other disciplines as noted in the GSA's response: "Please note this will impact multiple trades, especially the wood ceiling Sub-Contractor. Other drawings *impacted by this requested modification will be issued in an upcoming bulletin.* This RFI response does not constitute a change in scope to the contract documents, does not cause an increase in contract cost and does not add time to the construction schedule."

RFI-0688. (Ex. 96.) There were no wall penetrations shown on drawings for fire mains @ P & Q lines near 4 line where they are shown to run on drawing P-100B. Due to the lack of space available in wall penetrations between F & L lines near 4 line, pipe had to be raised above the other MEP trades and beams and walls sleeved for fire mains.

**Category E.** This category of RFI's consists of confirming RFI's which were required to be written by Dick/Morganti to document the GSA's verbal responses and directions relative to a design problem. During MEP coordination, engineering site walks, phone teleconferences and meetings, verbal solutions and directions relating to design problems were provided to Dick/Morganti by the GSA's design team. To confirm the verbal direction and to provide a written record of the resulting design changes or clarifications, a confirming RFI was required by the GSA to be submitted by Dick/Morganti. The RFI's in this category totaled approximately 5% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI-0246. (Ex. 97.) In order to maintain a symmetrical pattern with the fire sprinkler head, an extended coverage type head was needed due to the wave ceilings. This RFI was to confirm past conversations with the design team that extended coverage heads would be acceptable.

RFI-0632. (Ex. 98.) This RFI was sent to confirm a meeting with the design team, Dick/Morganti and related trades in which underground plumbing and structural conflicts were discussed and resolved.

RFI-0668. (Ex. 99.) In accordance with a coordination meeting regarding the curtain wall and the interface between controls and the finned-tube hot water heating systems, it was

resolved that the controls conduit from the below floor to the trench at the window wall would be 2" in diameter; the hot water supply sleeve would be 2-1/2" diameter conduit; hot water piping with-in the sleeve, trench and window wall structure can be type L hard or soft copper at the contractors option; hot water piping to be insulated up to up-turn beam below the floor; and no insulation is required from the sleeve to, from or between convectors.

After the design team reviewed the RFI and minutes from the meeting, they revised and clarified their position as to the installation and insulation of the hot water piping which included continuous insulation through the sleeve and within the finned-tube mullions.

RFI-1803r1. (Ex. 100.)  Reference RFI 1803, and Conference Room TO505.  The purpose of this RFI was to confirm a conversation between Dick/Morganti and Smith Group with regard to the location of the data outlets previously located, in RFI-1803, in a structural beam.  After review by Dick/Morganti and the GSA designer, the outlets were relocated away from the beam.

RFI-1858. (Ex. 101.)  This RFI confirmed a conversation at the coordination meeting with the design team concerning the sub-floor sprinkler piping in the Sky Garden area on the 11th floor. Code requires access to the sprinkler pipe.  The GSA designer stated that a 20" clear crawl space is sufficient for access and required three additional access panels under the access flooring.

**Category F.**   This category of RFI's consists of RFI's which Dick/Morganti had to submit to obtain correction of design errors in Instructional Bulletins issued by the GSA on the Project.  One of the persistent problems with the numerous design changes issued by the GSA's design team on this Project was that the changes themselves were not appropriately integrated into the GSA's overall design of the Project.  Often, instructions given to the contractor

regarding changed/added work in the IB's, were inconsistent with other portions of the Project's design, which were not changed by that IB. The RFI's in this category totaled approximately 3% of those 1,615 RFI's analyzed in detail.

Specific examples of this category or type of GSA design problem include the following RFI's:

RFI 1687. (Ex. 102.) This RFI followed the issuance of IB #25 which, among other things, added a new upper cabinet to the Project. Unfortunately, this cabinet was to be constructed in an area occupied by a column shown on another design document. This circumstance prompted this RFI, which resulted in another change order by the GSA in order to avoid the interference of the previously directed change.

RFI 1485. (Ex. 103.) Need Update to E-101A & E-151A. Changes made by IB 25 to room T0115, electrical drawing were not sent with the change. IB 25 created wall changes and caused electrical panels to change locations. The issued drawings with the IB 25 changes did not include the electrical drawing changes. The RFI response attached sketches 1485ESK-1 and 1485ESK-2 for the electrical work modifications in the room. The sketches were copies of the electrical drawing with the changes clouded.

RFI 2221. (Ex. 104.) E-100A/A-411 Signage Discrepancy. Bulletin 26 Drawing A-411 added a clouded detail # 18 which is for static signage. Electrical Drawing E-100A indicates two (2) J-boxes with note 47 "connection to electronic sign". The response to RFI 2221 called out in question is a typographical error and should read 19. This is a clarification to figure what the two J-boxes go with.

Below are other examples of RFI's relating to GSA-issued IB's:

Group 1 – The RFI response states to see Bulletin, implying that the requested information was provided in previously issued Bulletins and that Dick/Morganti had the information and did not coordinate or did not provide the information to its subcontractors. The fact is that the RFI was written and submitted requesting information, and the GSA response was issued either the same day Dick/Morganti received the Bulletin or, in some cases, the RFI response came *after* the Bulletin was issued. RFI's included in this group are 143, 1322, 1384R1, 1406, 1451R1, 1511, 1512, 2288R1, 2392, 2361, 2362, 2363, 2386, 2387 and 2388. (Ex. 105.)

Group 2 – IB changes where the GSA designers did not review, change and coordinate all the Contract drawings associated with the issued IB change, thereby creating conflicts within the design documents. RFI's were written because of the conflicts and to get direction from the GSA designers regarding which detail or document to use. Examples of RFI's in this group are RFI 939, 963, 1252, 1374, 1472, 1485, 1502, 1687, 1839, 2206, 2212, 2746, 2884, 3294 & 3294R1, 3323, 3394, 3508. (Ex. 106.)

Group 3 – These are RFI's written requesting additional details for changes directed in a GSA-issued Bulletin. Examples of RFI's in this group include RFI's 997, 1178, 1211, 1239, 1239R1, 2132, 2134, 3336, 3441, 3448, 3561, 3563 and 3564. (Ex. 107.)

Group 4 – These include RFI's associated with GSA-issued Bulletins where clarification was needed of the GSA design team's intent. Examples include RFI 2221 and 2244. (Ex. 108.)

In addition to the large number of RFI's that were required, Dick/Morganti believes that the magnitude of the defective and deficient design on the Project is also indicated by the large amount of changed/added work required, as reflected in the GSA issued change orders and the Dick/Morganti COR's. As stated above, the GSA, to date, has issued change orders of

approximately $8,700,000. to Dick/Morganti (excluding Phase I change orders and the GSA's unilateral assessment of LD's), and there are over $10,000,000 of open and/or disputed Dick/Morganti COR's on this Project. These change orders and COR's include amounts owed for the changed/added work associated with the 63 GSA issued IB's on the Project (includes two revisions to IB56).

Dick/Morganti believes that the 61 GSA-issued IB's are instructive, in and of themselves. Especially in the early portions of the Project, IB's were used by the GSA and the design team to communicate corrections to the design documents or to provide missing design information. In fact, the 63 IB's issued by the GSA caused 891 of the 1610 Contract Drawings (approximately 55%) to be modified. Those 61 IB's also caused changes to sixteen (16) of the Contract Specification Sections. Looked at over time, 22 of the GSA's IB's were issued in 2003, 16 in 2004, 12 in 2005 and 13 in 2006. Indeed, the GSA issued 13 IB's to Dick/Morganti AFTER the Contract completion date of November, 2005. Those 13 IB's issued after the Contract completion date resulted in modifications to 162 of the Contract Drawings on the Project.

An accurate, consistent and defect-free design for this Project would not have required the GSA to issue 63 separate IB's (revising approximately 55% of the Contract drawings and 16 of the Contract Specifications), and would not have required the addition of this substantial dollar value of work (reflected in the change orders and COR's) to a project which, based on the February 14, 2003 Contract documents, was represented by the GSA to be a complete (except for limited instances), accurate and constructable design.

The magnitude of defects and deficiencies in the GSA's design for this Project had a profound impact in the ability of Dick/Morganti and its subcontractors to manage and administer their work, and to perform their work in an efficient and timely manner. Working around and

dealing with the extreme amount of design problems on this Project, as well as implementing the corrective or missing work, caused Dick/Morganti and its subcontractors to incur substantial field labor support costs and administrative costs, as well as to incur substantial labor inefficiency costs and delays.

Simply processing and dealing with the magnitude of approximately 3,600 RFI's alone on this Project caused Dick/Morganti to incur substantial additional field office administrative costs. The graph below demonstrates the substantial increase in staffing Dick/Morganti was required to utilize on this project due to the design deficiencies.



The following describes the process and extra work which Dick/Morganti had to perform for each of the RFI's which were generated as the result of a design problem, conflict or question identified (usually by a subcontractor) prior to the affected work proceeding in the field:

1.    Dick/Morganti receives RFI from subcontractor electronically (email). RFI was saved in the subcontractor's correspondence received file or email file. If any

sketches or drawings were required to clarify or support the RFI, these documents would be scanned in, filed and attached to the RFI.

2.      RFI is distributed to Dick/Morganti Project Management and Project Engineers for review.

3.      Dick/Morganti Engineers review the RFI to identify and understand the request, issue a Dick/Morganti RFI number and log and save the RFI in System.

4.      The Dick/Morganti Engineer either answers the RFI in house or transmits the RFI to Hunt Construction Group ("HCG") for a response.

- If a Dick/Morganti engineer answers, he would review the Contract documents and compose a response.

- The engineer would then transmit the answer back to Dick/Morganti document control person who would enter the response into the expedition file and print out 3 hard copies of the RFI for posting. One copy would be posted in the office record as-built set of drawings, one copy posted in the field set of drawings and one copy filed in the RFI binders. The answer is transmitted back to originating Subcontractor and a copy is distributed (via email) to all other subcontractors and a copy to Dick/Morganti office and field for their review, with a request to notify Dick/Morganti if the RFI has any cost impacts associated with it. A copy of the Dick/Morganti answered RFI is transmitted to HCG for their records.

- If the RFI is sent to HCG to answer, Dick/Morganti would wait for the response from HCG and, if required, Dick/Morganti Project Engineers would engage in conversations with the design team or HCG about the RFI. When the response was received from HCG, the Dick/Morganti document control person would enter

the response into the expedition file and print out three hard copies of the RFI and response for posting. One copy would be posted in the office record as-built set of drawings, one copy posted in the field set of drawings, and one copy filed in the RFI binders. The answer would be transmitted back to originating Subcontractor and a copy is distributed (via email) to all other subcontractors, and a copy to Dick/Morganti office and field for their review with a request to notify Dick/Morganti if the RFI response has any cost impacts associated with it.

5.   If Dick/Morganti is notified that implementing the RFI response had cost impacts associated with it, a copy of the notification would be sent to the Dick/Morganti Change Order Group ("COR Group") who would initially review the response with a Dick/Morganti project engineer to evaluate and understand the Change Order Request ("COR") and assign an Issue number to the RFI in order to identify and track information associated with the issue.

6.   The COR Group would then send HCG notification of pending cost and/or schedule impacts associated with the RFI response.

7.   The Dick/Morganti COR Group then would gather the costs (from the subcontractors and/or Dick/Morganti) associated with the RFI, meet again with a Dick/Morganti Project Engineer to discuss, and assist with the submission of the COR. The COR would then be sent to HCG for approval.

8.   The Dick/Morganti COR Group would then have to meet (sometimes on multiple occasions) to negotiate the amount of the COR with HCG and, once resolved and the change order is received from GSA and verified, the Dick/Morganti COR Group would issue the respective change orders to the subcontractors.

For design problems, conflicts or questions which occurred or were discovered in the field, however, additional impacts and costs were incurred by Dick/Morganti and its subcontractors in performing the work in question. Most often, that design problem, conflict or question was discovered when the affected Dick/Morganti subcontractor was attempting to install the work in question or its work in that area. The following is a listing of the impacts and inefficiencies which most frequently occurred at the time the design defect, conflict or question was discovered in the field:

1.  Problem occurs;

2.  Subcontractor's crew evaluates this problem or question;

3.  Subcontractor's crew notifies their foreman of the problem and he evaluates the problem. Balance of subcontractor's crew waits and subcontractor's other contract work is affected because of dilution of supervision (absence of foreman);

4.  Subcontractor's foreman calls its general foreman and they evaluate the problem. Balance of subcontractor's crew waits and subcontractor's other contract work is affected because of dilution of supervision (absence of foreman and general foreman);

5.  Subcontractor's general foreman calls Dick/Morganti's assistant superintendent or general superintendent. Subcontractor's crew continues to wait for direction;

6.  Dick/Morganti's assistant superintendent or general superintendent evaluates the problem and tries to determine solution to the problem. Subcontractor's crew continues to wait.

7.    Dick/Morganti's Assistant Superintendent or General Superintendent notifies the Dick/Morganti Project Engineer and they review the problem and possible solutions to the problem.

8.    Dick/Morganti's Assistant Superintendent or General Superintendent either directs the subcontractor to proceed with Dick/Morganti's proposed fix, at which time the subcontractor's crew could go back to the work, or he instructs the subcontractor and Dick/Morganti's Project Engineer that HCG/GSA's approval was needed for the proposed fix or that HCG/GSA needed to provide a fix for the problem prior to the subcontractor proceeding with the work.  If the subcontractor's work cannot proceed, the subcontractor's supervisors rescheduled their work and assigned their crew to other work areas.

9.    If direction or design resolution was needed from HCG/GSA, Dick/Morganti's Project Engineer would submit an RFI to HCG explaining the problem and request a fix or approval of the proposed solution.

Sequence of writing and submitting RFI after design problem discovered in field:

1.    Dick/Morganti's Project Engineer would review the Contract documents in order to reference the appropriate documents needed to properly identify problem and to compose RFI.

2.    If a proposed solution was included in the RFI, the Dick/Morganti Engineer would create sketches to properly explain the fix and attach the sketches to the RFI.

3.    After RFI is drafted, the Dick/Morganti Engineer sends RFI and attachments to Dick/Morganti's document control person, assigns a Dick/Morganti RFI number and logs and saves the RFI in System.

4.    The RFI is then transmitted by Dick/Morganti to HCG for a response, and a copy of the submitted RFI is transmitted to all the subcontractors to make them aware of the problem.

5.    Dick/Morganti would wait for the response from HCG and, if required, Dick/Morganti Project Engineers would engage in conversations with the design team or HCG about the RFI.  When the response was received from HCG, the Dick/Morganti document control person would enter the response into the expedition file and print out 3 hard copies of the RFI for posting.  1 copy would be posted in the office record as-built set of drawings, 1 copy posted in the field set of drawings and 1 copy filed in the RFI binders. The answer was then transmitted back to the originating subcontractor and a copy is distributed (via email) to all other subcontractors with a copy of Dick/Morganti office and field for their review, with a request to notify Dick/Morganti if the design team's response to the RFI has any cost impacts associated with it.

6.    Subcontractor's General Superintendent reviews the design team's RFI response with the subcontractor's General Forman, and plans work and, if needed, locates and orders material and tools required to perform work.

7.    Dick/Morganti's field superintendent reviews the RFI's response and meets with the subcontractor's field supervision and reschedules work.

8.    Subcontractor's General Foreman reviews work with his Foreman.

9.  Subcontractor's Foreman reviews work with the crew who will be performing the work.

10. Subcontractor's crew returns to the work area, out of sequence, to resume original work activity.

11. If Dick/Morganti is notified that implementing the RFI response had cost impacts associated with it, a copy of the notification would be sent to the Dick/Morganti COR Group who would initially review the response with a Dick/Morganti project engineer to evaluate and understand the COR and assign an Issue number to the RFI in order to identify and track information associated with the issue.

12. The COR Group would then send HCG notification of pending cost and/or schedule impacts associated with the RFI response.

13. The Dick/Morganti COR Group then would gather the cost (from the subcontractors and/or Dick/Morganti) associated with the RFI, meet again with a Dick/Morganti Project Engineer to discuss, and assist with the submission of the COR. The COR would then be sent to HCG for approval.

14. The Dick/Morganti COR Group would then have to meet (sometimes on multiple occasions) to negotiate the amount of the COR with HCG and, once resolved and the change order is received from the GSA and verified, the Dick/Morganti COR Group would issue the respective change orders to the subcontractors.

Similar processes to manage and obtain answers on RFI's had to be implemented by every major subcontractor on this Project. Dick/Morganti and its affected subcontractors are entitled to additional compensation for the administrative costs of performing this significant added work.

In addition, Dick/Morganti and its subcontractors incurred substantial unanticipated field support costs and labor inefficiencies in having to deal with the large number of design deficiencies on this Project. Countless manhours were expended by Dick/Morganti and its subcontractors in the field and in the field offices identifying design problems, planning their work around or through the areas or planned activities affected by the design problems, developing solutions or fixes to the design problems, and relocating work crews and directing them to work that could proceed during the time necessary to correct the design problems or to obtain the necessary design information so that the affected work could proceed.

The design defects and deficiencies, however, were not the only GSA issues which caused Dick/Morganti and its subcontractors to incur added field support costs and labor inefficiencies. The substantial added and changed work on this Project performed by Dick/Morganti and its subcontractors (as reflected in the GSA-issued change orders and Dick/Morganti COR's) also significantly contributed to those incurred costs and represent costs which were never compensated in any amount or paid by the GSA in either bilateral or unilateral change orders. These costs were real and significant, and were incurred by Dick/Morganti and its subcontractors in supporting their own field labor performing the changed/added work, (and, in the case of Dick/Morganti, in supporting the field labor of the subcontractors performing the changed/added work).

## SECTION D – SCHEDULE ANALYSIS AND DELAYS TO THE WORK

### 1.    Delay overview

On March 19, 2003, GSA issued Dick/Morganti a Notice to Proceed for Phase II of the Project with construction to begin on March 24, 2003.  At that time the planned and contractually required completion was November 18, 2005. The actual Substantial Completion of the Project was February 28, 2007; this is 473 calendar days later than planned.

To date the GSA has only recognized 59 calendar days of contract time extension, resulting in an extended contract completion date of January 10, 2006.

Dick/Morganti retained Project Controls & Forensics, LLC ("PCF") to analyze project delays.  One of the specific tasks was to identify and quantify the Project delays for which GSA is responsible. PCF has identified and quantified the delays on the Project by analyzing the contemporaneous Project updates and the final as-built schedule. The results of the analysis find that GSA is responsible for 406 calendar days of compensable delay and those days are also excusable. Further, as a result of Dick/Morganti's mitigation efforts discussed below (see Mitigation Logic Changes) and believed concurrency with GSA caused issues, Dick/Morganti's delays are excusable entitling Dick/Morganti to an additional 67 days of a non-compensable, excusable time extension.

### 2.    Methodology

Two separate yet related analyses were performed to determine the quantity and causation of the delays on this project. The Contemporaneous Period Analysis ("CPA") and the Collapsible As-Built ("CAB") schedule analyses methods were used. The results of each analysis were then correlated with the other to confirm the reasonableness of the findings.

**Contemporaneous Period Analysis**

The periodic updates define, on a contemporaneous basis, the current plan for completion of the project and the resulting current project completion date. Where the current planned completion is pushed to a date later than the previous planned completion, the project has incurred a delay. At any time during the project, the planned completion date is controlled by the longest calculated chain of related activities for the project; this chain of activities is known as the critical or longest path. Therefore to identify the causes of project delay, each current critical path must be analyzed and understood.

At the beginning of the project, before there is any actual progress, all activities are planned and there is a critical path from the beginning of the project to the end. At any point during the performance of the project ("data date") there is actual progress of work before the data date and planned work remaining after the data date. The periodic critical path is derived from the longest path through the remaining planned work.

General CPA process – The CPA tracks the movement of the project completion date and the project delays responsible for the movement by monitoring the longest path and the resulting project completion date on a periodic basis. The periods used correspond to the effective dates of the progress updates submitted during the Project. For each periodic schedule analyzed the monitoring consists of first determining the calculated completion date. Next, the longest path activities controlling the completion are identified, focusing on the activities to be performed immediately after the data date of the current update and before the next periodic update.

After progress is entered for performance of current activities, the schedule is calculated to indicate the current longest path and the current overall scheduled project completion date ("SPCD"). If the current SPCD is later than the SPCD calculated for the prior period then a

project delay due to lack of progress is realized. Lack of progress results when previously identified critical activities have actual completions that are later than the schedule for the previous period's calculated completion.

Where the updated schedule is revised to mitigate delays to the project, the modified SPCD is a function of the actual progress of activities performed during the previous update period and the logic changes for future work. These logic changes are made to either mitigate the current delays or to recognize a more accurate depiction of the logic during future periods of the project based on information that is obtained as the project progresses and from additional knowledge about the project that is gained through historical experience.

In order to properly evaluate the effects of the current project progress on the change in SPCD from update period to update period, the progress effects must be analyzed distinct from any mitigation logic changes. Where the logic for future critical work remains constant and unchanged then current progress is responsible for the new calculated SPCD. This separation is integral to this implementation of the CPA method. The two phases of the CPA consist of first identifying activities that have moved due to lack of progress (normally delays) and then identifying those activities that have moved due to logic changes (normally mitigation).

The attached 44 'Update Comparison' plots compare the current month's update to the previous month's update and the subsequent month's update. (Ex. 109.) There are columns indicating the start and finish for each of these schedules to enable movement comparison.

Progress Delays – If the current SPCD is delayed as compared to the preceding SPCD then further analysis is required to isolate the activities causing the delay. To facilitate this more in-depth analysis, the set of critical activities in the current update is compared to the set of critical activities in the preceding month. To the extent the critical activities in both schedules are

on the same chain, the planned schedule for the preceding critical activities is compared to the actual performance dates found in the current update for the same activities. The cause of the delays to these activities can than be allocated to the contractor or GSA after review and analysis. If the critical activities on the current update differ from those on the previous update, then an additional level of analysis must be performed on the two sets of critical activities to determine the reason for the change. To the extent the current update SPCD is delayed as compared to the previous SPCD, then the current critical activities have been subject to a delay that is greater than the previous critical activities. This analysis may require going back beyond the previous schedule to determine the cause of the current delayed critical activities.

Mitigation Logic Changes – The second phase in the CPA process is to identify the logic changes from the previous update to the current project update. Normally the changes to the actual update are for the purpose of mitigating performance delays to the SPCD realized in the immediately preceding update period. These mitigation efforts include planning for concurrency of operations, or reducing durations among other efforts. These mitigating measures are contractually Dick/Morganti's means and methods and thereby entitle Dick/Morganti to claim the results as mitigation credits to offset their own delays.

(a)    **Contemporaneous Period Analysis Chart**

The results of the analysis are contained in the attached chart entitled, "Contemporaneous Period Analysis." (Ex. 110.) In the chart, there is a row with data for each of the periodic updates. The chart is divided into two sections: 'Submitted Updates' and 'Delay Causation Assignment Per Updates'. Each of these sections is further broken down into more detail.

The 'Submitted Schedules' section includes the 'File Name,' which corresponds to the file name of the submitted schedule; the 'Data Date,' which is the effective date of the schedule

update; the 'Dur' which is the duration between updates; the 'Projected Finish,' which is also known as the early finish or the scheduled finish that is defined by the current critical path; and the 'Net Movement' which is the amount of movement either positive or negative that the scheduled completion has moved as compared to the previous update. The net movement is a function of delays less mitigation.

The section 'Delay Causation Assignment' contains columns for each of the critical general types of work identified. For each periodic update, the critical delays and Dick/Morganti mitigation are quantified by allocating the net movement. In each type of work column, the periodic delays and mitigation are totaled. The column at the far right contains the total of all delays and Dick/Morganti mitigation.

The Contemporaneous Period Analysis results in a total delay of 924 calendar days and credits Dick/Morganti with 451 calendar days of mitigation resulting in a total project delay of 473 calendar days.

**Collapsible As-Built Schedule Analysis**

The Collapsible As-Built schedule analysis illustrates when the project would have completed but for the delays at issue, in this case, GSA-cause delays. The Collapsible As-Built schedule is a calculated model that depicts the actual starts, finishes and duration of the work activities performed on the project. The Collapsed As-Built schedule (derived from the Collapsible As-Built schedule) reflects when the project would have been complete but for the delay at issue by removing them from the schedule.

**(b)    As-Built Schedule of Critical and Near Critical activities**

Because the San Francisco Federal Building Project as-built schedule has over 10,000 activities, it would not be practical or manageable to perform a collapsed as-built analysis of the

entire schedule. To avoid unnecessary economic waste, this analysis is based on the contemporaneous longest path(s) and near critical activities. This results in a 2,500-activity subset consisting of the most significant activities that controlled project completion. Therefore, the analysis of causes of delays to these significant activities will properly quantify and allocate delay responsibility.

The significant sets of activities that make up the As-Built schedule were collected from the Project's periodic updates. In each update schedule, the longest path activities and near critical activities were identified; within this set of activities, a subset of current activities were identified that started and/or finished after the current data date and before the subsequent period's data date. Each subset of the current most critical activities was added to the Collapsible As-Built schedule model. Once the schedule model was fully populated with activities selected based on the foregoing criterion, the as-built dates for each activity were added. The result is an abridged as-built schedule with 100% actual dates.

### (c)    Collapsible As-Built Schedule Model

The Collapsible As-Built schedule reproduces the as-built starts and finishes for all work performed using actual logic. Actual logic is derived from the planned schedule logic modified to reflect the actual sequence and timing of the work performed. Activities are added as necessary to accurately depict delays and the logic is added to these delay activities to reflect how the planned performance was actually impeded by the delay activity.  The resulting schedule is a calculated model of the actual starts and finishes of the work activities as they were actually performed.

Once the As-Built schedule model is prepared, then activities impacted by alleged GSA-responsible issues are identified. The duration of these activities are collapsed, or reduced in

duration by the amount equivalent to the estimated delay in order to evaluate the critical impact of the delay. To the extent that the completion of the overall project results in an earlier date after the collapsing of the delay, then the GSA-caused delay is considered to be critical.

The plot "As-Built Longest Path," (Ex. 111), depicts the critical activities for the as-built project grouped by type of work. The columns in the plot denote the following:

- Act. ID: this is the activity number from the as-built schedule;

- UD File: this is the update file where the activity first showed as critical;

- Level: this is the Tower or Annex floor;

- UD: this is the duration used for the activity in the schedule;

- AD: this is the actual duration for the activity derived from the as-built schedule;

- DD: this is the delay duration for the activity;

- CD: this is the collapsed duration used for the activity in the collapsed schedule;

- PD: this is the planned duration from the as-built schedule typically derived from the last planned duration for the activity before the activity realized actual performance;

- Iss: this is the issue code assigned to the delayed activity.

The delay issues and the corresponding impacted activities are listed in the attached plot, "Delays Identified in the As-Built Model," (Ex. 112), with the following additional column designations:

- Area: this is the area of the project where the work of the activity took place;

- Del Code (=Iss): these codes designate the collapse issue for the activity, this plot is organized by these issues; the entry in the adjacent column designates whether or not the activity is collapsed in the Collapsed As-Built schedule, and a 'C' indicates the activity is collapsed.

- TF: this is the total float for the activity in the as-built schedule.

The impact of concurrent Dick/Morganti delays is fully considered in the analysis because only the GSA-caused delays are removed from the schedule. Therefore, the remaining activities in the collapsed as-built schedule still contain the impact of the contractor-caused delays and continue to drive the Project completion to the extent they are critical, after the removal of the GSA delays.

The "Collapsed Longest Path," (Ex. 113), plot shows what the project schedule critical path would have been if the GSA delays had not occurred based on the actual durations and logic of the as-built project. In addition to the columns discussed above in the "As-Built Longest Path," (Ex. 111), it contains the following column designations:

- CAB Start and CAB Finish: these are the dates indicating when the activity would have started and finished but for all the GSA-caused delays;

- Start Var. and Finish Var.: this is the difference between the collapsed dates for the activity and the as-built dates.

The results of the CAB analysis are a Project completion of January 16, 2006, after removing all the GSA-caused delays. This is 406 days earlier than the actual completion of February 28, 2007. The GSA is responsible for these 406 days of delay and these days are compensable for Dick/Morganti and its subcontractos.

## 3.    Comparing the CPA to the CAB

The CPA and the CAB approach delay analysis in fundamentally different concepts, of prospective versus retrospective analysis. The CPA consists of an analysis of the contemporaneous schedule updates critical path. This method identifies delays based on actual performance compared to the current planned performance. The CPA takes into account the

contemporaneous position of what is critical. The CAB method is an after-the-fact analysis that seeks to identify the actual critical path for the overall project and identifies controlling delays to the as-built critical path.

Though the two methods approach the analysis differently, a review of the "CPA & CAB Comparison," (Ex. 114), chart verifies that the results of the two comparisons are similar in identifying similar critical paths, delay causation and quantum of delay in corresponding periods.

The schedule plot of "CAB Longest Path & Predecessors Organized by Update Period," (Ex. 115), supplies the details that feed into the "CPA & CAB Comparison" chart. (Ex. 114.) The delays along this critical path are then quantified and listed in the "CPA & CAB Comparison" chart.

The critical path delays identified in the two analyses are separated into time period windows based on the type of operation driving the longest path. All of the windows consist of a critical path that goes through the Tower structure; the Annex and other buildings were never independently critical on the project. The first window consists of the construction of the tower foundation, this includes the installation of the piles, perimeter walls, rat slabs and slabs on grade. This work actually took place from March 2003 at the beginning of the project to approximately December 2003.

In December 2003 the Tower structure concrete became critical; this included the forming, rebar and pouring of concrete for the vertical construction of the Towers. This window ends approximately January 2005. The Tower exteriors and drying in of the Tower became critical in approximately January 2005 through October of 2005, and this work included the closing of the F-L line area as well as window walls on the east and west Towers. In the winter of 2005/2006 framing and rough-ins became critical; this work included the tenant

improvements. In the fall of 2006 final project testing became critical and remained most critical until project substantial completion at the end of February of 2007.

**Discrete Delay Issues**

These are issues that were identified contemporaneously during the Project performance. Many of the issues were added into the Project updates as fragnets and then progressed as the issue was performed or experienced. Some of these fragnets have been previously submitted to the GSA.

These issues are discussed below in the Concurrent Issues section.

**Change in Character**

The issues identified as change in character impacted the performance of original contract activities. The difference in the actual duration for performance of the activities and what the duration would have been but for the change in character results in the delay duration used. In some instances inefficiencies are identified and compared to a measured mile area to derive the delay duration. Reasonable planned durations are used, where a delay is identified and no measured mile is available. Where a reasonable planned duration is unattainable a minimal delay is attributed to GSA, while Dick/Morganti takes the responsibility for the balance.

**Extra Work Direction**

The tenant improvement bulletins, specifically 52, 53 and 56, delayed the Project in many ways. First, there was a direct progress delay to the areas where Stop Work Orders had been directed. These bulletins also had direct and indirect impacts due to the performance of the necessary extra work. Finally, the lack of direction resulted in a loss of resources for the impacted areas once the direction was available.

**Pacing**

Many non critical activities were paced against the critically delayed areas of the Project. Pacing is evident where there is a known critical path delay to the Project, the paced work is not critical and the paced work could be completed before it became critical. The collapse of the paced activities in most cases assumes a duration greater then the planned duration.

**Delayed Approvals**

GSA has a responsibility to return submittals within a timely manner. To the extent an unreasonable amount of time was taken to approve submittals, a delay was recognized as the difference in the actual time to approve submittals and the time it should have taken.

**Force Majeure**

To the extent earlier delays in the Project, which were beyond the control of Dick/Morganti, precluded Dick/Morganti from securing the building from the elements before the wet weather season, a delay is experienced until the wet weather season is over. The work which was pushed into the winter of 2004/2005 discussed below falls into this class.

Each of these classes occurs during one of the time period windows. To the extent the delay was not contemporaneously critical, the CAB analysis satisfies the consideration of concurrent delays by analyzing them as occurring at the same time as the critical delay issues.

**Tower Foundation Delays**

   (a)    **Issue 001 - High Water**

The lowest area of excavation for the Project is in the tower core, beneath an elevator pit pile cap (164). Even with additional dewatering wells, the ground water level was slow to reach an acceptable level to allow for placement of the rat slab in this area. Final grading and ultimately the rat slab of the tower core (Area 3) were delayed.

**(b)    Issue 002 – Waterproofing at Grade Beams**

GSA delayed the approval of the submitted waterproofing at the grade beams; this delayed approval impacted not only waterproofing but also the MEP activities that could not be completed until the waterproofing was complete.

**Tower Structure Concrete**

**(c)    Issue 004 – Congested Rebar and Finishes**

The Tower structure concrete delays consist of delays to Webcor and Bay Area Rebar during the structural concrete installation from the basement to the roof. The GSA impacts that delayed this work consisted of congested rebar in the concrete and the final finish requirement of the concrete. These requirements caused inefficiencies to the planned work of Webcor and Bay Area Rebar.

The claims of Webcor and Bay Area Rebar identify upper floors on the Project that were not impacted by the additional requirements and are used as a measured mile. The production on these unimpacted areas was then used to derive a reasonable duration of the impacted lower floors. The difference between the actual duration of the impacted activities and the reasonable duration is the delay duration used. The reasonable duration is used for the collapsed duration.

For clarity and consistency the collapsible as-built schedule was modified by replacing the as-built model activities for the tower structure concrete with a simplified version of activities that represent the same work and dates. Rather than approximately 50 activities per floor for the east and west tower concrete work 4 activities were used that encompasses the same scope of work as the 50 eliminated and the as-built dates are consistent. This modification makes it much easier to understand the interrelationships between activities on each floor and the interrelationship of activities between floors.

**Tower Exterior**

The Tower exterior delays consist of the F-L infill issue and the window wall issues.

**(d)     Issue 913 – F-L Infill**

This issue stems from the omission in the plans of the necessary construction required for the attachment of the flat lock cladding in the F-L Core area. Activities were added to the schedule that incorporated the scope of the required system for the flat lock cladding. Activities were also added for the necessary engineering and procurement of the scaffolding required for the additional work. Re-sequencing was required for the installation of the exterior system due to the change in the required scaffolding system.

**(e)     Issue 914 – Window Wall Issue**

Issue 914 includes the delays caused by GSA providing direction on the tolerance issue and window wall installation impacts at levels 4 and 5, North Facade where several areas are out of tolerance and adjustments were required. The adjustments required chipping, bushing and grinding after survey of the wing beam was performed and calculations complete. All of this foregoing work was required before window wall installation could commence.

**Framing and Rough-in**

**(f)     Issue 009 – Tenant Improvement Bulletins**

In October of 2005 a Stop Work Order was issued for multiple areas of planned tenant improvement construction. It was not until the spring of 2006 that plans, issued as IB 52 and IB 53, were made available to continue the construction of this portion of the Project. After the work was again underway IB 56 was issued which made additional changes to the tenant improvement work further delaying completion of this work.

Besides the direct impact to the trades responsible for the tenant improvement work, follow on work including testing was impacted.

**Testing**

**(g)    Issue 912 – BAS & FLS Submittals**

The submittal and approval of the BAS engineering resulted in extended actual durations that were not critical during the submittal and approval process; however, the final testing of the system was delayed in part due to the delayed submittal and approval process. The process was paced against the ongoing critical project delays.

**Concurrent Issues**

**(h)    Issue 007 – Fire Damage @ Water Proofing**

Fire on 2-21-04 along the S-Line in the NW Corner of the building. Delay period from Notice of delay on 2-25-04 when they planned to rebuild the wall to 3-12-04 when they were able to rebuild the wall.

**(i)    Issue 014 – Elevator Support**

This issue involved fabrication and installation revisions at elevator columns due to rebar interference with the Hilti connections. This work delayed the completion of the connections of rail support beams from the basement to floor 3.

**(j)    Issue 015 – 1 Line Blast Wall**

The final location of the attachments to the grid line 1 blast wall from grid line A to S, level 1 through 4 was an issue after the wall was poured. The resolution of this location impeded the completion of the louver and window openings located in the blast wall at various locations. The blast wall could not be completed until the resolution of this matter.

**(k)    Issue 017 – 18 Line Blast Wall**

This issue involves locations where the Annex window wall could not be erected until the blast wall is completed, thus delaying the window wall at these locations. Further there were concerns of the design of the blast wall that cantilevers over a pedestrian walkway; ultimately the wall had to be removed. Once the wall was removed, then the window wall could be installed and the plan for the temporary move of the bus stop to west location could be coordinated.

(l)     **Issue 018 – Stair #8 Design Issue**

Stair #8 could not be completed until multiple design issues were resolved. Essentially, stair #8 had to be completely redesigned and calculated beyond the anticipated scope in the specification; further, there were multiple RFI's that impeded this design process. The completion of the stair #8 design delayed stair submittals for other stairs and ultimately the fabrication of multiple stairs.

(m)     **Issue 960 – Telephone Riser Conduit Issue**

This issue delayed the installation of conduit in contractually installed sleeves. Rough in at various locations could not be completed until this issue was resolved.

**Force Majeure**

(n)     **Issue 907 – 2004/2005 Winter Shut Down 1-6**

Due to previous Project delays, the building could not be closed in sufficiently to allow interior work to be performed on levels 1 through 6 and the basement. But for the earlier critical path delays, work could have been performed during the winter months of 2004/2005. Because the Project was not weather proof at that time, all work in the foregoing locations was suspended until the spring of 2005.

## SECTION E – SUBCONTRACTOR CLAIMS

Because of the GSA caused impacts and delays on this Project (including the cumulative impact from the defective/deficient design and the changed/added work), every major subcontractor of Dick/Morganti on this Project incurred substantial additional costs for which they are seeking additional compensation.

Webcor was Dick/Morganti's subcontractor responsible for the concrete forming and placement on the Project. On June 13, 2007, Dick/Morganti submitted Webcor's certified claim to the Contracting Officer requesting a Final Decision on Webcor's claim seeking additional compensation for the delays and impacts caused by the rebar congestion and concrete finish problems on the Project. The rebar congestion and concrete finish problems are discussed in that certified claim and those entitlement positions are incorporated herein, specifically into the above Sections C.1 and C.2.

Webcor has also submitted other claims to Dick/Morganti on this Project which Dick/Morganti will soon be forwarding to the GSA, since those additional Webcor claims arise out of the GSA's actions and are the responsibility of the GSA.

In addition to Webcor, a number of other Dick/Morganti subcontractors have prepared or are preparing claims for additional compensation on the Project. Those subcontractors include the following: Bay Area Reinforcing; Rosendin Electric, Inc.; Permasteelisa Cladding Technologies, Ltd., T&M Manufacturing; Marelich Mechanical; Performance Contracting, Inc., Boyett Door and Hardware; and ISEC, Inc. As those subcontractor claims are finalized, they will be forwarded by Dick/Morganti to the GSA to be considered as part of this Dick/Morganti Claim. Dick/Morganti hereby notifies the GSA that these subcontractor claims will be

forthcoming, and Dick/Morganti reserves the right to supplement this claim with the later claim submissions from any of its subcontractors.

## SECTION F – PENDING DICK/MORGANTI BOARD APPEALS

Certain of the discrete items and COR's included in this claim are based upon entitlement issues preserved through appeals currently before the Civilian Board of Contract Appeals (the "CBCA"). Dick/Morganti has included discussion of these entitlement items in this claim document for clarification.

There are five such appeals pending at the CBCA at this time, as follows:

1.    CBCA Docket No. 810, Dick/Morganti v. GSA, July 5, 2007 Appeal involving Dick/Morganti Issue No. 1788 (appeal from Contracting Officer's Final Decision of April 24, 2007);

2.    CBCA Docket No. 818, Dick/Morganti v. GSA, July 5, 2007 Appeal involving Dick/Morganti Issue No. 1121 (appeal from Contracting Officer's Final Decision of April 24, 2007);

3.    CBCA Docket No. 450, Dick/Morganti v. GSA, April 24, 2006 Appeal involving Dick/Morganti Issue No. 712 (appeal from Contracting Officer's Final Decision of January 27, 2006);

4.    CBCA Docket No. 451, Dick/Morganti v. GSA, April 24, 2006 Appeal involving Dick/Morganti Issue No. 779 (appeal from Contracting Officer's Final Decision of February 14, 2006); and

5.    CBCA Docket No. 420, Dick/Morganti v. GSA, October 14, 2005 Appeal involving Dick/Morganti Issue No. 1145 (appeal from Contracting Officer's Final Decision of July 27, 2005).

The bases for entitlement with respect to each of the above appeals are summarized in the documents accompanying each of the Notices of Appeal filed by Dick/Morganti with the CBCA.

For the sake of continuity, additional information regarding the appeal claims is included in the body of this claim document. Dick/Morganti wishes to advise the GSA of this in order that proper consideration is given to the entitlement issues involved with each of the claims on appeal.

## SECTION G – DAMAGES

Dick/Morganti is currently in the process of verifying and finalizing its damages caused by the entitlement events identified in this claim against the GSA. Those damages will be presented to the GSA as soon as possible in a damages statement which supplements this claim.

Additionally, Dick/Morganti will, as soon as possible, submit to the GSA the claims and requests for additional compensation from its subcontractors on the Project. Dick/Morganti reserves the right to supplement this claim with its request for additional compensation, as well as the requested additional compensation of any of its subcontractors on the Project.

## SECTION H – CONCLUSION

Given the magnitude of losses incurred by Dick/Morganti and its subcontractors on this Project, Dick/Morganti requests that the GSA expedite its review of the entitlement positions stated in this claim, and that the GSA promptly perform its evaluation of the claimed damages, when presented.  With reasonable notice, Dick/Morganti and its subcontractors are willing to meet with the GSA at anytime to discuss the issues raised by this claim and the requested additional compensation.  To resolve this matter, however, Dick/Morganti and its subcontractors must receive full and fair compensation for the cost impacts they were forced to bear on this Project as a result of the actions of the GSA and its agents.

Dick/Morganti and its subcontractors worked through the multitude of GSA caused problems, incurred those substantial added costs, and finished this award-winning building for the GSA.  It is now time for Dick/Morganti and its subcontractors to receive the additional compensation to which they are entitled from the GSA.

## LIST OF EXHIBITS TO DICK/MORGANTI CLAIM NARRATIVE

1.   GSA Solicitation No. GS-09P-02-KTC-0002 dated January 25, 2002

2.   Amendment 0001 of GSA Solicitation No. GS-09P-02-KTC-0002 dated February 11, 2002

3.   Amendment 0002 of GSA Solicitation No. GS-09P-02-KTC-0002 dated February 15, 2002

4.   Amendment 0003 of GSA Solicitation No. GS-09P-02-KTC-0002 dated February 26, 2002

5.   Amendment 0005 of GSA Solicitation No. GS-09P-02-KTC-0002 dated March 8, 2002

6.   GSA letter to Dick/Morganti/Nibbi, a Joint Venture dated May 6, 2002 re Contract No. GS-09P-02-KTC-0002 (Notice of Award)

7.   Notice of Award dated May 6, 2002 in the amount of $3,572,000.00 for "Base Contract"

8.   GSA letter to Dick/Morganti/Nibbi, a Joint Venture (the "Dontractor") dated August 15, 2002 re Contract No. GS-09P-02-KTC-0002 (the "Base Contract")

9.   DMJV Constructability Review dated September 16, 2002

10.   Hunt Submittal Transmittal Form to Dick/Morganti/Nibbi, JV dated September 20, 2002

11.   Transmittal No. 00154 to Dick/Morganti/Nibbi, JV dated October 10, 2002

12.   Transmittal No. 00220 to Dick/Morganti/Nibbi, JV dated October 31, 2002

13.   Hunt Transmittal to Dick/Morganti/Nibbi JV dated January 24, 2003 transmitting GMP Requirements

14.   GSA Memorandum of Transmittal to DMN dated February 14, 2003 transmitting the "Final Construction Set" of drawings

15.   Amendment/Modification No. PS09 of contract GS-09P-02-KTC-0002 dated February 25, 2003

16.   Amendment/Modification No. PO10 of contract GS-09P-02-KTC-0002 dated February 28, 2003

17.   GSA letter to Dick-Morganti-Nibbi Bros. (A Joint Venture) dated March 18,. 2003 re NOTICE TO PROCEED for Constrcution Services Phase

18.   GSA letter to Dick Corporation dated August 5, 2005 re: Preliminary Response to Dick Corporation August 1, 2005 Response to CURE NOTICE - July 20, 2005

19. Subcontract No. 21058-121 between Dick/Morganti, Joint Venture and Bay Are Reinforcing dated March 28, 2003

20. Subcontract No. 21058-109 between Dick/Morganti, Joint Venture and Webcor Construction, Inc. dated May 5, 2003

21. GSA letter to Dick/Morganti dated October 10, 2006 re: Issue 364 - Rebar Congestion & Concrete Finishes REA

22. GSA letter to Dick/Morganti, Joint Venture dated May 5, 2004 re: CURE NOTICE --IMMEDIATE ATTENTION

23. Original Contract Drawing A-840

24. Original Contract Drawing A-841

25. Original Contract Drawing A-820

26. Revised Contract Drawing A-820 rev. 1

27. RFI 0806 dated October 15, 2003

28. Original Contract Drawing A-204

29. Original Contract Drawing A-338

30. Original Contract Drawing A-339

31. Original Contract Drawing A-703

32. Original Contract Drawing A-343

33. Original Contract Drawing A-891

34. RFI 1053 dated November 13, 2003

35. GSA Instruction Bulletin No. 0026

36. Roof Detail 27 from Original Contract Drawing A-820

37. Roof Detail 27 from Revised Contract Drawing A-820 rev. 1

38. Original Contract Drawing A-800

39. Plan Detail 40 from Original Contract Drawing A-800

40. DMJV letter No. 21058-02359 dated June 6, 2005

41.    GSA letter to Dick/Morganti dated June 9, 2005 re: Issue 1145/RFI 806 - Request for Direction; Framing Infill

42.    DMJV letter No. 21058-02243 dated July 7, 2005

43.    DMJV letter No. 21058-02491 dated July 12, 2005

44.    PCI ltr to Dick/Morgtanti JV dated May 25, 2005 re: Added Exterior Framing 5th Floor - Roof, F-L Line South Elevation

45.    GSA letter to Dick Morganti dated July 13, 2005 re: Dick Morganti Letter No. 21058-02243, dated July 7, 2005

46.    Plan Details 20 and 10 from Original Contract Drawing A-800

47.    DMJV letter No. 21058-02499 dated July 14, 2005

48.    DMJV letter No. 21058-02244 dated July 19, 2005

49.    GSA letter to Dick/Morganti, JV dated July 27, 2005

50.    DMJV Meeting Minutes No. SP019 dated May 21, 2003

51.    E-mail from Steve Ratchye to Brandon Welling and Jon Gherga dated May 30, 2003 re: sffb concrete deflections

52.    DMJV Meeting Minutes for Meeting No. Tolerances 001 dated June 6, 2003

53.    RFI 2810 dated July 19, 2005

54.    DMJV Transmittal No. 02747 to Webcor Concrete dated March 2, 2004

55.    GSA letter to Dick/Morganti dated October 6, 2005 re: Deletion of Miscellaneous Items

56.    GSA letter to Dick/Morganti dated October 25, 2005 re: GSA October 6, 2005, Deletion of Miscellaneous Items letter

57.    GSA letter to Dick/Morganti dated November 16, 2005 re: Direction to proceed with GSA October 25, 2005 Deletion of Miscellaneous Items letter

58.    GSA Instruction Bulletin No. 0052

59.    GSA Instruction Bulletin No. 0053

60.    GSA Contract Modification No. PCE6(PC141) dated March 15, 2006

61.    GSA Contract Modification No. PCF5(PC149) dated May 11, 2006

62.    GSA letter to Dick/Morganti dated March 1, 2006 re:  Request for Proposal - IB #52 DOL Changes

63.    GSA Contract Modification No. PSH8(PS170) dated September 20, 2006

64.    GSA letter to Dick/Morganti dated April 2006 re:  Request for Proposal - IB #56 - Annex 1st Floor Revisions

65.    GSA letter to Dick/Morganti dated August 15, 2006 re: Request for Proposal - IB #56B

66.    GSA letter to Dick/Morganti dated August 21, 2006 re:  Relocate Light Fixtures 1st Floor Annex

67.    GSA letter to Dick/Morganti dated August 23, 2006 re:  Request for Proposal - IB #0056 - Supplemental Info re: Data Outlets

68.    GSA letter to Dick/Morganti dated September 5, 2006 re:  Direction to Proceed - IB #56BR1

69.    GSA letter to Dick/Morganti dated September 7, 2006 re:  SSA Electrical Clarifications

70.    GSA letter to Dick/Morganti dated September 14, 2006 re:  Request for Proposal - IB #56b R1 - Supplemental Electrical

71.    GSA letter to Dick/Morganti dated December 4, 2006 re:  IB #56/56b Clarifications

72.    GSA letter to Dick/Morganti dated August 7, 2006 re:  Request for Proposal - IB #0061

73.    RFI 3558R1 dated March 21, 2007

74.    GSA letter to Dick/Morganti dated August 23, 2006 re:  Request for Proposal - IB #61 - Tower Level 2 Server Room Changes and Tower Levels 5, 6 & 7 Electrical Room Changes

75.    GSA Contract Modification PCI8(PC179) dated September 18, 2006

76.    RFI 1388

77.    RFI 2379

78.    RFI 3559

79.    RFI 739

80.    RFI 2549

81.    RFI 0985

82.   RFI 1252

83.   RFI 2022R1

84.   RFI 2381

85.   RFI 2841

86.   RFI 0691.1

87.   RFI 2879

88.   RFI 3061

89.   RFI 1939

90.   RFI 2735

91.   RFI 3204

92.   RFI 0476

93.   RFI 0504

94.   RFI 0578

95.   RFI 0679

96.   RFI 0688

97.   RFI 0246

98.   RFI 0632

99.   RFI 0668

100.  RFI 1803R1

101.  RFI 1858

102.  RFI 1687

103.  RFI 1485

104.  RFI 2221

105.  Group 1 RFIs - 143, 1322, 1384R1, 1406, 1451R1, 1511, 1512, 2288R1, 2392, 2361, 2362, 2363, 2386, 2387 and 2388

106. Group 2 RFIs - 939, 963, 1252, 1374, 1472, 1485, 1502, 1687, 1839, 2206, 2212, 2746, 2884, 3294 & 3294R1, 3323, 3394, 3508

107. Group 3 RFIs - 997, 1178, 1211, 1239, 1239R1, 2132, 2134, 3336, 3441, 3448, 3561, 3563 and 3564.

108. Group 4 RFIs - 2221 and 2244

109. Update Comparison Plots

110. Contemporaneous Period Analysis Chart

111. As-Built Longest Path plot

112. Delays Identified in the As-Built Model

113. Collapsed Longest Path plot

114. CPA & CAB Comparison Chart

115. CAB Longest Path & Predecessors Organized by Update Period Plot